**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**KENT D. STUCKEY, Stockholders'** :
**Representative,**
: **Case No. 2:08-cv-1188**
**Plaintiff,**
: **Judge Holschuh**
**v.**
: **Magistrate Judge Kemp**
**ONLINE RESOURCES CORP.,**
:
**Defendant.**
:

**MEMORANDUM OPINION AND ORDER**

Plaintiff Kent D. Stuckey was named the representative of the former shareholders of Internet

Transaction Solutions, Inc. ("ITS") in the Merger Agreement between ITS and Online Resources

Corporation ("ORC"), which authorized him to:

> act on behalf of [the ITS shareholders] in any litigation or arbitration involving this
> Agreement . . . including, without limitation, the power: . . . (f) to do or refrain from
> doing any further act or deed on behalf of the Stockholders that [he] deems necessary
> or appropriate in [his] sole discretion relating to the subject matter of this Agreement
> as fully and completely as the Stockholders could do if personally present.

Merger Agreement § 2.12. In this representative capacity, he filed this suit against ORC, alleging

breaches of contract and fiduciary duty, as well as negligent misrepresentation, and seeking

monetary damages and a declaratory judgment. Before the Court now is ORC's Rule 12(b)(6)

motion to dismiss for failure to state a claim upon which relief can be granted. For the reasons set

forth below, ORC's motion is denied in part and granted in part.

**I. Background and Procedural History**

From 1999 until its merger with ORC, ITS provided specialized electronic payment services to the accounts receivable management and utilities industries. It entered into an auction process for the sale of shareholder interests in late 2006, which resulted in multiple bids of forty-five-million dollars, and on July 26, 2007, a Merger Agreement was signed with the shareholders of ORC. In the Merger Agreement, ITS shareholders were given a choice between receiving payment for their shares in the form of either cash or ORC stock, or both. Complaint, at 6. Out of the forty-five-million dollar purchase price, the ITS shareholders chose to receive $24,713,061.00 worth of ORC stock. Id. at 7.

Part of the inducement behind choosing to receive ORC stock in lieu of cash lay in a number of associated provisions in the Merger Agreement. Of primary importance to Stuckey's claim here, ORC promised that it would file a registration statement with the Securities and Exchange Commission within 90 days after the closing. Merger Agreement, § 10.6. The ITS shareholders were also assured the right to receive additional shares of ORC stock on the six-, nine-, or twelve-month anniversary of the effective date of the Agreement to make up for any decline in stock price that may have occurred in the interim. Id. at § 2.6. Lastly, the Merger Agreement required ORC to submit a Net Working Capital Statement within 90 days after the closing, upon which the parties were ultimately to agree. Id. at § 2.5(b). ORC also entered into an Escrow Agreement with the Wilmington Trust Company. This Agreement provided that part of the purchase price would be put in escrow and required ORC to give notice of any claims for indemnification, which would be taken out of the escrow account, within one year of the closing of the Merger Agreement. Escrow Agreement, § III(b)(i).

The closing occurred on August 10, 2007, making November 8, 2007 the ninetieth day after the closing, and Stuckey alleges that ORC took numerous actions after the closing that constituted breaches of contract, breaches of fiduciary duty, and negligent misrepresentation. Specifically, Stuckey alleges that ORC breached the Merger Agreement when it (1) failed to file a registration statement by November 8, 2007 for the stock given to ITS shareholders as part of the merger, (2) provided insufficient additional shares to ITS shareholders upon their election to receive them under the Price Protection Clause of the Merger Agreement, and (3) failed to submit a Net Working Capital Statement on time, and that ORC breached the Escrow Agreement when it (4) gave notice of claims for indemnification after the one-year anniversary of the closing, thereby preventing the ITS shareholders from receiving the money in the escrow account.

Stuckey's breach of fiduciary duty claim arises out of ORC's alleged failure to (5) ensure that ITS shareholders had access to their shares once they became unrestricted on the one-year anniversary of the closing. Stuckey's negligent misrepresentation claim is based on (6) statements made by ORC during the period after ORC was required to file a registration statement that it was still planning to file a registration statement. Stuckey also alleges wrongdoing in the form of ORC's failure to (7) complete the termination of ITS's Profit Sharing Plan and disburse the funds of the Plan, and lastly, Stuckey seeks (8) a declaratory judgment on various aspects on these claims.

ORC responds with the present motion to dismiss for failure to state a claim upon which relief can be granted as to all of these claims except for the second, relating to the Price Protection Clause, and the fourth, relating to the Escrow Agreement. These two, ORC acknowledges, have been adequately stated. Motion to Dismiss, at 14.

## II. Standard of Review

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that a complaint may be dismissed if it fails to state a claim upon which relief can be granted. Because a motion under Rule 12(b)(6) is directed solely to the complaint itself, <u>Roth Steel Prods. v. Sharon Steel Corp.</u>, 705 F.2d 134, 155 (6th Cir. 1983), the focus is on whether the plaintiff is entitled to offer evidence to support the claims, rather than on whether the plaintiff will ultimately prevail. <u>Jackson v. Birmingham Bd. of Educ.</u>, 544 U.S. 167, 184 (2005) (citing <u>Scheuer v. Rhodes</u>, 4l6 U.S. 232, 236 (1974)). The purpose of a motion to dismiss under Rule 12(b)(6) "is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." <u>Mayer v. Mylod</u>, 988 F.2d 635, 638 (6th Cir. 1993). If there is an absence of law to support the type of claim made, or if the facts alleged are insufficient to state a valid claim, or if on the face of the complaint there is an insurmountable bar to relief, dismissal of the action is proper. <u>Little v. UNUMProvident Corp.</u>, 196 F. Supp.2d 659, 662 (S.D. Ohio 2002) (citing <u>Rauch v. Day & Night Mfg. Corp.</u>, 576 F.2d 697 (6th Cir. 1978)).

The function of the complaint is to afford the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. <u>See</u> <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957); <u>Lewis v. ACB Business Serv., Inc.</u>, 135 F.3d 389, 405 (6th Cir. 1998). A complaint need not set down in detail all the particularities of a plaintiff's claim. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." However, "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1950 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u> at 1949.

See also Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("A formulaic recitation of the elements of a cause of action" is not enough). The complaint "must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988) (emphasis in original).

Legal conclusions "must be supported by factual allegations" that give rise to an inference that the defendant is, in fact, liable for the misconduct alleged. Iqbal, 129 S.Ct. at 1949–50. The factual allegations must show more than a possibility that the defendant acted unlawfully. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" Id. at 1949 (quoting Twombly, 550 U.S. at 557).

