**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **KENT D. STUCKEY, as authorized Stockholders' Representative of the former stockholders of Internet Transaction Solutions, Inc.,** | **CASE NO.:  2:08-CV-1188** |
| **Plaintiff,** | **JUDGE JOHN D. HOLSCHUH** |
| **vs.** | **MAGISTRATE JUDGE KEMP** |
| **ONLINE RESOURCES CORPORATION,** | |
| **Defendant.** | |

**FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT, COMMON LAW
FRAUD AND SECURITIES FRAUD**

**JURISDICTION AND VENUE**

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§1332 because there is complete diversity between Plaintiff, all Stockholders, and Defendant,

and the amount in controversy in this action, exclusive of interest, exceeds $75,000.00.

2.      Venue in this Court arises under 28 U.S.C. §1391(b) and (c), as this action

addresses an agreement and transaction that was executed and closed in, and regarded a business

located in Franklin County, Ohio, which is where all or part of the claims for relief arose.

3.      The parties to this action consented to jurisdiction and venue in Columbus, Ohio

through the following terms in their written Agreement and Plan of Merger ("Agreement"), a

true and accurate copy of which is attached hereto as **Exhibit A**:

> "14.10 Choice of Forum and Consent to Jurisdiction.  Any action arising
> out of or under this Agreement … shall be brought only in a federal or state court
> having jurisdiction and venue in Columbus, Ohio, and each of the parties hereto
> hereby irrevocably submits to the jurisdiction of such courts and agrees that venue
> in Ohio is proper …"

## ITS STOCKHOLDERS AND ONLINE RESOURCES

4.      Internet Transaction Solutions, LLC; Value Recovery Group, Inc.; New Ridge LLC; PWI Inc.; G Tek LLC; Scott L. Evans ; Barry H. Fromm; Kent D. Stuckey; Eben L. Kent; Mark S. Johnson; Robert J. Massey; John G. Ritchey; Sudhir and Anjali Sehgal; Richard and Cheryl Evans CRUT; Scott Evans CRUT; and, Scott Evans GRAT ("Stockholders") were stockholders of Internet Transaction Solutions, Inc. ("ITS"), which is not a party to this lawsuit.

5.      Online Resources Corporation ("Defendant", "Buyer" and "Online Resources") is a publicly traded corporation incorporated in the state of Delaware, with its principal place of business located at 4795 Meadow Wood Lane, Suite 300, Chantilly, VA 20151.

## STOCKHOLDERS' REPRESENTATIVE

6.      The Agreement includes the designation and authorization of a Stockholders' Representative through the following terms:

"2.12 <u>Stockholders' Representative.</u>  By the execution and delivery of this Agreement, each of the Stockholders hereby irrevocably constitute and appoint Kent D. Stuckey (the "*Stockholders' Representative*") as his, her or its true and lawful agent and attorney-in-fact with full power of substitution to act in the name, place and stead of such Stockholders with respect to the transfer of the shares of Stock owned by such Stockholders to the Buyer in accordance with the terms and provisions of this Agreement, and to act on behalf of such Stockholders in any litigation or arbitration involving this Agreement, to do or refrain from doing all such further acts and things, and to execute all such documents as the Stockholders' Representative shall deem necessary or appropriate in connection with this Agreement or otherwise relating to the transactions contemplated by this Agreement, including, without limitation, the power:

(a)      to act for the Stockholders with regard to matters pertaining to indemnification referred to in this Agreement, including the power to defend, negotiate, assert, and compromise any indemnity claim on behalf of the Stockholders and to transact matters of litigation;

(b)      to execute and deliver all amendments, waivers, ancillary agreements (including the Escrow Agreement), assignments, certificates and documents, and take any and all actions, that the Stockholders' Representative deems necessary or appropriate in connection;

(c) to execute and deliver all consents, amendments and waivers to this Agreement that the Stockholders' Representative deems necessary or appropriate, whether prior to, at or after the Closing;

(d) to receive funds, make payments of funds, and give receipts for funds;

(e) to receive funds for the payment of expenses of the Stockholders and apply such funds in payment for such expenses;

(f) to do or refrain from doing any further act or deed on behalf of the Stockholders that the Stockholders' Representative deems necessary or appropriate in its sole discretion relating to the subject matter of this Agreement as fully and completely as the Stockholders could do if personally present; and

(g) to receive service of process in connection with any claims under this Agreement.

The appointment of the Stockholders' Representative shall be deemed coupled with an interest and shall be irrevocable, and the Buyer and any other person may conclusively and absolutely rely, without inquiry, upon any action of the Stockholders' Representative in all matters referred to herein. All notices required to be made or delivered by the Buyer to the Stockholders shall be made to the Stockholders' Representative for the benefit of the Stockholders and shall discharge in full all notice requirements of the Buyer to the Stockholders with respect thereto. The Stockholders hereby confirm all actions that the Stockholders' Representative shall do or cause to be done by virtue of its appointment as the Stockholders' Representative of the Stockholders. The Stockholders' Representative shall act for the Stockholders on all of the matters set forth in this Agreement and the Escrow Agreement in the manner the Stockholders' Representative believes to be in the best interest of the Stockholders and consistent with the obligations under this Agreement and the Escrow Agreement, but the Stockholders' Representative shall not be responsible to the Stockholders for any loss or damages the Stockholders may suffer by the performance of its duties under this Agreement or the Escrow Agreement, other than loss or damage arising from willful violation of law or gross negligence in the performance of its duties under this Agreement. The Stockholders agree jointly and severally to indemnify, defend and hold harmless the Stockholders' Representative from and against any and all loss, damage, liability and expense that may be incurred by the Stockholders' Representative arising out of or in connection with its appointment as Stockholders' Representative under this Agreement (except such as may result from the Stockholders' Representative's willful violation of law or gross negligence in the performance of its duties under this Agreement), including the legal costs of defending itself against any claim or liability in connection with its performance under this Agreement and all other

documents and agreements executed and delivered by the Stockholders' Representative in connection with this Agreement, including, without limitation the Escrow Agreement. The Stockholders' Representative, each Stockholder and the Buyer expressly acknowledge that the Stockholders' Representative shall have no authority or responsibility to act on behalf of any Stockholder in connection with any claim, action or proceeding initiated against such Stockholder pursuant to a breach by such Stockholder of such Stockholders' individual representations, warranties or covenants hereunder. All decisions by the Stockholders' Representative shall be binding upon all Stockholders.