When considering a motion to dismiss pursuant to Rule 12(b)(6), the court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the complaint as true. See Scheuer, 4l6 U.S. at 236; Arrow v. Federal Reserve Bank of St. Louis, 358 F.3d 392, 393 (6th Cir. 2004); Mayer, 988 F.2d at 638. The court will indulge all reasonable inferences that might be drawn from the pleading. See Saglioccolo v. Eagle Ins. Co., 112 F.3d 226, 228 (6th Cir. 1997). However, it will not accept conclusions of law or unwarranted inferences cast in the form of factual allegations. See Gregory v. Shelby County, 220 F.3d 433, 446 (6th Cir. 2000); Lewis, 135 F.3d at 405.

## III. Analysis

Defendant ORC moves to dismiss several of Plaintiff Stuckey's claims of breach of contract, breach of fiduciary duty, and negligent misrepresentation, plus Stuckey's declaratory judgment claim. For the reasons stated below, the Court grants the motion in part and denies the motion in part.[1]

### A. Breach of Contract Claims

Putting aside the two claims that ORC acknowledges have adequately been stated, Stuckey claims that ORC breached the Merger Agreement in two main ways: first, that ORC's failure to register the stock by November 8, 2007 breached § 10.6, which required ORC to file a registration statement "within ninety (90) days after the Closing and [to] have the Registration Statement declared effective by the SEC as soon as practicable thereafter;" and second, that ORC's failure to file a Net Working Capital Statement by November 8, 2007 breached § 2.5(b), which also set a 90-day filing limit.

### 1. ORC's Failure to Register

Taking, as the Court must, all allegations in Stuckey's complaint as true, the failure of ORC to file a registration statement for its stock by November 8, 2007 appears at first blush to be quite clear cut. Section 10.6 of the Merger Agreement, after all, states quite clearly that, "[ORC] shall file with Securities and Exchange Commission (the "_SEC_") a registration statement covering the resale

---

[1]

In connection with his Opposition to ORC's Motion to Dismiss, Stuckey has filed an affidavit and several exhibits offering evidentiary support regarding his argument that Rule 144 did not dispense with any harm suffered by the ITS shareholders from ORC's failure to file a registration statement. The Court has ruled in his favor on this issue on other grounds, however, and therefore did not need to refer to these documents. If it had, the motion would have been converted to one for summary judgment.

of the [ORC] Stock (the "_Registration Statement_") within ninety (90) days after the Closing and shall have the Registration Statement declared effective by the SEC as soon as practicable thereafter." (Emphasis in original.) Stuckey then alleges that, "to this day Defendant has not filed a registration statement for the Stock." Complaint, ¶ 29. In response, however, ORC makes three arguments as to why Stuckey has failed to state a claim on this matter. Each of these is without merit.

* * *

ORC first claims that the type of damages sought here—a decline in the price of the ORC stock after the November 8, 2007 deadline—are prohibited by the Agreement. It points to § 11.4(c), which states in relevant part that the "sole recourse" for disputes arising out of the Agreement is a claim for indemnification:

> Except as to claims based upon fraud, the sole recourse and exclusive remedy of Buyer and Stockholders against each other arising out of this Agreement or otherwise arising out of Buyer's acquisition of the Stock, whether based on tort, contract, statutory or common law remedy or equitable remedy or otherwise, including but not limited to, any misrepresentation, breach of warranty or otherwise, shall be to assert a claim for indemnification under the indemnification provisions of this Article 11 . . . .

Merger Agreement, at § 11.4(c). ORC then points out that § 11.4(a) expressly prohibits indemnification claims for any loss of profits or consequential damages when it states that, "(i) the parties shall have no right to indemnification with respect to any loss of profits or any consequential, indirect, special or punitive damages. . . ." Completing its argument, ORC claims that the loss Stuckey seeks here, which, as mentioned, is the decline in the price of the ORC stock after the November 8, 2007 registration deadline until the time at which the stock became freely tradable (one

year after the closing), is a consequential damage and is therefore barred.[2]

Both general and consequential damages are ordinarily included in calculating a party's expectation interest for breach of contract. RESTATEMENT (SECOND) OF CONTRACTS § 347 (1981). Section 347 distinguishes between general and consequential damages as follows, however, putting the latter in the category of "other loss":

> Subject to the limitations stated in §§ 350–53, the injured party has a right to damages based on his expectation interest as measured by
>
> (a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus
> (b) any other loss, including incidental or consequential loss, caused by the breach, less
> (c) any cost or other loss that he has avoided by not having to perform.

The difference between general and consequential damages clearly still matters in a case such as this, where the parties have expressly agreed that consequential damages are not recoverable. This difference can best be described as follows:

> General damages are considered to include those damages that flow naturally from a breach, that is, damages that would follow any breach of similar character in the usual course of events. Such damages are said to be the proximate result of a breach, and are sometimes called "loss of bargain" damages, because they reflect a failure on the part of the defendant to live up to the bargain it made, or a failure of the promised performance itself.

---

[2] ORC also argues that this claim should be dismissed because it is not styled as a claim for indemnification. As Stuckey notes, however, his claim for damages is substantially the same as one for indemnification. Taking, as the Court must, all inferences in favor of the plaintiff, the Court will construe this complaint as one seeking indemnification. This is especially appropriate in light of the fact that ORC has agreed to indemnify the ITS shareholders for a very broad array of damages, encompassing "any Loss . . . caused by . . . a failure to perform any covenant made by [ORC] anywhere . . . in th[e] Agreement," subject to the limitations in § 11.4(c). Merger Agreement, § 11.2.

Consequential damages, on the other hand, include those damages that, although not an invariable result of every breach of this sort, were reasonably foreseeable or contemplated by the parties at the time the contract was entered into as a probable result of a breach. These, too, must be proximately caused by the breach, and the difference is that they do not always follow a breach of this particular character.

24 WILLISTON ON CONTRACTS § 64:12 (4th ed.). Thus, the question becomes whether the decline in stock value sought by Stuckey should be categorized as general, "loss of bargain" damages, or consequential damages, i.e., foreseeable but not ordinarily flowing from every breach of this sort.

In Duncan v. TheraTx, Inc., 775 A.2d 1019 (Del. 2001), the Delaware Supreme Court considered a certified question from the Eleventh Circuit in a dispute similar to the one here.[3] The plaintiffs in Duncan were holders of restricted, unregistered shares of TheraTx, who was "required, through a merger agreement, to file a shelf registration statement, to last for two years, that would permit holders to trade these shares in the event that TheraTx elected to undertake a public offering." Id. at 1020–21. As a result of certain actions by TheraTx, the shelf registration was suspended, leaving the plaintiffs unable to sell their shares. Id. at 1021.