7. The Agreement, which includes the provision appointing Plaintiff as "Stockholders' Representative," was incorporated by reference in the Action by Written Consent of the Stockholders of Internet Transaction Solutions, Inc. ("Stockholders' Consent"), and was executed, agreed and signed by and on behalf of each of the Stockholders.

8. A true and accurate copy of the Stockholders' Consent is attached hereto as **Exhibit B**.

9. This case is properly brought on behalf of the Stockholders by Kent D. Stuckey, as the Stockholders' Representative, upon the agency and authority established by the Agreement and Stockholders' Consent.

10. Plaintiff Kent D. Stuckey is a resident of the State of Florida.

## FACTUAL BACKGROUND

**A.    Sale of ITS to Online Resources**

11. ITS was formed in 1999 and engaged in the business of providing specialized electronic payment services to the accounts receivable management and utilities industries.

12. ITS achieved substantial success and rapid growth, including being ranked the second fastest growing company in the central Ohio region Fast Fifty Award, and being recognized multiple years by receiving the Inc. 500 and Deloitte Technology Fast 500 Awards.

13. Beginning in late 2006, ITS conducted an extended auction process for the sale of Stockholder interests, culminating in the receipt of multiple firm offers from three different

buyers each of which bid purchase price consideration in the amount of Forty-Five Million Dollars ($45,000,000.00) for the acquisition to ITS.

14.     On July 26, 2007, the Agreement was executed by, and for the specific benefit of, the Stockholders with Online Resources.

15.     The closing of the Agreement occurred on August 10, 2007 ("Closing").

16.     The Agreement established a purchase price ("Purchase Price") of Forty-Five Million Dollars ($45,000,000.00) for ITS.

17.     The Agreement gave the Stockholders an election to receive payment for their ITS shares in cash or in stock of Online Resources with associated registration and price protection rights ("Stock").

**B.     Online Resources Provides Incentives to Induce Stockholders to Take Online Resources Stock Instead of Cash Consideration - Namely Registration of Stock Coupled with Twelve Months of Price Protection**

18.     To incentivize the Stockholders to forego cash and receive a portion of their consideration in the form of Stock, Online Resources agreed to file a registration statement with the Securities and Exchange Commission ("SEC") that would allow the Stockholders to freely trade their Stock on the market, and coupled that promise with certain price protection terms designed to protect the Stockholders from decreases in share value of the Stock for 12 months following the closing.

19.     Under Section 10.6 of the Agreement, Online Resources unconditionally promised to file that registration statement no later than November 8, 2007.

20.     The Agreement imposes the following absolute and unconditional obligation on Online Resources:

> "10.6 _Registration Statement_.   Buyer shall file with Securities and Exchange Commission (the "_SEC_") a registration statement covering the resale of the Buyer Stock (the "_Registration Statement_") within ninety (90) days after the

Closing and shall have the Registration Statement declared effective by the SEC as soon as practicable thereafter. …"

21.    Until such registration was complete, the Stock would not be freely transferrable by Stockholders under applicable law and SEC regulations.

22.    Coupled with Defendant's promise to file a timely registration statement, Defendant also agreed to provide the Stockholders with "price protection" for up to twelve months following the effective date of the merger (the "Effective Date"). Specifically, Section 2.6 of the Agreement provided that if the share price of the Stock declined from its share price as of the Effective Date (the "Protected Price"), each Stockholder would have the right to sell their Stock back to Online Resources at the Protected Price. Online Resources would then have the obligation to either pay cash for such Stock at the Protected Price, or issue an amount of additional shares of Stock to the Stockholders sufficient to make up for the decline in share price. Alternatively, Online Resources could opt for some combination of cash payment plus issuance of shares as long as the Stockholders were made whole and received value equal to the consideration that they would have received at the Protected Price.

23.    These price protection rights and related provisions were for the sole benefit of, and could be exercised by, the Stockholders on the sixth, ninth and twelfth month anniversary dates of the Effective Date, at each Stockholder's option.

24.    In addition to the registration and price protection rights granted in the Agreement, Online Resources made specific representations to the ITS Stockholders in Section 4 of the Agreement regarding the absence of any SEC concerns that would impact Online Resources' ability to deliver on its promise to register the Stock.

25.    Specifically, in Section 4.2 of the Agreement, Defendant represented that the execution, delivery and performance of the Agreement does not and will not "result… in a

violation of or default under any material government law, rule, or regulation … having applicability to [Defendant] which would have a material adverse effect on [Defendant] or the transaction contemplated hereby" or "require… any approval, consent, order, authorization, declaration or filing with, any person, entity or body, private or governmental, which failure to obtain would have a Material Adverse Effect on the consummation of the transactions contemplated hereby."

26.     In Section 4.5, Defendant represented that there is "no . . . investigation, pending against [Defendant]."

27.     In Section 4.7 of the Agreement, Defendant represented that:

> 4.7     _Financial Reports and SEC Documents_.  Buyer's Annual Report on Form 10-K for the fiscal year ended December 31, 2006, and all other reports, registration statements, definitive proxy statements or information statements filed or to be filed by it with the SEC subsequent to December 31, 2006 under the Securities Act or under the Exchange Act, in the form filed together with any amendments required to be made with respect thereto, that were required to be filed with any applicable Governmental Authority under any applicable Law (collectively, "_Buyer SEC Documents_") as of the date filed, (A) complied in all material respects with the applicable requirements under the Securities Act or the Exchange Act, as the case may be, and (B) did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading…"

28.     In reliance upon the provisions of the Agreement described in paragraphs 20 through 23 above and upon the Defendant's representations set forth in paragraphs 24 through 27, above, the Stockholders elected Stock rather than cash because these provisions and representations assured them control of registered and freely tradeable Stock combined with the benefit of potential increases in the stock price of Online Resources, while protecting them against downside risk of decreases in the stock price.

29.     Specifically, in reliance upon these material provisions and representations, the

Stockholders elected to receive Stock with the associated registration rights and price protection terms for Twenty-Four Million Seven Hundred Thirteen Thousand Sixty One Dollars ($24,713,061.00) of the Forty Five Million Dollar ($45,000,000.00) Purchase Price. This was in lieu of receiving an additional Twenty-Four Million Seven Hundred Thirteen Thousand Sixty One Dollars ($24,713,061.00) in cash at Closing.

30.     This deal structure, which allowed the Stockholders to receive Stock with registration rights and extended price protection, and the accompanying representations, were material factors in the Stockholders' decision to sell their interests in ITS to Defendant rather than to another bidder.