The Delaware Supreme Court was called upon to state the appropriate measure of damages in a situation such as this. The precise question certified was: "[T]o determine the appropriate default measure of damages under Delaware law for an issuer's breach of a merger agreement that results in a temporary restriction on certain stockholders' ability to sell their shares." Citing § 347 of the Restatement (Second) of Contracts, the court recognized that expectation damages are the normal measure of damages for a breach of contract. The court's focus was then on the first prong of the § 347 calculation of expectation damages, i.e., finding, in the court's words, the measure of

---

[3]

The parties have agreed that the Merger Agreement shall be "governed, construed, applied and enforced in accordance with the laws of [Delaware]." Merger Agreement, § 14.9.

damages that would "compensate the promisee for the promisee's reasonable expectation of the value of the breached contract, and, hence, what the promisee lost." Duncan, at 1022. Accordingly, the court focused on the loss in value to the plaintiffs of TheraTx's performance, stating that:

> [t]he stockholders' lost expectation interest in this situation is the reduction in the stockholders' presumptive capital gains attributable to the trading restrictions. The magnitude of this reduction is, in theory, the difference between the market price of the shares at the time that the stockholders could have sold the shares in the absence of the restrictions and some measure of the value of the shares after restrictions were lifted.

Duncan, at 1022. Ultimately, the court found that the best way to apply this theoretical calculation of damages was to measure "the difference between the highest price of the shares during a reasonable time after the registration is suspended and the average price of the shares during a reasonable period after the registration is reinstated." Id. at 1029. It thus appears clear that the court was not focused on stating how to calculate what § 347 calls "other loss," including consequential damages; instead the loss described was general—or "loss of bargain"—damages.

In support of its claim that "[a] decline in stock value constitutes consequential damages," however, ORC cites a 2002 case from the Court of Federal Claims and a 2000 Pennsylvania trial court decision. Motion to Dismiss, at 9 (citing Hansen Bancorp, Inc. v. United States, 53 Fed. Cl. 92 (Fed. Cl. 2002); Pioneer Commercial Funding Corp. v. Am. Fin. Mortgage Corp., 50 Pa. D. & C. 4th 31 (Pa. Ct. Com. Pl. 2000)). These cases are of no help to ORC. As for Hansen, while the Merger Agreement is governed by Delaware law, Hansen involved a federal court applying New Jersey law in a situation totally different from the one here. Furthermore, Hansen was overruled on appeal, with the Federal Circuit disapproving of the trial court's statement that the decline in share price in the context of that case was a consequential damage. Hansen Bancorp, Inc. v. U.S., 367 F.3d 1297, 1317 (Fed. Cir. 2004).

Pioneer involved a jury award of $13.5 million in consequential damages resulting from defendants' wrongful acts against the plaintiff corporation. Nowhere in the opinion does the court state that in all situations where damages in the form of a decline in stock value are sought, they must be classified as consequential damages. Instead, the court affirmed the use by the jury of the decline in stock value as one permissible way to measure consequential damages in that particular case. This result is unsurprising since the plaintiff company "proved that greater damage to its business flowed" from the defendant's wrongful actions—an ordinary case of consequential damages. Pioneer, 50 Pa. D. & C. 4th at 60.

The present case, however, does not involve "greater damage . . . flow[ing]" from ORC's failure to register its shares. It involves the damage directly resulting from this failure—the "loss in value to [the ITS shareholders] of the other party's performance caused by [ORC's] failure" to register the shares. RESTATEMENT (SECOND) OF CONTRACTS § 347 (1981). Indeed, the promise to file a registration statement and have it declared effective was part of the inducement for ITS shareholders to accept payment in the form of ORC stock rather than cash for the Merger Agreement, as they believed publicly tradable shares of ORC would be more valuable than unregistred, restricted shares of ORC. Complaint, at ¶¶ 19, 25–27. The failure of ORC to file a registration statement thus would result in a "loss of [the] bargain" for ITS shareholders. Accordingly, the Court rejects ORC's argument that damages in the form of the decline in stock price stemming from ORC's failure to file a registration statement are consequential damages barred by the Merger Agreement.

* * *

The second argument ORC makes against Stuckey's breach of contract claim regarding ORC's failure to file a registration statement is that no harm has been alleged after February 15, 2007 because, as of that date, the shares could have been traded under Securities and Exchange Commission Rule 144, 17 C.F.R. § 230.144. Further, ORC claims that no harm can be alleged prior to February 15, 2007 because there was no guarantee that the SEC would have approved the registration statement by then had one been filed. These arguments are also unpersuasive.

Dealing with the pre-February 15, 2007 period first, ORC's argument has no merit. Applying Delaware law to the Agreement, supra n.3, Delaware law is clear that ORC cannot use the uncertainty surrounding precisely when the SEC would have declared a registration statement effective had one been filed when claiming that plaintiffs suffered no harm. In the Duncan case mentioned above, the Delaware Supreme Court stated, in the course of considering how to measure the damages suffered by the plaintiffs, that it is the defendant who should "bear the risk of uncertainty in the share price because the 'defendant's acts prevent a court from determining with any degree of certainty what the plaintiff would have done with his securities had they been freely alienable.'" Duncan v. TheraTx, 775 A.2d 1019, 1023 (Del. 2001) (quoting American General Corp. v. Continental Airlines Corp., 622 A.2d 1, 10 (Del. Ch. 1992)).

Moreover, the Chancery Court of Delaware has applied this rule to a case even more similar to the one here. In BioLife Solutions, Inc. v. Endocare, Inc., 838 A.2d 268 (Del. Ch. 2003), the plaintiff sold assets to the defendant, a competitor, for both cash and stock in the defendant. The defendant, in a related agreement, was bound to file a registration statement within ninety days of the agreement's effective date, just as in the present case. And just as in the present case, the defendant never filed the statement. Not only did the Chancery Court conclude that the plaintiff did

suffer damage from this failure, but when considering how to calculate the damages suffered, the court stated:

> [Defendant] is correct that there is no way of knowing precisely when a registration statement would have become effective . . . Nevertheless, since the cause of that uncertainty lies in [Defendant's] failure to file at all, the court will resolve the question by assuming that it met its obligation on . . . the last possible date for filing under the . . . Agreement. [Plaintiff] presented . . . expert testimony [supporting the conclusion that] it was more likely than not that a registration statement would have become effective within seven business days of [the registration deadline].

BioLife, 838 A.2d at 284. The court accepted the expert's testimony and presumed for the purpose of calculating damages that the registration statement would have been declared effective within seven business days of the deadline. Id.

This reasoning has force here. This Court sees no reason to permit ORC to benefit from its alleged breach of the registration requirement in the Merger Agreement. Nor should ORC be able to fault ITS's shareholders for the uncertainty it has created. Following Duncan and BioLife, this Court rejects ORC's argument that plaintiffs suffered no harm because "there were no guarantees under the Agreement that the former ITS stockholders could have sold their Online Resources stock before February 15, 2008." While it is true that the Agreement had no specific terms setting a particular date by which plaintiffs could expect that the registration statement would have been declared effective, ORC created a whole new level of uncertainty in place of the uncertainty stemming from the SEC's regular process for approving filed registration statements when it chose not to file the registration statement by the 90-day deadline. ORC's argument that plaintiffs suffered no harm before February 15, 2008 must therefore be rejected.