**C.     Online Resources' Fraud**

31.     However, unbeknownst to the Stockholders, at the time the Agreement was executed, at the time the merger transaction closed, and at the time that the Stockholders elected Stock rather than cash, Defendant was under active nonpublic review by the SEC. Specifically, on or about June 14, 2007, Defendant had received an SEC Comment Letter initiating that SEC review and identifying eight concerns regarding the accuracy, reliability, propriety and/or compliance of Defendant's Annual Report on Form 10-K for the fiscal year ended December 31, 2006. A true and accurate copy of the June 14, 2007 SEC Comment Letter is attached hereto as **Exhibit D**. This Comment Letter was not publicly available at the time the Agreement was executed at the time the transaction was closed.

32.     Defendant had full knowledge of this pending SEC review from the time it was commenced but did not disclose it to the Stockholders at any time before the Stockholders signed the Agreement, closed the transaction, or elected to receive $24,713,061 of the $45,000,000 of the merger consideration in the form of Stock. The existence of that non-public SEC review rendered untrue Defendant's representations in Sections 4.2, 4.5 and 4.7 of the Agreement

33.     Moreover, on August 9, in anticipation of the Closing, Defendant's counsel sent an email communication to all Stockholders and their counsel with securities disclosure documents that Defendant's counsel stated "should be considered in connection with your election to receive shares of [ORC] common stock."  Included with this disclosure was Defendant's 2006 10-K, a proxy statement filed April 17, 2007, Defendant's 10-Q filed on May 10, 2007, and Forms 8-K filed on May 17, 2007, July 26, 2007 and August 1, 2007.  Absent from that disclosure was any document or reference to the pending non-public SEC review of the 2006 10-K.

34.     Several weeks after the Closing and after the Stockholders had elected to receive Stock in lieu of cash as described above, Defendant disclosed for the first time to a Stockholder (in late August 2007) and to Stockholders' legal counsel, Scot Crow, Esq. (in early September 2007) that an SEC review and investigation had begun.  Defendant did not, however, disclose to the Stockholders the non-public information that the SEC review and investigation had begun more than a month before the Stockholder had signed the Agreement, closed the transaction and elected Stock rather than cash.  Defendant has continued to fail to disclose that fact even in this litigation, stating under oath in an interrogatory response that the SEC review began "[a]fter the closing of the transaction, in the fall of 2007," when in truth it began in June of 2007.

35.     Defendant's communications confirmed, however, that the existence of the SEC review was not only material, but centrally critical, to the Agreement, to the Closing of the transaction, and to the Stockholders' election to receive Stock rather than cash.  As Defendant has stated, the SEC's regulations "do not allow an S-3 [registration statement] to become effective while there is an open comment letter on [ORC's] 10-K."  In this litigation, Defendant has stated to this Court that the "Securities and Exchange Commission's review of the

Defendant's Annual Report on Form 10-K for the year ended 2006 was in process, which would have precluded the registration statement from being declared effective *until April 2008*."

**D.     Online Resources' Failure to Register Stock.**

36.     Defendant breached its contractual promise to file a registration statement for the Stock prior to November 8, 2007.

37.     In fact, to this day Defendant has not filed a registration statement for the Stock.

38.     After the Closing in August of 2007, the Stockholders repeatedly requested Defendant to provide a reliable date by which it would file a registration statement for the Stock.

39.     Despite the pending SEC review, Defendant repeatedly represented and promised, in writing and orally, that it would file a registration statement for the Stock and that Defendant expected prompt approval by the SEC.

40.     On October 30, 2007, Defendant's General Counsel sent an email to Stockholders' counsel stating in part:

> "We are getting close to being able to file the S-3, and I want to make sure we have all the [Stockholder] questionnaires."

41.     By December 21, 2007, when Defendant still had not filed the registration statement, Plaintiff communicated to Defendant by email, stating in part:

> "As you can imagine, selling shareholders are pushing me very hard for answers on why this is still pending.   Some were relying upon the stock to issue this calendar year."

**E.     Defendant's Attempt to Evade Their Absolute and Unconditional Obligation to File a Registration Statement**

42.     By the end of February 2008, having breached its absolute and unconditional obligation to file the registration statement by November 8, 2007, Defendant attempted to evade its obligation by asserting a position that a revision to SEC "Rule 144" effective in February of 2008 would allow Stockholders to sell their Stock without the need for registration. "Rule 144" is

not a substitute for, and did not excuse Defendant's failure to file a registration statement. Instead, Rule 144 only provides a safe-harbor for certain sales of restricted stock if certain conditions are met.

43.     Because of the additional conditions, restrictions, risks and consequences associated with sales under the Rule 144 safe-harbor, the proposed use of the Rule 144 provisions was not a substitute for, and did not excuse, Defendant's breach of its promise to timely file a registration statement, which once approved would have allowed for the unrestricted public resale and other beneficial use of the Stockholders' Stock.

44.     Accordingly, Stockholders, through counsel, continued to demand that the Defendant file the registration statement. Defendant responded that it was still proceeding with registration and did not consider the amendment to Rule 144 to eliminate their obligation to register the Stock.

45.     On March 12, 2008, Stockholders' counsel sent an email to Defendant's General Counsel stating:

> "I am writing to confirm that ORCC is still pursuing the S-3 filing. While I appreciate the relaxed 144 rules, they still come with limitations and not equivalent to having the shares registered as required under the Merger Agreement. Could you please provide me with a quick status update on the filing of the S-3?"

46.     On March 12, 2008, Defendant's General Counsel sent an email to Stockholders' counsel stating:

> "We are still pursuing it. The 144 rule change is a stopgap that hopefully alleviates some pressure, but we are not viewing it as a permanent solution and have not reduced our intensity."

**F.** **Defendant's Fraudulent Misrepresentations Regarding Its Intent and Plan to File a Registrations Statement In The Spring of 2008.**

47.     In response to the ongoing demands by Stockholders, Defendant's General

Counsel communicated by email to Stockholders' counsel on May 2, 2008, stating in part:

> "We think the best approach forward is to file an S-1 prospectus to cover the
> shares issued to the former ITS shareholders; the shares will then be fully
> registered.  Unlike the S-3, which stays current all by itself, we have to update the
> S-1 with our quarterly financial results – it is a simple amendment that we would
> file with our 10-Q each quarter.  We can discuss the duration we would keep the
> S-1 open, but the presumption is that it will be at a minimum until August 10, at
> which point the shares we issued become qualified under Rule 144(k) to have the
> legend removed and are then treated just like registered shares whether or not
> there is a prospectus covering them.  We are researching how Rule 144(k) treats
> the price protection shares; we think they may "piggyback" on the original shares,
> and thus they would be eligible for legend removal on August 10 as well…
>
> The goal would be to file the S-1 right after we file our 10-Q, which is scheduled
> for May 10 at the latest.  We would incorporate our first quarter financials into the
> S-1, so it will be current until August."