As for the post-February 15, 2007 period, ORC's arguments are equally unavailing. The availability to plaintiffs of Rule 144, which is included within the overall scheme of the Securities

Act of 1933, did not dispense with the harm suffered as a result of ORC's refusal to file a registration statement. As an initial matter, Section 5 of the Securities Act makes it illegal to sell securities unless a registration statement is in effect. 15 U.S.C. § 77e(a) (2000).[4] To avoid this strict requirement, a number of exemptions exist. Of relevance here is § 4(1), which exempts transactions in securities not involving an issuer, underwriter, or dealer. 15 U.S.C.A. § 77d(1). Although the term "underwriter" is defined in § 2(a)(11), 15 U.S.C. § 77b(a)(11), the SEC promulgated Rule 144 as a safe harbor to give more certainty regarding who would not be considered an "underwriter." The rule sets forth somewhat strict requirements, and if they are met, one who is holding restricted or control securities may sell them through the § 4(1) exception to Section 5 without fear of being considered an "underwriter."

While Rule 144 has greatly aided the resale of restricted and control securities, most notably through the recently reduced holding period of six months for securities of reporting issuers, numerous requirements and conditions remain. The conditions are more onerous for one who is an "affiliate" of the issuer, defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." 17

---

[4]15 U.S.C. § 77e(a) provides:

Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly--

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

C.F.R. § 230.144(a)(1). Under the Rule, affiliates must comply with the current public information requirement, volume limitations, manner of sale requirements for equity securities, and also file a Form 144. 17 C.F.R. § 230.144(b)(2). Non-affiliates need only comply with the current public information requirement, and need only do so until six months after the six-month holding period for reporting issuers. 17 C.F.R. § 230.144(b)(1).

This Court cannot say at this point that Rule 144 did, in fact, dispense with all harm to the ITS shareholders stemming from ORC's failure to file a registration statement. Specifically, non-affiliates of the issuer would still be required to comply with the current public information requirement. Stuckey has claimed that:

¶ 35.   "Rule 144" is not a substitute for, and did not excuse Defendant's failure to file a registration statement. Instead, Rule 144 only provides a safe-harbor for certain sales of restricted stock if certain conditions are met.

¶ 36.   Because of the additional conditions, restrictions, risks and consequences associated with sales under the Rule 144 safe-harbor, the proposed use of the Rule 144 provisions was not a substitute for, and did not excuse, Defendant's breach of its promise to timely file a registration statement, which once approved would have allowed for the unrestricted public resale of the Stockholders' Stock.

Complaint, ¶¶ 35–36. Drawing, as the Court must, all reasonable inferences in favor of the Plaintiff, this Court believes that Stuckey has made pleadings that adequately claim harm despite the alleged availability of Rule 144. The ITS shareholders would not have had to ensure compliance with the requirements of Rule 144, including the current public information requirement, with the potential for liability associated with Rule 144 resales, had a registration statement been in effect. Nor has there been any showing at this point that the requirements would have been so minimal as to be ignored by this Court. Instead, having to comply with the requirements of Rule 144 is, in itself, a harm sufficient to permit this claim for relief to survive. This holding is especially appropriate, the

Court believes, given the allegation in ¶ 37: "Accordingly, Stockholders, through counsel, continued to demand that the Defendant file the registration statement. Defendant responded that it was still proceeding with registration and did not consider the amendment to Rule 144 to eliminate their obligation to register the Stock."

Moreover, if any of the plaintiffs are now, as a result of the merger between ORC and ITS, "affiliates" of ORC, they most certainly would have been harmed, as Rule 144 imposes detailed constraints on their ability to resell the ORC shares they received. Specifically, it is not clear whether one of the ITS, Inc. shareholders, an entity named ITS, LLC, is now, as a result of the merger with ORC, "controlled by . . . the issuer," ORC, which would make it an "affiliate" of ORC. It may not be, but if it is, the volume limitations and manner of sale restrictions would prevent it from being able to engage in certain resales that would be possible had a registration statement been filed and effective. While it does not matter in one sense because, as mentioned, the ITS shareholders have suffered harm even if they are all non-affiliates, it is simply too early to tell whether any plaintiffs are affiliates of ORC, and have therefore suffered further harm.

Accordingly, this court cannot say that, as a matter of law, the ITS shareholders have not suffered any harm stemming from ORC's failure to file a registration statement. This ground for ORC's Rule 12(b)(6) dismissal is therefore rejected.

\* \* \*

ORC's third argument that Stuckey's claim for breach of § 10.6 of the Merger Agreement should be dismissed for failure to allege any harm is made too late. The argument is that the Price Protection Mechanism in the Merger Agreement reimbursed plaintiffs for all losses in the value of their ORC stock experienced up to the point of the Mechanism's exercise. It is an established rule,

however, that arguments not made in the opening brief may not be made for the first time in the reply. U.S. v. Lopez-Medina, 461 F.3d 724, 743 n.4 (6th Cir. 2006). Nor does a perfunctory reference to an argument in an opening brief suffice to permit development of that argument in the Reply, which is intended only to allow the moving party the opportunity to rebut statements made in the non-moving party's response. McPherson v. Kelsey, 125 F.3d 989, 995–96 (6th Cir. 1997); Thurman v. Yellow Freight Systems, Inc., 97 F.3d 833, 835 (6th Cir. 1996); see also Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat, 289 F.3d 434, 441 (6th Cir.2002); U.S. S.E.C. v. Sierra Brokerage Services, Inc., 608 F.Supp.2d 923, 952 n.29 (S.D. Ohio 2009). The primary purpose behind this rule is to afford fairness to the other party, who was not given a meaningful opportunity to respond to arguments raised for the first time in the Reply. Scottsdale Ins. Co. v. Flowers, 513 F.3d 546, 553 (6th Cir. 2008).

The only mention of this Price Protection Mechanism argument in ORC's Motion to Dismiss is made almost as an afterthought to ORC's argument regarding Rule 144. In one sentence of text and a two-sentence footnote, ORC states:

> Any decline in the Online Resources share price was made up upon exercise of th[e] price protection. [Footnote 3:] It is interesting to note that under Section 2.7 of the Agreement, any former ITS stockholder who sold any shares would have forfeited his price protection right. Because the stockholders exercised their price protection right, they should not complain that they were damaged from the inability sell [sic] shares prior to the exercise of the right.

Motion to Dismiss, at 11. Stuckey makes no response to this undeveloped and conclusory argument, but in its Reply, ORC expands the argument greatly. Because this argument was not properly raised in the Motion to Dismiss, and because the contents of a Reply are only to address issues raised in the other party's Opposition, ORC has waived its argument that the exercise of the Price Protection Mechanism prevented the plaintiffs from suffering any harm up to that point.