48.     On May 6, 2008, Defendant's General Counsel communicated by email to

Stockholders stating:

> "We are planning to file within the next couple of weeks.  S-1s frequently take a
> long time to prepare from scratch.  Fortunately, we have nearly all the material we
> need from our 10-K, proxy and 10-Q, so it should not take long to prepare.  The
> SEC has a right to review, but that is usually a brief period, and given that it will
> be based on already filed disclosures, it is unlikely they will have many (if any
> objections)."

49.     In reliance upon these representations, and anticipating that their Stock would be

registered and freely tradeable in short order, the Stockholders exercised their price protection

rights effective May 10, 2008.

50.     The Stockholders would not have exercised their price protection rights effective

on May 10, 2008 if those representations had not been made by Defendant because without the

ability to freely trade their Stock, the Stockholders could not protect themselves from further

declines in share price or mitigate their risk through hedging transactions.

51.     Upon information and belief, Defendant knew or should have known that Stockholders would rely on its representation in making their election to exercise price protection rights effective May 10, 2008.

52.     But those representations were, upon information and belief, false, as the document discovery in this action has revealed.  Plaintiff's First Requests for Production of Documents required defendant to produce "[a]ll documents that evidence, refer or relate to your noncompliance with applicable federal or state securities laws or regulations or your ability to file a registration statement for any purpose during the period from January 1, 2007 through August 10, 2009 (including but not limited to the subject matter of footnote 1 of Defendant Online Resources' Reply in Support of Motion to Dismiss)."  (Plaintiff's Document Request No. 8).  Defendant responded that it would "produce documents reasonably responsive to this request."  However, in its document production, there were no draft registration statements or other documents produced regarding any preparation of a registration statement for the Stock at any time between January 28, 2008 and May 10, 2008.

53.     In subsequent communications regarding that document production, Defendant stated that it had "conducted the search as appropriate and consistent with our written responses, and produced the responsive, non-privileged documents" and that it was "not holding additional documents to be produced."  Defendant then stated "[i]n response to your specific inquiry about documents regarding efforts to register after Jan. 28, 2008, we are looking to see if there are any such additional documents.  If there are any that are properly discoverable, they will be produced."  To date no such documents have been produced.

54.     There is no reasonable possibility that Defendant would have, on May 6, 2008, been "planning to file [a registration statement] within the next couple of weeks" without there

being draft documents being worked on and created pertaining to that registration.  Nor is there any reasonable possibility that on May 2, 2008, Defendant's "goal would be to file the S-1 right after we file our 10-Q, which is scheduled for May 10 at the latest" without there being draft documents pertaining to that registration being created and worked on at the time**.**

55.     Based upon the absence of any such documents, plaintiff alleges, upon information and belief, that Defendant's representation on May 6, 2008, that it was "planning to file within the next couple of weeks" was false and that defendant's representation that its "goal" was to file the S-1 right after May 10, 2008" was also false.

56.     The Stockholders who elected to exercise price protection on May 10, 2008 relied upon Defendant's representations that they were planning to register their shares within the next couple of weeks."  Because Defendant was in control of its own activities in registering the stock, those Stockholders' reliance upon Defendant's representations was justifiable.

57.     Thereafter, Defendant continued its pattern of false and fraudulent representations as to its intent to file a registration statement for the Stock.  Specifically, in response to ongoing inquiries requesting status updates on the pending Stock registration, Defendant's General Counsel communicated by email on June 3, 2008:

>    "We're reviewing it right now.  We should have a final draft ready to file by early
>    next week."

But, Defendant's document production included no drafts of any registration statement between January 28, 2008 and June 3, 2008.

58.     Then, in response to a subsequent inquiry requesting a status update on the registration of the Stock, Defendant's General Counsel communicated by email on June 17, 2008:

>    "Things are progressing on the S-1, but I was overly optimistic in my prior
>    assessment because I didn't factor sufficient time for review.   I think end of

14

month is a more realistic timeframe."

But Defendant's document production included no drafts of any registration statement between January 28, 2008 and June 17, 2008.

59.     The above-described absence of any draft documents evidencing any effort by Defendants during this time reveals that Defendant's representations on June 17, 2008, that "things are progressing on the S-1" and that "the end of the month [of June 2008] is a more realistic time frame" were false and a continuation of Defendant's attempt to cover up and perpetuate its fraudulent misrepresentations regarding its intent file a registration statement for the Stock.

60.     On June 20, 2008, Stockholders' counsel sent a letter to Online Resources which included an explanation of Stockholders' reliance upon Defendant's representations that the Stock would soon be registered, which reliance resulted in Stockholders' exercise of price protection rights effective May 10, 2008, thereby increasing the risk to Stockholders.

61.     In response to an inquiry requesting a status update on the registration of the Stock, on June 27, 2008, Defendant's General Counsel communicated by email:

> "With respect to control of the stock, we are working on the registration statement for the shares."

62.     In order to reduce their exposure and achieve their benefit of the bargain, Stockholders requested Defendant to provide renewed and extended price protection.

63.     When the parties discussed by phone Stockholders' urgent request for renewed and extended price protection, Defendant's officers stated that they were "considering it".

64.     On July 8, 2008, Stockholders inquired by email regarding the status of the registration of the Stock, to which Defendant did not respond by email until August 12, 2008.

65.     Defendant assured Stockholders orally throughout all relevant time periods

through late July 2008 that it would soon file a registration statement for the Stock. Upon information and belief, this was false. In truth, Defendant had no intent to file for registration.

66.     The parties discussed the issues in a telephone conference on July 24, 2008, in which Stockholders asked if they were still planning to file the Stock registration.

67.     Finally, in a telephone conference on July 29, 2008, Defendant first communicated that it would not be filing the Stock registration, but that it was taking all necessary actions so that Stockholders could promptly take control of the Stock on August 10, 2008.

68.     At no time did Defendant register the Stock, which finally became unrestricted solely through the passage of time and not through registration by Defendant.