Even if this court were to consider the merits of this argument, however, it should be rejected. As an initial matter, it is simply too soon to tell whether any harm has been suffered despite the exercise of the Price Protection Mechanism, which permitted the ITS shareholders to elect to receive additional shares of ORC on the six-, nine-, or twelve-month anniversary of the closing to make up for any drops in share price that might have occurred. Such a fact-intensive issue is improper for a Rule 12(b)(6) dismissal. Moreover, ORC agrees that Stuckey has stated a valid claim that ORC did not comply with the agreed-upon method of calculating the number of shares to be provided pursuant to the Price Protection clause. If there is merit to this claim, it would seem necessary also to conclude that the Price Protection Clause did not fully compensate the plaintiffs for the harm they have suffered from the failure of ORC to file a registration statement. Thus, this Court cannot conclude, as ORC requests, that no harm whatsoever has been suffered by Stuckey and the ITS shareholders due to the presence and exercise of the Price Protection Mechanism in the Merger Agreement.

\* \* \*

Accordingly, this Court finds that Stuckey has validly stated a claim for breach of contract regarding ORC's failure to file a registration statement and have it declared effective.

## 2. ORC's Failure to Submit a Net Working Capital Statement On Time

ORC next seeks dismissal of Stuckey's claim that ORC breached § 2.5(b) of the Merger Agreement by not providing a Net Working Capital Statement within ninety days of the effective date of the Agreement, November 8, 2007. The text of § 2.5(b) is quite clear as to this requirement: "As soon as practicable, and in any event, within ninety (90) days after the Closing Date, the Buyer shall prepare or cause to be prepared and delivered to the Stockholders' Representative (as defined

in Section 2.12) . . . a statement of the Net Working Capital as of the Closing Date (the "*Final Net Working Capital Statement*")." (Emphasis in original).

The complaint's allegations on this issue are contained in paragraphs 80–85. Complaint, ¶¶ 80–85, at 15–16. Taking, as the Court must, all factual allegations as true, Stuckey has not explicitly claimed any harm at all resulting from the failure to file the Statement on time; he has simply claimed in these paragraphs the existence of the provision in the Agreement, ORC's breach, and that the shareholders made an unfulfilled request for information supporting their claim. Stuckey also points to paragraphs 90-95 of his complaint, but these all refer to his claim for breach of the Escrow Agreement and only involve the Net Working Capital Statement insofar as ORC's allegedly untimely claims for adjustments to the Statement were part of its actions causing the funds in escrow wrongfully to be withheld from ITS shareholders. What is missing is a clear statement of alleged harm that resulted from ORC's failure to file the Statement on time. Without this, the allegations relating to the claim for breach of § 2.5(b) fall short of the Iqbal/Twombly pleading standard that requires Stuckey to state specific factual allegations giving rise to an inference that ORC is, in fact, liable for the misconduct alleged. Iqbal, 129 S.Ct. at 1949–50. Although Stuckey does, in ¶ 99, make the allegation that "Stockholders have been harmed" by ORC's breaches of contract, this is not a specific factual allegation; it is merely a conclusory one and is entitled to no weight. Accordingly, Stuckey's claim for breach of § 2.5(b) of the Merger Agreement is dismissed for failure to state a claim upon which relief can be granted.

## B. Breach of Fiduciary Duty Claim

Stuckey next brings a claim for breach of fiduciary duty against ORC. He claims that ORC breached its fiduciary duty to the former ITS shareholders by failing to ensure that the shareholders had access to their shares of ORC once they became unrestricted through the passage of time on the one-year anniversary of the closing, August 10, 2008. Complaint, ¶¶ 55–67. The problem, Stuckey continues, is that ORC's General Counsel made numerous statements in emails indicating, with varying degrees of specificity and certainty, that the shares should have the restrictive legend on them removed soon, and also that certain of the shareholders had additional troubles in receiving their shares because the limited liability company through which they were to receive the shares improperly was denied the ability to receive them.

ORC responds by arguing that (1) Stuckey has failed to allege facts that show the existence of a fiduciary duty because the relationship between ORC and ITS was adversarial, (2) no damages have been suffered because a decline in stock price constitutes consequential damages, barred by the Agreement, and (3) because the claim does not arise from the Merger Agreement, Stuckey is not authorized to bring it on behalf of all the ITS shareholders. The Court notes that the second argument made by ORC—that no damages have been suffered because a decline in stock price constitutes consequential damages—has already been considered and rejected in the discussion above regarding § 10.6. The first argument, however, is meritorious. Stuckey has failed to allege facts that show a fiduciary duty existed from ORC to the ITS shareholders.

Although, as mentioned, the parties chose Delaware law to apply to enforcement of the Agreement, and therefore the breach of contract claims, Agreement, § 14.9, <u>supra</u>, n.3, the Court must determine which state's law will apply to the fiduciary duty claim, as it is not a matter of

contract construction, application, or enforcement. Where jurisdiction in a federal district court in the Sixth Circuit is based on diversity, the court must apply the choice of law rules of the state in which it sits. <u>Charash v. Oberlin College</u>, 14 F.3d 291, 296 (6th Cir.1994) (citations omitted). Ohio choice of law rules apply here, then, and these rules call for a presumption that the law of the place of the injury will apply to the claim unless another jurisdiction has the "most significant relationship" to the case. <u>Morgan v. Biro Mfg. Co., Inc.</u>, 474 N.E.2d 286, 289 (Ohio 1984). Determining if a state has the "most significant relationship" requires consideration of the following contacts with the state: "(1) the place of the injury; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; (4) the place where the relationship between the parties, if any, is located; and (5) any factors under Section 6 [of 1 RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 10] which the court may deem relevant to the litigation.[5]

Here, the only state with a consistent relationship to the case is Ohio. The first three prongs—the place of the injury, the place where the conduct causing the injury occurred, and the

---

[5]Section 6 of 1 RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 10, provides as follows:

(1)      A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2)      When there is no such directive, the factors relevant to the choice of the applicable rule of law include

    (a)      the needs of the interstate and international systems,

    (b)      the relevant policies of the forum,

    (c)      the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

    (d)      the protection of justified expectations,

    (e)      the basic policies underlying the particular field of law,

    (f)      certainty, predictability and uniformity of result, and

    (g)      ease in the determination and application of law to be applied."

location of the parties—are of little guidance because ORC is incorporated in Delaware and has its principal place of business in Virginia, while the location of the ITS shareholders is unknown and Stuckey, their representative, is from Florida. The fourth prong, and all the remaining aspects of the case, however, point to Ohio. First, ITS is located in Ohio, and ORC has its local office in the state, as well. Second, the Merger Agreement, which constitutes the source of the relationship between the parties for this claim, was executed and closed in Ohio, thereby causing the fourth prong to point to Ohio. Third, Stuckey claims that "all or part of the claims for relief arose" in Ohio. Complaint, ¶ 2, at 1. The Court notes that there has been no showing that the law of Delaware regarding a claimed breach of fiduciary relationship differs in any respect from the law of Ohio.