69.     Upon information and belief, Defendant's false and fraudulent misrepresentations (a) on March 12, 2008, that "[w]e are still pursuing it [registration] and "have not reduced our intensity;" (b) on May 6, 2008, that "[w]e are planning to file within the next couple of weeks," (b) on June 3, 2008 that "[w]e're reviewing it [a registration statement] right now" and "should have a final draft ready to file by early next week," (c) on June 17, 2008 that "[t]hings are progressing on the S-1," and (d) on June 27, 2008 that it was "working on the registration statement for the shares" were all a subterfuge made with the intent to string the Stockholders along until August 10, 2008, when the shares would become freely tradeable through the passage of time.

**G.     Defendant's Failure to Timely Process Stock Transfer Requests**

70.     During several days following August 10, 2008, Stockholders sought to initiate the transfer of Stock to their brokerage accounts and were advised by Defendant's transfer agent that it could not yet remove the restrictions from the Stock and effectuate transfers.

71.     On August 11, 2008, Defendant's General Counsel communicated by email stating:

> Mark Wishner is instructing AS&T to release the hold on the electronic book-entry shares at AS&T. They should be released tomorrow and transferable by your clients without any further input from us.

72.     On August 13, 2008, Stockholders' counsel sent an email to Defendant's General Counsel stating:

> "AS&T has communicated to us this afternoon that no instructions from ORCC or ORCC counsel (Mark Wishner) have been received instructing them to lift the restrictive legend on these shares. Can you please confirm that instructions have been provided and when they were provided?"

73.     On August 14, 2008, Stockholders' counsel followed up by email stating:

> "Could you please help me understand what is going on . . . I have some anxious shareholders."

74.     Later on August 14, 2008, Defendant's General Counsel sent an email stating:

> "I'm reaching out to GT right now to find out.   We should have it taken care of today."

75.     On August 15, 2008, Stockholders' counsel addressed multiple significant outstanding issues in an email to Defendant, which included:

> "August 10th has passed and we still have several issues outstanding:
>
> 1.  Release of the Shares.  Please confirm that the legends have been removed from the shares by AST.  The shareholders would like to begin the process of transferring the shares to their individual brokerage accounts."

76.     On August 15, 2008, Defendant's General Counsel responded in an email, which included:

> "We've had some issues with AST, but we should have this worked out by Monday."

77.     On August 19, 2008, Stockholders' counsel again needed to request Defendant's General Counsel to address the share transfer issue, who responded by email stating only:  "The

shares should be released."

78.     On August 20, 2008 it was generally confirmed that Defendant's transfer agent was willing to commence transfers of Stock to Stockholders.

79.     Upon Defendant's transfer agent commencing to work with Stockholders to transfer the Stock, over the course of several ensuing days Stockholders were separately advised by AST or their brokerage firms that Defendant had failed to associate Stockholder IRS W-9 Forms with the transfer accounts, which W-9 Forms had been provided to Defendant at Closing.

80.     Certain of the Stockholders in the form of a single-member limited liability company ("LLC") were advised by Defendant's transfer agent that they needed to provide additional documents and information in order to transfer the Stock, which included a completed W-9 Form, the most recent AST Statement of Account, the LLC "articles of incorporation", the associated state Certificate, and the Appointment of Statutory Agent, some of which was not readily available to these Stockholders, resulting in further delay.

81.     Certain Stockholders were also generally advised by their brokerage firms that the transfer of assets would require ten to fifteen days for completion.

82.     In at least one case, an LLC Stockholder provided to Defendant's transfer agent a letter and completed new W-9 Form including both the relevant employer identification number (EIN) and social security number (SSN), after which AST rejected the asset transfer request of this Shareholder's brokerage firm on the basis that the brokerage provided the EIN and not the SSN, and AST required the submission of a revised transfer request resulting in additional delay.

**H.     Material Pecuniary Harm Caused to the Stockholders**

83.     For many Stockholders, by the time the Stock became freely-transferable by passage of time and they were finally able to obtain control from Defendant's transfer agent over

their Stock in late September 2008, the share price of their Stock had declined substantially and continued to decline before they could take any reasonable measures, resulting in material financial damages and harm to the Stockholders.

84.     At many times after the Stock was required to be registered, delivered and under the control of Stockholders, such Stock could have been sold at a price above the Protected Price, but Stockholders were prevented from selling because of Defendant's failure to register the Stock as required in the Agreement.

85.     Stockholders were also harmed by the loss of opportunity and liquidity caused by Defendant's breach of its obligation to register Stock, and repeated assurances it would do so.

## I.     Stockholders Are Deprived of the Value of Their Price Protection Terms

86.     The failure of Defendant to timely register the Stock deprived Stockholders of the bargained for value of their negotiated price protection terms.  Because the price protection rights allowed Stockholders to participate in share price gains, while protecting against price drops, these rights were a valuable aspect of the consideration for Stockholder's sale of ITS.

87.     The deal structure provided for the Stock registration to be completed prior to the times at which Stockholders could exercise their price protection rights.

88.     These price protection rights had significantly more value when coupled with freely transferable Stock as required in the Agreement because the Stockholders could control their risk after exercise by entering into various sale or hedging transactions with the Stock.

89.     However, because the Stock was restricted during the entire price protection term, Stockholders were deprived of this value and were unable to control their investment risk after exercise of price protection.

90.     Defendant's failure to register therefore deprived Stockholders of the value of their negotiated price protection terms.

**J.     Defendant Breached the Terms of the Price Protection Clause By Providing Insufficient Additional Shares**

91.     As indicated above, Stockholders reasonably relied to their detriment upon Defendant's representations, including but not limited to those of May 2 and May 6, 2008, that they would soon receive control of registered Stock, and were wrongfully induced to exercise price protection rights effective May 10, 2008.

92.     Defendant then improperly left out the lowest price highest volume trading day in miscalculating the volume weighted average price ("VWAP") applicable to the May 10, 2008 exercise of price protection terms in violation of Section 2.6 of the Agreement.

93.     Defendant then deposited into the AST transfer accounts insufficient amounts of additional Stock pursuant to the May 10, 2008 exercise of price protection terms.

94.     This mistake was communicated to Defendant by phone, email and in the letter of June 20, 2008, in response to which Defendant improperly declined to correct its faulty calculation and deposit the proper amount of additional Stock due Stockholders.

**K.     Online Resources' Breach of Net Working Capital Provision**

95.     The Agreement contemplated that the parties would agree upon a "Net Working Capital" adjustment post-closing in order to true up any material differences between the projected financial position of ITS at Closing and the actual financial position of ITS at Closing.