"To support a breach of fiduciary duty claim, a party must show the existence of a fiduciary relationship, failure to comply with a duty accorded that relationship, and damages proximately resulting from that failure." Keybank Natl. Assoc. v. Guarnieri & Secrest, P.L.L., Slip Copy, 2008 WL 5124562, ¶ 33 (Ohio Ct. App. 2008) (citing Strock v. Pressnell, 527 N.E.2d 1235, 1243 (Ohio 1988)). Stuckey claims in his Opposition to the Motion to Dismiss that the fiduciary duty was a de facto fiduciary duty, which obligated ORC to transfer the shares to the ITS shareholders "[a]fter Defendant breached the Merger Agreement by filing [sic] to timely register the Buyer Stock" and after it represented that it would still register the shares. Opposition, at 36–37. Such a de facto, informal fiduciary duty is created, however, "only when both parties understand that a special trust or confidence has been reposed." Umbaugh Pole Bldg. Co., Inc. v. Scott, 390 N.E.2d 320, 323 (Ohio 1979). So the real question is whether Stuckey has pled facts sufficient to infer that "both parties underst[ood] that a special trust or confidence ha[d] been reposed," id. See Iqbal, 129 S.Ct. at 1949–50.

Although Stuckey expands on his complaint in his Opposition, only the allegations made in the complaint will be considered. A close look at these allegations reveals that he has not, in fact, pled sufficient facts to infer a de facto fiduciary relationship. In paragraphs 55–67, Stuckey provides details on several email conversations that he had with ORC's General Counsel in which Stuckey indicated that the ITS shareholders were eager to have the restrictive legend removed from their shares so they could be transferred to their individual brokerage accounts. The General Counsel indicated a number of times that ORC was in the process of ensuring this would be done, and on August 20, 2008—a mere ten days after the shares became unrestricted on August 10, 2008—"it was generally confirmed that Defendant's transfer agent was willing to commence transfers of the Stock to Stockholders," Complaint, ¶ 63. Even then, however, some of the shareholders experienced an additional delay in obtaining their shares due to the transfer agent's need for additional information from them. Complaint, ¶¶ 64–67.

While, as mentioned, Stuckey alleges that a de facto fiduciary duty arose at the point where ORC allegedly breached the Merger Agreement, these allegations fail to establish the existence of a fiduciary duty because they fail to establish the existence of an understanding that a "trust or confidence has been reposed." The emails are merely statements that reflect a duty imposed by contract, not any special trust or confidence. "A contractual relationship alone does not automatically create a fiduciary duty." Shaver v. Std. Oil Co., 135 Ohio App.3d 242, 245 (Ohio App. 1999) (citing Blon v. Bank One, Akron, N.A., 35 Ohio St.3d 98, 101–02 (Ohio 1988)); RPM, Inc. v. Oatey Co., Not Reported in N.E.2d, 2005 WL 663057, *4 (Ohio App. 2005) ("Ordinarily, in business transactions where the parties deal at arm's length, no fiduciary relationship exists."). Moreover, because the relationship arose out of a contract, which was the result of arm's-length

bargaining, neither party was in a position of "superiority" over the other. It is true that the shares could not be traded until the legend was removed, but in the larger context of the merger this relationship was not one of superiority.[6]

As a result, Stuckey has failed to plead facts sufficient to infer that a fiduciary relationship existed with respect to the transfer of the ORC shares to the ITS shareholders once they became unrestricted through the passage of time. This claim is, therefore, dismissed for failure to state a claim upon which relief can be granted.

## C. Negligent Misrepresentation

Stuckey's next claim is for negligent misrepresentation, arising from statements made by ORC during the period after it was required to file a registration statement to the effect that it was still about to file one. For the same reasons as for the breach of fiduciary duty claim, this claim is governed by Ohio law, which holds that negligent misrepresentation occurs when:

> One who, [(1)] in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, [(2)] supplies false information [(3)] for the guidance of others in their business transactions, is subject to liability for [(4)] pecuniary loss caused to them [(5)] by their justifiable reliance upon the information, if he [(6)] fails to exercise reasonable care or competence in obtaining or communicating the information.

Delman v. City of Cleveland Heights, 534 N.E.2d 835, 838 (Ohio 1989) (quotation marks omitted).

ORC argues that no claim is stated because (1) the Merger Agreement contained an integration clause, § 14.7, in which the parties agreed that neither would be bound by representations made by

---

[6] The Court also notes that the section of the Complaint entitled "Additional Wrongful Actions and Inactions" consists entirely of conclusory allegations entitled to no assumption of truth under the Iqbal/Twombly standard. Complaint, ¶¶ 86–95, at 18–19; Ashcroft v. Iqbal, 129 S.Ct 1937, 1949 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

the other, (2) Stuckey has not identified any representations that are false and on which the ITS

shareholders relied, and (3) no recoverable harm has been alleged. The Court believes there is merit

in this second argument.

Stuckey has not specifically identified which of the 111 paragraphs of factual allegations in

the Complaint relate to the negligent misrepresentation claim. After reviewing the Complaint,

however, the Court is left with the impression that a claim for negligent misrepresentation is

intended only with respect to the following allegations:

> ¶ 38. In response to the ongoing demands by Stockholders, Defendant's General
> Counsel communicated by email to Stockholders on May 6, 2008:
>
>> We are planning to file within the next couple weeks. S-1s frequently
>> take a long time to prepare from scratch. Fortunately, we have nearly
>> all the material we need from our 10-K, proxy and 10-Q, so it should
>> not take long to prepare. The SEC has a right to review, but that is
>> usually a brief period, and given that it will be based on already filed
>> disclosures, it is unlikely they will have many (if any objections).
>
> ¶ 39. Based on this representation, and anticipating that their Stock would be
> registered and freely tradeable in short order, the Stockholders exercised their price
> protection rights effective May 10, 2008.
>
> ¶ 40. The Stockholders would not have exercised their price protection rights on May
> 10, 2008 if that representation had not been made by Defendant because without the
> ability to freely trade their Stock, the Stockholders could not protect themselves from
> further declines in share price or mitigate their risk through hedging transactions.
>
> ¶ 41. Upon information and belief, Defendant acted negligently in making the
> representation on May 6, 2008 that registration would follow promptly, and should
> have known that its representation was false and inaccurate at the time it was made.
>
> ¶ 42. Upon information and belief, Defendant knew or should have known that
> Stockholders would rely on its representation in making their election to exercise
> price protection rights effective May 10, 2008.

A close reading of these allegations reveals that Stuckey has not claimed that the May 6,

2008 statement of ORC's General Counsel that ORC was "planning to file within the next couple

weeks" was false. Indeed, even looking beyond ¶¶ 38–42, the statements Stuckey alleges the General Counsel to have made after the ITS shareholders exercised their Price Protection Rights on May 10, 2008 all fall in line with the May 6 statement that ORC was in the process of "planning" to file. In ¶ 43, for example, the General Counsel is alleged to have stated on June 3, 2008 that, "[w]e're reviewing [the filing] right now. We should have a final draft ready to file by early next week." And in ¶ 44, the General Counsel is alleged to have stated that, "[t]hings are progressing on the S-1, but I was overly optimistic in my prior assessment because I didn't factor sufficient time for review. I think the end of the month is a more realistic timeframe." Later, on June 27, 2008, the General Counsel is alleged to have said, "[w]ith respect to control of the stock, we are working on the registration statement for the shares." Complaint, ¶ 49. Accepting these allegations as true, this Court sees no reason to believe these statements are anything other than updates as to ORC's "plan[s]" regarding the filing of the registration statement.