96.     Under Section 2.5(b) of the Agreement, Defendant was required to submit its determination of the Net Working Capital adjustment no later than November 8, 2007, after which time Stockholders would have a certain time period to object to Defendant's determination.

97.     Defendant failed its obligation under the Agreement to provide a statement of Net Working Capital by November 8, 2007.

98.     Defendant finally provided a statement of Net Working Capital well after the deadline, on January 15, 2008.  Stockholders requested additional information related to this statement, which Defendant did not provide.

99.     Seven months later, Defendant submitted a new, higher claimed adjustment to Net Working Capital.

100.    When receiving the new August determination of Net Working Capital, Stockholders requested detailed information supporting this claim, which Defendant again did not provide.

**L.      Plaintiff is Entitled to Funds Remaining in Escrow Holdback And Online Resources is Precluded From Asserting Any Claims for Indemnification**

101.    As part of the acquisition transaction, Plaintiff, Online Resources and Wilmington Trust Company (a Delaware corporation) executed and entered into an Escrow Agreement ("Escrow Agreement") pursuant to which a portion of the Purchase Price was placed in escrow to cover claims for indemnification or other relief made by the first anniversary of the Closing.

102.    A true and accurate copy of the Escrow Agreement is attached hereto as **Exhibit C**.

103.    Under the terms of the Escrow Agreement, in order to make a claim to any portion of the escrowed funds, Defendant was obligated to provide notice of any claims by the first anniversary of the Closing using the delivery methods, and consistent with the time frames, set forth in the Escrow Agreement.

104.    Moreover, under the terms of the Agreement, Online Resources had to provide notice of any claims for indemnification by the first anniversary of the Closing using the delivery

methods, and consistent with the time frames, set forth in the Agreement.

105.     Defendant failed to provide notice of any claim for indemnification or escrow claim consistent with the notice requirements in the agreements, and therefore is not entitled to any portion of the escrowed funds, and is barred from raising indemnification claims.

106.     Defendant attempted to submit notice, which was untimely under the terms of the Agreement and Escrow Agreement, claiming entitlement to $760,890.89 comprising of the increased claimed Net Working Capital adjustment and certain indemnification claims.

107.     Plaintiff responded that Defendant's attempt at notice was deficient and untimely under the terms of the Escrow Agreement and the Agreement, and demanded disbursement of the escrowed funds as required under the terms of the agreements.

108.     Defendant improperly objected to Plaintiff's demand for disbursement, and as a result of such improper objection the escrow agent continues to hold funds in the escrow account.

109.     Stockholders are entitled to disbursement of the remaining escrow funds under the terms of the Agreement and the Escrow Agreement.

110.     Defendant has waived and lost any rights that it may have had to pursue claims for any Net Working Capital adjustment, or other claims to indemnification or escrow funds.

111.     As of October 31, 2008 the amount remaining in the escrow account was Seven Hundred Sixty-Six Thousand Three Hundred Two Dollars and Sixty-Two Cents ($766,302.62), with interest continuing to accrue.

## M.     Profit Sharing Plan Distribution

112.     In 2004, ITS established a profit sharing plan ("Profit Sharing Plan") in which certain Stockholders are participants.

113.    Defendant identified several actions it required be completed following execution of the Agreement and prior to Closing as set forth in the Agreement as "CONDITIONS PRECEDENT TO THE OBLIGATIONS OF BUYER TO CLOSE", which included:

> "8.13  <u>Termination of the Company's Profit Sharing Plan</u>.  The Company shall have taken all actions necessary to terminate its profit sharing plan."

114.    ITS, its board of directors and the Stockholders, took formal board action to terminate the Profit Sharing Plan pursuant to Defendant's requirement and Agreement terms requiring they do so as a condition precedent to Closing.

115.    Defendant and Stockholders knew and agreed that additional actions or approvals of government agencies (such as the Internal Revenue Service and Department of Labor) could not be finalized or obtained prior to Closing and were required to be performed by Defendant.

116.    Accordingly, in Section 11.1(d) of the Agreement, the parties specifically agreed that the Stockholders would provide indemnification to Defendant for "any costs associated with the termination of the Company's profit sharing plan".

117.    In Section 10.9 of the Agreement, the parties agreed:

> "From time to time after the Closing without further consideration, the parties will… take such other action or arrange for such other action as may reasonably be requested to more effectively complete any of the transactions provided for in the Agreement or any document annexed hereto."

118.    Following execution of the Agreement, Stockholders and the ITS board took formal action on July 30, 2007 to terminate the Profit Sharing Plan, which board resolution was provided to Defendant prior to Closing.

119.    Defendant, through its wholly owned subsidiary BuyerSub, assumed control of the Profit Sharing Plan and agreed and confirmed that it was responsible and obligated under the

Agreement to complete the termination of the Profit Sharing Plan and to distribute funds to the plan participants.

120.    On March 20, 2008, Defendant's Chief Financial Officer communicated to Plaintiff by email stating in part:

> "…if ITS did not communicate the Plan termination to the participants before the acquisition and effect distributions or rollovers, we have assumed the obligation to do so."

121.    Defendant has failed to fulfill administrative requirements necessary to give effect to the Profit Sharing Plan termination and has not yet disbursed the Profit Sharing Plan funds to the Plan participants, including certain of the Stockholders.

122.    The Plan funds are invested in Fidelity Account Number 670-708020 in the amount of Two Hundred Two Thousand Two Hundred Nineteen Dollars and Fifty-Nine Cents ($202,219.59) as of November 30, 2009.

123.    Defendant breached its obligations under the Agreement to finalize termination of the Profit Sharing Plan and Stockholders are entitled to Defendant's termination of the Profit Sharing Plan and distribution of proceeds to the Plan participants.

**COUNT ONE**

**BREACH OF CONTRACT**

124.    Plaintiff hereby reasserts and incorporates by reference all of the above allegations of this Amended Complaint

125.    Stockholders have fully performed their obligations under the Agreement and Escrow Agreement.

126.    Defendant has materially breached the terms of the Agreement and Escrow Agreement as set forth above, including the breach of registration rights, breach of price protection rights, breach of its obligation to complete the termination of the ITS Profit Sharing

Plan, and breach of the terms of the Escrow Agreement requiring distribution of all funds therein to the Stockholders and Stockholders are entitled to damages, including indemnification by Defendant.

127.     Stockholders have been harmed as a direct and proximate result and are entitled to legal damages, equitable remedies and other relief.