Having made no allegation that ORC's statement that it was "planning to file" was false, Stuckey does allege another falsity: that an ORC statement that it "would" file a registration statement was false. Complaint, ¶ 41 ("Defendant acted negligently in making the representation on May 6, 2008 that registration would follow promptly, and should have known that its representation was false and inaccurate at the time it was made."). The problem is, however, that Stuckey does not make any specific allegation that either ORC or its General Counsel ever made the statement that registration "would follow promptly." Stuckey only claims that the General Counsel made statements as to ORC's "plan[s]". Furthermore, Stuckey's catch-all allegation in ¶ 51 that "Defendant assured stockholders verbally throughout all relevant time periods through late July 2008 that it would soon file a registration of the Stock" (emphasis added) will not save this claim

for negligent misrepresentation because Stuckey has not claimed that any of these statements were made negligently. The only claim of negligence is with respect to the May 6, 2008 statement of the General Counsel. See ¶ 41. Equally problematic is the fact that the allegation in ¶ 51 does not identify any particular statement made by ORC; it merely asserts that a statement was made at some point, without providing any information whatsoever as to when the statement was made, by whom, and in what context. Without identifying these features, this allegation is conclusory and cannot support a claim for negligent misrepresentation. Ashcroft v. Iqbal, 129 S.Ct 1937, 1950 (2009).

Indeed, this allegation appears to be conclusory in a way similar to the allegations rejected in both Twombly and Iqbal. In Twombly, the Court rejected the plaintiffs' general allegation that the defendants "entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets" in violation of § 1 of the Sherman Act. Twombly, 550 U.S. 544, 551 (2007). Although the Court was focused primarily on its finding that separate allegations of parallel conduct by Defendants were insufficient to plausibly suggest an illegal agreement, the Court noted that, "a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." Id. at 557 (emphasis added); see also id. at 564. As stated in Iqbal:

> Recognizing that § 1 enjoins only anticompetitive conduct "effected by a contract, combination, or conspiracy," the plaintiffs in Twombly flatly pleaded that the defendants "ha[d] entered into a contract, combination or conspiracy to prevent competitive entry ... and ha[d] agreed not to compete with one another." The complaint also alleged that the defendants' "parallel course of conduct ... to prevent competition" and inflate prices was indicative of the unlawful agreement alleged.

> The Court held the plaintiffs' complaint deficient under Rule 8. In doing so it first noted that the plaintiffs' assertion of an unlawful agreement was a "'legal conclusion'" and, as such, was not entitled to the assumption of truth. Had the Court simply credited the allegation of a conspiracy, the plaintiffs would have stated a claim for relief and been entitled to proceed perforce. The Court next addressed the

"nub" of the plaintiffs' complaint—the well-pleaded, nonconclusory factual allegation of parallel behavior—to determine whether it gave rise to a "plausible suggestion of conspiracy." [The Court] concluded that it did not . . . .

129 S.Ct at 1950 (internal citations omitted). Thus, the bare assertion that an agreement existed was insufficient to maintain the claim.

In <u>Iqbal</u>, the Supreme Court rejected as conclusory the plaintiff's allegation that, "petitioners 'knew of, condoned, and willfully and maliciously agreed to subject [him]' to harsh conditions of confinement 'as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest.'" <u>Id.</u> at 1951. It also rejected the allegation that "[then-Attorney General John] Ashcroft was the 'principal architect' of this invidious policy, and that [FBI Director Robert] Mueller was 'instrumental' in adopting and executing it[.]" <u>Id.</u> (internal citations omitted). The Court explained that these allegations were conclusory, and therefore entitled to no assumption of truth:

> These bare assertions, much like the pleading of conspiracy in <u>Twombly</u>, amount to nothing more than a "formulaic recitation of the elements" of a constitutional discrimination claim, namely, that petitioners adopted a policy "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." As such, the allegations are conclusory and not entitled to be assumed true. To be clear, we do not reject these bald allegations on the ground that they are unrealistic or nonsensical. We do not so characterize them any more than the Court in <u>Twombly</u> rejected the plaintiffs' express allegation of a "'contract, combination or conspiracy to prevent competitive entry,'" because it thought that claim too chimerical to be maintained. It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.

<u>Id.</u> (internal and parallel citations omitted).

Just as the plaintiffs in <u>Twombly</u> alleged the mere existence of an "agreement at some unidentified point," Stuckey has done nothing more than allege the mere existence of statements "at some unidentified point" that ORC "would" file a registration statement. And just as the two

-28-

allegations in <u>Iqbal</u> alleged, in a conclusory way, that the defendants had taken actions that would have constituted one of the elements of the cause of action brought, the allegation Stuckey makes here in ¶ 51 is little more than a "bare assertion," "amount[ing] to nothing more than a 'formulaic recitation of the [one of the] elements' of a [negligent misrepresentation] claim." <u>Id.</u> For example, Iqbal made the conclusory claim that Ashcroft was the "principal architect" of the alleged policy at issue, but nothing in this allegation rises above the general allegation that Ashcroft took actions that constituted one element of his claim. Similarly, Stuckey's allegation that ORC "assured stockholders verbally throughout all relevant time periods . . . that it would soon file a registration of the Stock" merely alleges one element of a negligent misrepresentation claim, but claims nothing more specific, such as when the statement was made, by whom, and in what context. Had allegations been made as to specific instances in which ORC told the ITS shareholders that registration "would" soon follow, it would no longer be a conclusory recitation of an element of a claim of negligent misrepresentation. Lacking this, however, it is entitled to no assumption of truth under the <u>Iqbal</u>/<u>Twombly</u> standard for Rule 8. And even if it is, Stuckey has not, as mentioned, claimed that these statements were made negligently.

Because the Court is left without any clear allegation that a statement made by ORC was false, this claim must be dismissed for failure to state a claim upon which relief can be granted.