**COUNT TWO**
**COMMON LAW FRAUD**

**FRAUDULENTLY INDUCING THE STOCKHOLDERS TO ENTER INTO THE AGREEMENT AND TO ELECT TO RECEIVE $24.7 MILLION OF THE PURCHASE PRICE IN STOCK RATHER THAN CASH**

**Fraudulent Misrepresentations**

128.     Plaintiff hereby reasserts and incorporates by reference all of the above allegations of this Amended Complaint.

129.     As a material inducement to the Stockholders' decision to enter into the merger and elect to take Stock in lieu of cash, Defendant made material representations of fact to Stockholders in the Agreement as set forth below.

130.     Defendant represented in Section 4.2 of the Agreement that the execution, delivery and performance of the Agreement does not and will not "result… in a violation of or default under any material government law, rule, or regulation … having applicability to [Defendant] which would have a material adverse effect on [Defendant] or the transaction contemplated hereby."  This representation was knowingly false when made because the sale of Stock without disclosure of the pending SEC review violated applicable securities laws.

131.     Defendant also represented in Section 4.2 of the Agreement that the execution, delivery and performance of the Agreement did not "require . . . any approval, consent, order, authorization, declaration or filing with, any person, entity or body, private or governmental,

which failure to obtain would have a Material Adverse Effect on the consummation of the transactions contemplated hereby." This representation was knowingly false when made because Defendant knew at the time that the pending but undisclosed non-public SEC review precluded the registration statement from being declared effective.

132. Defendant represented in Section 4.5 that there was "no . . . investigation . . . pending against [Defendant]." This representation was knowingly false because the then pending non-public SEC review constituted an investigation by the SEC into the completeness and accuracy of Defendant's compliance with the applicable disclosure requirements to which Defendant was required to respond and which Defendant knew precluded any registration statement for the Stock from becoming effective.

133. In Section 4.7 of the Agreement, Defendant represented as follows:

4.7 Financial Reports and SEC Documents. Buyer's Annual Report on Form 10-K for the fiscal year ended December 31, 2006, and all other reports, registration statements, definitive proxy statements or information statements filed or to be filed by it with the SEC subsequent to December 31, 2006 under the Securities Act or under the Exchange Act, in the form filed together with any amendments required to be made with respect thereto, that were required to be filed with any applicable Governmental Authority under any applicable Law (collectively, "*Buyer SEC Documents*") as of the date filed, (A) complied in all material respects with the applicable requirements under the Securities Act or the Exchange Act, as the case may be, and (B) did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading…"

This representation was knowingly false when made because Defendant knew that the pending non-public SEC review of its 2006 10-K meant that Defendant's 2006 10-K did not "comply in all material respects with the applicable requirements under the Securities Act or the Exchange Act, as the case may be."

134.     Defendant and its legal counsel also represented to Stockholders' legal counsel that there were no issues, obstacles or impediments to its registration of the Stock as contemplated by the terms of the Agreement.  These representations were knowingly false when made.

135.     Defendant intended that the Stockholders rely on these misrepresentations in making their decision to enter into the Agreement and close the transaction and in making their election of Stock in lieu of cash in the amount of Twenty-Four Million Seven Hundred Thirteen Thousand Sixty One Dollars ($24,713,061.00).

136.     Defendant's misrepresentations were material to the Agreement, the merger transaction and to the Stockholders' election to take Stock in lieu of cash at the time of closing because a pending SEC review adversely affected Defendant's ability to timely register the stock as promised.

137.     Stockholders justifiably and reasonably relied upon Defendant's false representations of material fact to their substantial detriment.

138.     Defendant's fraudulent misrepresentations proximately caused material harm to Stockholders, including but not limited to their election to accept Stock instead of cash under the terms of the Agreement and their determination to execute the Agreement with Defendant rather than to accept cash purchase offers from other buyers.

139.     Defendant is liable to Plaintiff for its legal damages, equitable remedies, litigation costs, including attorneys' fees, and punitive and exemplary damages.

**Fraudulent Non-Disclosure**

140.     At the time of execution of the Agreement and its Closing, Defendant was under active nonpublic review and investigation by the Securities Exchange Commission regarding its 2006 10-K, and Defendant knew of the SEC review and its pending status.

141.     Defendant knew that the Stock could not be registered until it had satisfactorily resolved this investigation, including Defendant's filing of all requested and required information, and the issuance of a required closure letter or other approval or consent from the SEC.

142.     At no time did Defendant disclose, prior to the signing and Closing of the Agreement or prior to their election to take Stock in lieu of cash, that the SEC had commenced a non-public review and investigation of Defendant's 2006 10-K filing and that this ongoing review and investigation rendered Defendant unable to register the Stock as promised.

143.     Moreover, Defendant disclosed numerous SEC filings, including the 2006 10-K on August 9, 2007 "to be considered [by the Stockholders] in connection with [their] election to receive shares" of Defendant's Stock, but failed to disclose the pending SEC review relating specifically to the 2006 10-K on which Defendant's were asking Stockholders to rely.

144.     The ability of Defendant to successfully register the Stock was a fact basic to the transaction.  The Stockholders relied upon that basic fact in both entering into the Agreement with Defendant (rather than accepting cash purchase offers from other buyers) and in electing to accept Stock instead of cash under the terms of the Agreement.

145.     Defendant knew that the Stockholders were about to enter into the Agreement and elect to accept Stock instead of cash without knowledge of the pending non-public SEC review

which precluded Defendant's ability to successfully register the Stock until the review was closed by the SEC.

146.    Based upon the terms of the Agreement between the parties and the other objective circumstances of the transaction, Defendant knew that the Stockholders would reasonably expect disclosure of the basic fact that the SEC had commenced a non-public review and investigation of Defendant's 2006 10-K filing and that this ongoing review and investigation rendered it unable to register the Stock as promised.

147.    Based on the representations made in the Agreement as set forth in Paragraphs 129 to 133 above, the promise to register Stock as set forth in the Agreement, and the incomplete disclosure of SEC documents in connection with Stockholder's election to receive Stock at Closing, Defendant had a duty to disclose the existence of the pending nonpublic SEC review in order to prevent such statements and disclosures from being misleading.

148.    Defendant therefore had a duty before the Agreement was signed, before the Closing, and before the Stockholders' election to take Stock instead of cash, to disclose to the Stockholders those basic and material facts that Defendant was under active nonpublic review by the SEC regarding its 2006 10-K, and that that review precluded any registration statement from being declared effective until the review was concluded.