## D. Termination of the ITS Profit Sharing Plan

Stuckey also claims that ORC has wrongfully failed to terminate the ITS Profit Sharing Plan, of which some shareholders represented by Stuckey were members. Prior to the merger, ITS took certain actions to terminate the plan, but apparently, the Plan was never formally terminated and the funds contained within the Plan, which amounted to $158,398.69, were never distributed to the members. The allegations of the complaint on this point read in full:

> ¶ 81. ITS established a profit sharing plan ("Profit Sharing Plan") in which certain Stockholders are participants.
>
> ¶ 82. The ITS board took action to terminate the Profit Sharing Plan prior to Closing.
>
> ¶ 83. Defendant assumed control of the Profit Sharing Plan, which has not yet been formally terminated and funds have not been disbursed to the plan participants.
>
> ¶ 84. The plan funds are invested in Fidelity Account Number 670-708020 in the amount of One Hundred Fifty-Eight Thousand Three Hundred Ninety-Eight Dollars and Sixty-Nine Cents ($158,398.69) as of November 30, 2008.
>
> ¶ 85. Defendant is obligated to expeditiously take all reasonable actions to terminate the Profit Sharing Plan and to promptly distribute all proceeds to the plan participants.

Complaint, at 17–18, ¶¶ 81–85.

ORC seeks dismissal of this claim on the ground that the complaint has not stated the source of ORC's obligation to terminate the plan, and in any event, ORC is not obligated to terminate the plan and distribute the funds. Without expressing an opinion as to the latter proposition, this Court finds that there is merit in the first. The allegations appear to be tossed into the final portions of the complaint in the hopes that either the defendant will expose the wrongdoing or that the Court will state the claims for it. Even under the liberal notice-pleading standard, the complaint does not give fair notice as to the grounds for the claim. Instead, it does no more than make the conclusory and

uninformative assertion that an obligation existed to terminate the Plan. Yet "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, at 1949.

In his Response to ORC's Motion to Dismiss, Stuckey states that ¶¶ 81–85 allege both a breach of contract claim and a breach of fiduciary duty claim. As to the former, he points to §§ 10.9 and 11.1(d) of the Merger Agreement, which are mentioned nowhere in the Complaint. And as to the latter, he points to the Employee Retirement Income Savings Act ("ERISA"), which is also not mentioned in the Complaint. ORC is entitled, however, to a short and plain statement in the complaint of the claims being made against it, Fed. R. Civ. P. 8, so that it is able to respond to these claims either through an Answer or a pre-Answer motion. The longstanding purpose behind Rule 8 is to provide "fair notice of what the plaintiff's claim is and the grounds upon which it rests," Conley v. Gibson, 355 U.S. 41, 47 (1957), but Stuckey's complaint neither explains what his claim is (breach of contract, breach of fiduciary duty, or something else), nor explains the legal grounds upon which it rests by identifying a contractual provision at issue or law creating a fiduciary obligation. It is not surprising, then, that ORC's Motion to Dismiss addresses neither §§ 10.9 and 11.1(d) nor any fiduciary duty to terminate the Plan. Nor should it have. Stuckey's claim for ORC's wrongful conduct stemming from the termination of the ITS Profit Sharing Plan, whether sounding in contract or fiduciary duty, is therefore dismissed for failure to state a claim upon which relief can be granted.

### E. Declaratory Judgment Claim

Last but not least, Stuckey seeks a declaratory judgment on numerous issues contained within his Complaint. Specifically, he asks for a declaratory judgment that the ITS shareholders are entitled to:

- the immediate transfer of additional Stock as required by the price protection terms and calculation formula provided in the Agreement,
- the immediate disbursement and distribution of Stockholders of all funds and interest that remain on deposit in escrow with Wilmington Trust Company, and
- the expedited final termination of the ITS Profit Sharing Plan and disbursement of funds to all plan participants by Defendant.

Complaint, ¶ 107, at 20. ORC argues that the court should dismiss these claims because relief for them is already sought in Stuckey's other claims.

Looking first to the Declaratory Judgment Act, it provides that:

In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201 (2000). The use of the word "may," then, puts the decision as to whether to entertain the request for a declaratory judgment at the discretion of the district judge. See Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995) ("Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants."). Consequently, a district court should consider five factors to determine whether a case is appropriate for declaratory judgment:

(1)     whether the judgment would settle the controversy;
(2)     whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue;
(3)     whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata";
(4)     whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and
(5)     whether there is an alternative remedy that is better or more effective.

Bituminous Casualty Corp. v. J & L Lumber Co., Inc., 373 F.3d 807, 813 (6th Cir. 2004).

Consideration of these factors here leads the Court to believe that it should not entertain the claims for declaratory judgment at this time.

The first factor weighs against entertaining this claim because the controversy over the price protection terms, the escrow account, and the Profit Sharing Plan would not likely be settled by a declaratory judgment. The Court would necessarily have to conduct nearly the same type of inquiry to enter a declaratory judgment as it would to grant the primary relief sought on these issues. The second factor also weighs against entertaining the claims for a declaratory judgment. Much like the first factor, a declaratory judgment would not serve any useful purpose; nor is it likely that it would obviate the need for a court order regarding the price protection clause, the escrow account, and the termination of the Profit Sharing Plan if one is warranted. In many ways, then, these declaratory judgment claims are simply a different form of relief sought, and they do not bring with them any benefit not already attainable for Stuckey through his direct claims for relief.

The third and fourth factors are neutral with respect to the Court's decision whether to entertain the declaratory judgment claims, as the Court is not concerned that the claims are being used for "procedural fencing" or "to provide an arena for a race for res judicata," and nor do they pose a threat of increasing tensions between the federal and state courts. Lastly, however, the fifth factor is a reason not to entertain these claims because there are alternate remedies for the relief sought available. Indeed, Stuckey is already seeking them in this Complaint. There is no reason to believe they will not be "better or more effective," especially when, unlike a declaratory judgment, which merely declares legal rights and relationships, the orders sought in Stuckey's direct claims for relief would mandate the exact relief he seeks. Although the presence of these alternative forms of relief is not, in and of itself, a reason not to hear these claims for declaratory judgment, <u>see</u> Fed.

R. Civ. P. 57 ("The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate."), the Court feels that the combined effect of the first, second, and fifth factors counsels against entertaining these declaratory judgment claims. Consequently, the Court will grant ORC's Motion to Dismiss Stuckey's declaratory judgment claims.

### IV. Conclusion

For the foregoing reasons, defendant's motion to dismiss for failure to state a claim upon which relief can be granted is **GRANTED** as to Stuckey's claims for

- breach of contract resulting from ORC's failure to timely file a Net Working Capital Statement,
- breach of fiduciary duty resulting from ORC's actions regarding the release of its shares from the transfer agent,
- negligent misrepresentation resulting from ORC's statements allegedly leading the ITS shareholders to exercise their rights pursuant to the Price Protection Clause,
- breach of contract or breach of fiduciary duty, or both, resulting from the termination of the ITS Profit Sharing Plan and the disbursement of funds from the Plan, and
- declaratory judgment.

Defendant's motion to dismiss is **DENIED** as to Stuckey's claim for:

- breach of contract resulting from ORC's failure to file a registration statement and have it declared effective.

**IT IS SO ORDERED.**

Date: **December 11, 2009**          **/s/ John D. Holschuh**
                                    John D. Holschuh, Judge
                                    United States District Court