149.    Defendant intended to mislead the ITS Stockholders into making their decision to enter into the Agreement and close the transaction, and make their election of Stock in lieu of cash in the amount of $24,713,061 by failing to disclose the pendency of the material non-public SEC review of Defendant's 2006 10-K, which precluded any registration statement from being declared effective until that review was concluded by the SEC.

150.    The Stockholders justifiably relied on the fact that there was no such disclosure in

deciding to enter into the Agreement and close the transaction, and make their election of Stock in lieu of cash in the amount of $24,713,061 and in deciding to execute the Agreement with Defendant rather than to accept cash purchase offers from other buyers.

151.     Defendant's non-disclosure proximately caused material harm to Stockholders, including but not limited to their decision to enter into and close the Agreement, their decision thereafter to elect Stock instead of cash under the terms of the Agreement, and their determination to execute the Agreement with Defendant rather than to accept cash purchase offers from other buyers.

**COUNT THREE**
**COMMON LAW FRAUD**

**FRAUDULENTLY INDUCING STOCKHOLDERS**
**TO ELECT PRICE PROTECTION ON MAY 10, 2008**

152.     Plaintiff hereby reasserts and incorporates by reference all of the above allegations of this Amended Complaint.

153.     After January 28, 2008, Defendant represented to Stockholders that Defendant's filing of the registration statement was imminent, stating (a) on March 12, 2008, that "[w]e are still pursuing it [registration] and "have not reduced our intensity," (b) on May 2, 2008, that "[t]he goal would be to file the S-1 right after we file our 10-Q, which is scheduled for May 10 at the latest, and (c) on May 6, 2008, that "[w]e are planning to file within the next couple of weeks."

154.     For the reasons set forth in paragraphs 47 through 68 above, those representations were, upon information and belief, knowingly false and fraudulent.

155.     Defendant's false and fraudulent representations were intentionally made with the purpose of misleading the Stockholders into believing that registration of their Stock was imminent so that they would exercise price protection in May rather than preserving price

protection rights through August, as was their right under the Agreement.

156.    In justifiable reliance upon these false and fraudulent representations, and anticipating that their Stock would be registered and freely tradeable in short order, the Stockholders exercised their price protection rights effective May 10, 2008.

157.    Thereafter, Defendant continued its pattern of false and fraudulent representations as to its purported intent to file a registration statement for the Stock.  Those false and fraudulent misrepresentations were all a subterfuge made with the intent to string the Stockholders along until August 10, 2008, when the shares would become freely tradeable through the passage of time under SEC regulations.

158.    Defendant's fraudulent misrepresentations and omissions described above proximately caused material harm to Stockholders by inducing them to elect price protection on May 10, 2008.

159.    Defendant is liable to Plaintiff for its legal damages, equitable remedies, litigation costs, including attorneys' fees, and punitive and exemplary damages.

## COUNT FOUR

## SECURITIES FRAUD – O.R.C. CHAPTER 1707

160.    Plaintiff hereby reasserts and incorporates by reference all of the above allegations of this Amended Complaint, particularly those set forth in Counts 2 and 3 of this Complaint.

161.    Defendant's representations in the Agreement and during the negotiations of the Agreement, as well as Defendant's omissions as set forth herein, were knowingly false, constituted fraud, and violated securities laws, rules and regulations applicable to Defendant's sale of the Stock.

162. Pursuant to the Agreement, and in reliance on Defendant's fraudulent misrepresentations and omissions, Stockholders elected to acquire Stock in Defendant equal to $24,713,061 of the $45,000,000 merger consideration.

163. That exchange constituted a "sale" of securities governed by the Ohio Securities Act.

164. Defendant knowingly made or caused to be made false representations concerning material and relevant facts in oral and written statements for purposes including selling the Stock in the State of Ohio to Stockholders, all in violation of Ohio Revised Code Section 1707.44(B)(4).

165. Defendant knowingly engaged in acts and practices declared illegal, defined as fraudulent, or prohibited by Chapter 1707 of the Ohio Revised Code in violation of Revised Code Section 1707.44(G), including making false representations of material fact, and failing to disclose material facts relating to the existence of the pending SEC review.

166. Pursuant to Revised Code Section 1707.43(A), as a result of Defendant's fraudulent misrepresentations and omissions in violation of the Ohio Securities Act, Stockholders are entitled to void the exchange for Defendant's Stock and receive their $24,713,061 purchase price for the Stock, plus other costs incurred in this matter.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

(A) Enter judgment against Defendant in favor of Stockholders for legal damages in excess of Fifteen Million Dollars ($15,000,000.00);

(B) Enter judgment finding, enjoining, decreeing and ordering that Stockholders are entitled to relief under Chapter 1707 of the Ohio Revised Code in the amount of the full purchase price of the Stock in the amount of Twenty-Four Million Seven Hundred Thirteen Thousand

Sixty One Dollars ($24,713,061.00);

(C)     Enter judgment finding, enjoining, decreeing and ordering that Stockholders are entitled to (1) the immediate transfer of additional Stock as required by the price protection terms and calculation formula provided in the Agreement, (2) the immediate disbursement and distribution to Stockholders of all remaining funds on deposit in escrow with Wilmington Trust Company and all interest accrued thereon, and (3) the expedited final termination of the ITS Profit Sharing Plan and disbursement of funds to all plan participants by Defendant;

(D)     Enter judgment against Defendant in favor of Stockholders for punitive and exemplary damages in an amount three times the determined amount of compensatory damages;

(E)     Enter judgment against Defendant in favor of Stockholders for prejudgment and postjudgment interest on all damages recovered;

(F)     Award to Stockholders all costs incurred in litigating this action, including reasonable attorneys' fees; and,

(G)     Order such further relief as the Court may deem just and proper.

                    Respectfully submitted,


                    _____
                    /s/ Thomas W. Hill_____
                    Thomas W. Hill, Esq. (0012182)
                    Trial Attorney
                    Stephen C. Barsotti, Esq. (0075038)
                    KEGLER, BROWN, HILL & RITTER CO., L.P.A.
                    65 E. State St., Ste. 1800
                    Columbus, OH 43215-4295
                    Direct dial: (614) 462-5403
                    Telephone: (614) 462-5400
                    Fax:        (614) 464-2634
                    Email:  thill@keglerbrown.com
                              sbarsotti@keglerbrown.com
                    *Attorneys for Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was filed and served via the Court's ECF system on this 16th day of April, 2010.

/s/ Thomas W. Hill
Thomas W. Hill