**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **KENT D. STUCKEY,** | : | |
| | : | **Case No. 2:08-CV-1188** |
| **Plaintiff,** | : | |
| | : | **JUDGE ALGENON L.** |
| **v.** | : | **MARBLEY** |
| | : | |
| | : | **Magistrate Judge Terence Kemp** |
| **ONLINE RESOURCES CORPORATION,** | : | |
| | : | |
| **Defendant.** | : | |

## OPINION & ORDER

### I. INTRODUCTION

This matter is before the Court on Defendant Online Resources' Motion for Summary

Judgment ("Summary Judgment Motion").  (Doc. 61.)  Defendant Online Resource Corporation

("Defendant" or "ORC") asks this Court to grant summary judgment in its favor as to Plaintiff

Kent Stuckey's ("Plaintiff" or "Stuckey") claims for breach of contract for failure to file a

registration statement for ORC stock (part of Count I); breach of contract for failure to terminate

the Internet Transaction Solutions, Inc. ("ITS") profit sharing plan (part of Count I); common

law fraud, including fraudulent misrepresentation, fraudulent non-disclosure, and fraudulent

inducement (Counts II and III); and securities fraud under the Ohio Securities Act, Ohio Revised

Code Chapter 1707 (Count IV).  Because this Court dismissed Plaintiff's claim for breach of

contract for failure to terminate the ITS profit sharing plan in its July 12, 2011 Opinion and

Order, *Stuckey v. Online Resources Corporation*, Case No. 2:08-cv-1188, 2011 WL 4953372, at

*6 (July 12, 2011) ("*Stuckey II*"), the Parties' arguments related to that claim are no longer

relevant and will not be discussed in this Opinion and Order.  For the reasons below, Defendant's

Summary Judgment Motion is **DENIED** in its entirety.

## II. BACKGROUND

*A. Factual History*

<u>1. The Merger</u>

From 1999 until its merger with ORC, ITS provided specialized electronic payment

services to the accounts receivable management and utilities industries.  ITS entered into an

auction for the sale of its shareholder interest in late 2006, which resulted in multiple bids

between $45-50 million.

According to Plaintiff, there were two things that distinguished ORC's bid from the other

offers ITS received.  First, ORC offered to provide a portion of the purchase price in the form of

ORC shares that it would issue to ITS shareholders ("Shareholders") and then register the shares

promptly with the Securities Exchange Commission ("SEC").  The registration would render the

ORC shares freely tradable on NASDAQ.  Second, any Shareholder who did not sell any of his

or her ORC shares would have the right at six, nine, or twelve months after closing to put all (but

not less than all) of their shares back to ORC.  When a Shareholder exercised his or her "price

protection" right, ORC would, at ORC's option, either: (1) buy back the ORC shares for cash at

the same price they were selling at the time of closing; or (2) issue additional ORC shares to

compensate for the intervening price decline.  Plaintiff alleges that the combination of these

rights increased the effective value of the deal with ORC above the $45 million cash and stock

purchase consideration.

On July 26, 2007, ORC, ITS, and the Shareholders signed a merger agreement ("MA"),

in which ITS was merged into ITS Acquisition Sub, LLC, a wholly owned subsidiary of ORC.

2

The deal officially closed on August 10, 2007.  Shareholders were given a choice between receiving payment for their shares in the form of cash or ORC stock, or both.  Out of the $45 million purchase price, the Shareholders chose to receive approximately $24.7 million worth of ORC stock.

<u>2. Relevant Provisions of the MA</u>

Section 2.12 of the MA names Stuckey as a Shareholder representative and authorizes him to:

> [A]ct on behalf of [the Shareholders] in any litigation or arbitration involving this Agreement . . . including, without limitation, the power: . . .
> . . . .
> (f) to do or refrain from doing any further act or deed on behalf of the Stockholders that [he] deems necessary or appropriate in [his] sole discretion relating to the subject matter of this Agreement as fully and completely as the Stockholders could do if personally present; . . . .

(Doc.73-1.)  It is in his capacity as a representative of the Shareholders that he brings this lawsuit.

Section 10.6 of the MA, detailing ORC's obligation to register the ORC stock, states that the "Buyer shall file with [the SEC] a registration statement covering the resale of Buyer Stock ('the *Registration Statement*') within ninety (90) days after the Closing and shall have the Registration Statement declared effective by the SEC as soon as practicable thereafter."  (Doc. 73-1.)  Ninety days after the closing was November 8, 2007.

Finally, the price protection provision is contained in Section 2.6 of the MA.  The volume weighted average price per ORC share was $11.15 at closing, enabling the Shareholders to exercise their rights under the price protection clause if the value per share fell below $11.15 and they had not yet sold any of their shares.

3

<u>3. The SEC Comment Letter</u>

On August 30, 2007, twenty days after the closing, ORC's general counsel, Michael Bisignano, advised a Shareholder that ORC could not register the shares because its 2006 10-K was under review by the SEC.  Bisignano further advised that the "regulations do not allow an S-3 [registration form] to become effective while there is an open comment letter on our 10-k." (Doc. 73-7.)  Plaintiff later learned that the SEC's investigation had actually begun on June 14, 2007, before the closing and signing of the MA.  An SEC comment letter is not a matter of public record, so the Shareholders had no way of knowing about its existence prior to closing the MA.

Plaintiff alleges that the existence of the SEC review deprived the Shareholders of "the ability to assess the true risk of taking unregistered stock" and "the true value of ORC's offer in comparison with the other cash offers made in the competitive bid process."  (Doc. 73.)  In depositions taken by Plaintiff, Bisignano and ORC's Chief Financial Officer, Catherine Graham, conceded that they knew about the SEC comment letter before the MA was signed and that the pendency of an SEC comment letter would preclude registration of the ORC shares, but that they did not disclose its existence to the Shareholders.

<u>4. Representations Regarding ORC Stock Registration</u>

The SEC's review concluded on October 11, 2007, but Plaintiff alleges that ORC did not take any steps to file a registration statement even after the review was closed.  Both Parties agree that ORC failed to file a registration statement by the November 8, 2007 contractual deadline.

Plaintiff recounts instances in which ORC represented that it was working or planning on filing the registration statement.  First, on January 18, 2008, Graham emailed ORC's outside

accountants and stated that: "After much circling and discussion, we are ready to file the S-3 registering the shares we issued in the acquisition of ITS."  (Doc. 73-4.)  In the same email, Graham noted that it was important "to make every effort to get this filed by Friday, January 25." (*Id.*)  But on January 23, 2008, in another email from Graham to ORC's outside accountants, she stated that ORC was "shooting for filing the S-3 to register the ITS acquisition shares on Wednesday, Jan. 30."  (Doc. 73-10.)

 In March of 2008, Shareholders' counsel, Scot Crow, sent an email to Bisignano, in which Crow inquired as follows: "I am writing to confirm that ORCC is still pursuing the S-3 filing.  While I appreciate the relaxed 144 rules, they still come with limitations and not equivalent to have the shares registered as required under the Merger Agreement.  Could you please provide me with a quick status update on the filing of the S-3?"  (Doc. 73-13.)  Bisignano responded that ORC was still pursuing registration, and that "[t]he 144 rule change is a stopgap that hopefully alleviates some pressure, but we are not viewing it as a permanent solution and have not reduced our intensity."  (*Id.*)

<u>5. Rule 144</u>

When the MA was closed on August 10, 2007, Rule 144 required a one-year holding period before restricted securities could be sold.  17 C.F.R. § 230.144(d)(1) (1997 Amendments). Amendments to Rule 144 became effective February 15, 2008, changing the one-year holding period to six months.  17 C.F.R. § 230.144(d)(1)(i); Securities Act Release No. 33-8869.  As of February 15, 2008, the Shareholders had been holding the ORC stock for more than six months, and therefore, they could sell their stock pursuant to the newly amended Rule 144.

Selling unregistered stock pursuant to Rule 144 is not the same, however, as selling registered stock.  According to Plaintiff, to sell shares pursuant to Rule 144, a Shareholder would

have to first contact ORC's outside counsel and obtain a legal opinion stating that the sale complied with the requirements of Rule 144, and the Shareholder would have to do so each and every time he or she wanted to sell stock.  Rule 144 also contains a "current public information requirement," which requires that "[a]dequate current public information with respect to the issuer of the securities must be available." 17 C.F.R. § 230.144(c).  Stuckey alleges that he was advised by E*TRADE that to trade shares under Rule 144, he must have held the shares for more than 12 months (which he had not), and he also had to agree to indemnify the brokerage for any violation of SEC rules resulting from the sale.  He was further advised that it would take four to six weeks to effectuate the sale.  An SEC website publication advised anyone attempting to sell restricted shares under Rule 144 to obtain an attorney specializing in securities law prior to effectuating such a sale.

### 6. Further Representations Regarding ORC Stock Registration

In early May 2008, Defendant again made representations that it was planning on registering the ORC stock "within the next couple of weeks."  (Doc. 73-16.)  The remaining Shareholders who had not exercised their price protection rights, allegedly based in part on Defendant's representations, elected to exercise their rights on or around May 10, 2008.  Plaintiff contends that ORC was lying when it made these representations because discovery has revealed that there were no draft registration forms at the time ORC made these statements.  Plaintiff also alleges that ORC had motive to fraudulently induce the Shareholders to exercise price protection because the price protection rights were a liability on ORC's balance sheet that was difficult to value.  Had the Shareholders not exercised their price protection rights in May 2008, but held those rights until August 2008 instead, they would have been protected from further price decline

during that period, which, according to Plaintiff, caused the Shareholders damages in the amount of approximately $2.6 million.

Defendant presents evidence that Shareholders exercised their price protection rights for different reasons.  For example, Shareholder Gregory Salvato elected price protection "because he thought that Online Resources stock price had bottomed and was going to rise, and that by exercising in May, he would maximize the value of price protection."  (Doc. 61.)  Defendant also recounts how one Shareholder, Barry Fromm, sold ORC stock under Rule 144 immediately after exercising price protection and profited from the sale.

Defendant never registered the ORC shares, but the shares became eligible to have the restrictive legends removed one year after closing on August 10, 2008.  Plaintiff alleges that many Shareholders did not receive unrestricted ORC shares until September 2008 because Defendant failed to provide appropriate documentation in a timely fashion, and the ORC share price further declined during that time period.  Plaintiff provides an expert report which values damages to the Shareholders resulting from Defendant's breach of its obligation to register the ORC shares at approximately $14.5 million.

### B. Procedural History

The initial complaint in this lawsuit was filed on December 19, 2008.  Stuckey alleged claims for: (1) breach of contract resulting from ORC's failure to file timely a net working capital statement, termination of the ITS profit sharing plan, and failure to file a registration statement and have it declared effective; (2) breach of fiduciary duty resulting from ORC's actions regarding the release of its shares from the transfer agent and termination of the ITS profit sharing plan; (3) negligent misrepresentation resulting from ORC's statements leading the Shareholders to exercise their rights pursuant to the price protection clause; and (4) declaratory

judgment.  (Doc 2.)  Defendant filed a motion to dismiss on February 23, 2009, and Judge John

Holschuh[1] granted that motion on December 11, 2009 as to all of Stuckey's claims with the

exception of the breach of contract claim resulting from ORC's failure to file a registration

statement.  *Stuckey v. Online Resources Corp.*, No. 2:08-cv-1188, 2009 WL 5030794, at * 20

(Dec. 11, 2009) ("*Stuckey I*").

     With the Court's consent, Stuckey filed an amended complaint on April 16, 2010

alleging: (1) breach of contract arising from failure to file a registration statement, breach of the

price protection clause, breach of ORC's obligation to complete the termination of the ITS profit

sharing plan, and breach of terms of the escrow agreement requiring distribution of all funds

therein to Shareholders (Count I); (2) fraudulent misrepresentation and fraudulent non-disclosure

(Count II); (3) fraudulent inducement of Shareholders to elect price protection on or around May

10, 2008 (Count III); and (4) securities fraud under the Ohio Securities Act, Ohio Revised Code

Chapter 1707 (Count IV).  ORC again moved to dismiss, with the exception of Stuckey's claims

for breach of contract arising from breach of the price protection clause and the escrow

agreement.  On June 16, 2011, before this Court ruled on ORC's second motion to dismiss, ORC

filed its Summary Judgment Motion.  (Doc. 61.)

     In *Stuckey II*, this Court granted ORC's motion to dismiss the following claims: failure to

process timely the stock transfer (a claim that was not incorporated by Stuckey into the

enumerated courts in the amended complaint); breach of the net working capital provision (also a

claim that was not incorporated by Stuckey into the enumerated courts in the amended

complaint); and breach of contract resulting from ORC's obligation to terminate ITS's profit

---

[1] This case was later randomly reassigned to this Court on February 4, 2011. (Doc. 56.)

sharing plan (portion of Count I).  *Stuckey II*, 2011 WL 4953372, at *17.  This Court denied the

motion to dismiss as to the remainder of Stuckey's claims.  *Id.*

The Court heard oral arguments on the Summary Judgment Motion on December 22,

2011, making it now ripe for review.

### III. STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine dispute as to any material fact."  Fed.

R. Civ. P. 56(a).  But "summary judgment will not lie if the . . . evidence is such that a

reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  In considering a motion for summary judgment, a court must

construe the evidence in the light most favorable to the non-moving party.  *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The movant therefore has the initial burden of establishing that there is no genuine issue

of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel,*

*Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993).  The central inquiry is

"whether the evidence presents sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at

251–52.  If the moving party meets its burden, then the non-moving party is under an affirmative

duty to point out specific facts in the record, which create a genuine issue of material fact.

*Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992).  The non-moving party may not

rest merely on allegations or denials in its own pleadings, *see Celotex*, 477 U.S. at 324, but must

present "significant probative evidence" to show that there is more than "some metaphysical

doubt as to the material facts."  *Moore v. Philip Morris Cos., Inc.*, 8 Fed.3d 335, 340 (6th Cir.

1993).

"[A]t the summary judgment stage the judge's function is not himself to weigh evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  Moreover, a district court is not required to sift through the entire record to drum up facts that might support the nonmoving party's claim.  *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).  Instead, the court may rely on the evidence called to its attention by the Parties.  *Id.*

## IV. LAW & ANALYSIS

### A. Breach of Contract Claim

Under Delaware law,[2] the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) resulting damages to the plaintiff.  *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003); *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. Ct. 2005).  ORC challenges only the third element in its Summary Judgment Motion.  While the Parties' briefing on the issue of damages is lengthy and complex, ORC's main arguments can be summarized as follows: (1) Plaintiff's expert, Espen Robak, incorrectly relies upon *Duncan v. TheraTX, Incorporated*, 775 A.2d 1019 (Del. 2001) to calculate damages; (2) Robak's expert report is too speculative and incorrect; and (3) Plaintiff has not presented any evidence in support of his claim that he was deprived of the opportunity to decide to sell when ORC's stock was up 8-10% over the $11.15

---

[2]This Court will apply Delaware law to Plaintiff's contract claims because the Parties so agreed in Section 14.9 of the MA. (Doc. 73-1.)  As a federal court exercising diversity jurisdiction, this Court will apply Ohio law, the law of the forum state, to Plaintiff's tort claims.

issue price during December 2007.[3]  (Doc. 61.)  This Court will address each of ORC's
arguments, but finds them all unpersuasive.

1. Robak's Reliance on <em>Duncan</em>

As a threshold argument, Defendant contends that Robak incorrectly relies on the
Delaware Supreme Court's analysis in *Duncan* because it is distinguishable.  First, ORC
contends that because the registration of shares was suspended for six-months in *Duncan*, and
Rule 144 was unavailable since it had not yet been amended and still contained a one-year
prohibition on trading, not the six month period that applies in this case, effectively all trading
was precluded.  Next, ORC points out that there was no price protection option available to the
*Duncan* shareholder.  Finally, ORC notes that the *Duncan* Court did not discuss the
shareholders' ability to capture profits through sales on the secondary market.

Plaintiff rebuts ORC's arguments by submitting that this Court has already held that
Plaintiff properly alleged recoverable damages under controlling Delaware law established in
*Duncan* and its progeny.  In support of this argument, Stuckey cites *Stuckey I*, in which Judge
Holschuh summarized *Duncan* and noted that the Delaware Supreme Court was dealing with a
"dispute similar to the one here."  *Stuckey I*, 2009 WL 5040794, at *5.  Stuckey contends that in
light of Judge Holschuh's previous reliance, *Duncan* is now the law that should be applied in this
case.  (Doc. 73) (citing *Westside Mothers v. Olszewiski*, 454 F.3d 532, 538 (6th Cir. 2006)
("[W]hen a court decides upon a rule of law, that decision should continue to govern the same
issue in subsequent stages in the same case.")).  Plaintiff also argues that even if *Duncan* does
not apply in this case, ORC's argument that Stuckey cannot show damages on his breach of

_____

[3] This is not the order in which ORC makes its arguments, but the Court finds this to be the most logical
order in which to address Defendant's contentions.

contract claims is undermined by the fact that ORC's own expert witness opined that damages were in the amount of $253,575 using what he called a "reasonable investor" approach.  (Doc. 73-27.)

In its reply brief, ORC argues that Judge Holschuh did not specifically hold that *Duncan* provided the applicable measure of damages in this case, but rather relied on *Duncan* to conclude Stuckey's claimed damages were general, "loss of bargain" damages rather than consequential damages and to reject ORC's argument that the damages sought were consequential and thus barred by the MA.  (Doc. 76) (citing *Stuckey I*, 2009 WL 5040794, at *5–7).  ORC also concedes that Judge Holschuh relied upon *Duncan* to reject ORC's argument that uncertainty as to when the SEC may have approved registration of ORC shares precluded an award of damages.  *Id.* (citing *Stuckey I*, 2009 WL 5040794, at *8).

While Judge Holschuh may have not explicitly stated in *Stuckey I* that *Duncan* provides the applicable measure of damages in this case, this Court finds that the issues and facts presented in the *Duncan* case are similar to those presented here and *Duncan* should, in fact, provide the applicable measure of damages in this case.  Judge Holschuh's reliance on *Duncan* in *Stuckey I* only bolsters this Court's conclusion.

In *Duncan*, the Delaware Supreme Court considered a certified question from the Eleventh Circuit concerning the appropriate method of calculating contract damages where an issuer's temporary suspension of a shelf registration in violation of the terms of a merger agreement prevented trading by stockholders.  775 A.2d at 1021.  When TheraTx, Inc. and PersonaCare, Inc. merged, PersonaCare stockholders received restricted, unregistered shares in TheraTx.  *Id.* at 1020–21.  Under the terms of the merger agreement, TheraTx was required to file a shelf registration that would permit the stockholders to trade the shares if TheraTx elected

12

to undertake a public offering.  *Id.* at 1021.  TheraTx conducted an initial public offering of its

shares and filed a shelf registration for the restricted shares, but had to suspend the shelf

registration and re-impose the trading restrictions on the shares held by the stockholders

thereafter as the result of certain events.  *Id.*  The suspension lasted for approximately six

months, and the stockholders sued TheraTx thereafter for breach of the merger agreement.  *Id.*

The *Duncan* court held that:

> [C]ontract damages in this situation are measured by calculating the difference
> between (1) the highest intermediate price of the shares during a reasonable time
> at the beginning of the restricted period, which functions as an estimate of the
> price that the stockholders would have received if they had been able to sell their
> shares, and (2) the average market price of the shares during a reasonable period
> after the restrictions were lifted.

*Id.* at 1020.  The court explained that the standard remedy for breach of contract is based upon

the reasonable expectations of the Parties *ex ante*, and as a result, expectation damages must be

measured by the "amount of money that would put the promisee in the same position as if the

promisor had performed the contract."  *Id.* at 1022.  The court found that because under the

merger agreement the shareholders were entitled to trade their shares for a period of two years in

the event TheraTx conducted an initial public offering (which it did), they had "reasonably

expected to have the maximum freedom to choose when to trade their shares during this period

and at what price."  *Id.*  The *Duncan* court recognized the determinations related to the

shareholders' "lost expectation interest"—which is "the reduction in the stockholders'

presumptive capital gains attributable to the trading restrictions"—are "necessarily hypothetical."

*Id.*

Defendant first argues that *Duncan* is distinguishable because at the time *Duncan* was

decided, Rule 144 still contained the one-year prohibition on trading so that the *Duncan*

shareholders were precluded from any trading during the six-month suspension.  This argument is unpersuasive.  As the *Duncan* court explained, the remedy for breach of contract is based upon the reasonable expectation of the parities, and is measured by damages that would put the promisee back into a position that he or she would have been had the promisor not breached the contract.  *Id.* at 1022.  Both the *Duncan* shareholders and the Shareholders here contracted for the right to *registered* shares in the respective merger agreements, and did not receive that bargained-for right.  It does not matter whether Rule 144's prohibition period was one year or six months because, as will be explained in greater detail *infra* Section IV.A.2.c, the ability to trade registered stock is different from the ability to trade stock using Rule 144.  The *Stuckey I* Court in this case already explained that "[t]he availability to plaintiffs of Rule 144 . . . did not dispense with the harm suffered as a result of ORC's refusal to file a registration statement. . . . While Rule 144 has greatly aided the resale of restricted and control securities . . . numerous requirements and conditions remain."  *Stuckey I*, 2009 WL 5030794, at *8.  Furthermore, Shareholders "would not have had to ensure compliance with the requirements of Rule 144, with the potential for liability associated with Rule 144 resales, had a registration statement been in effect."  *Id.* at *9.  *Duncan* is not distinguishable because Rule 144's prohibition period has since been reduced.

ORC argues next that *Duncan* is distinguishable because there was no price protection option available to the *Duncan* shareholders.  This contention is also unconvincing.  The Shareholders contracted with ORC for *both* registered shares and price protection rights, as separate, bargained-for consideration, and Stuckey has alleged that "the combination of these rights increased the effective value of the deal with PRC substantially above the $45,000,000 shares and stock purchase consideration."  (Doc. 73.)  The fact that the Shareholders bargained

14

for rights in addition to the registration of their shares does not make the facts of this case distinguishable from those of *Duncan*.  Surely there were bargained-for rights in *Duncan* that were in addition to the right to registered shares, and different from the rights bargained for here, but does not make *Duncan* inapplicable.

Finally, ORC argues, unconvincingly, that the *Duncan* Court did not discuss the shareholders' ability to capture profits through sales on secondary market.  Presumably ORC is arguing that the Shareholders in this case could have mitigated damages by selling their shares on a secondary market.  But the Shareholders had no duty to do so where they had a contractual right to registered, freely tradable shares.  *See Duncan*, 775 A.2d at 1022 (explaining that the right to have registered shares is the right to "have the maximum freedom to choose when to trade their shares . . . and at what price").  A discussion of secondary markets was not necessary in *Duncan*, nor is it here.  This Court concludes that *Duncan* applies and provides the applicable measure of damages in this case.

### 2. Robak's Expert Report

ORC argues that Robak's expert report is both too speculative and too incorrect to prevail past the summary judgment stage.  ORC attacks the expert report's accuracy on the following three grounds: (1) Robak failed to offset any alleged damages by the actual profit made by at least two Shareholders, Fromm and Scott Evans, who sold their shares at a profit before August 2008; (2) Robak failed to account for the fact that as of February 15, 2008, Shareholders were able to sell under Rule 144; and (3) Robak did not give weight to price protection rights.  Again, this Court finds ORC's arguments unpersuasive.

### a. Too Speculative

ORC argues that Robak's damages analysis constitutes "speculation about what might have occurred." (Doc. 61.) Stuckey disagrees and argues that *Duncan* itself negates this argument.

The *Duncan* Court held that because TheraTx had promised to provide registered shares, the shareholders "reasonably expected to have maximum freedom to choose when to trade their shares during this period and at what price" and that TheraTx's "breach of the merger agreement . . . caused this expectation to be disappointed." 775 A.2d at 1021. The method of calculating damages provided by the *Duncan* Court is not speculative, but "necessarily hypothetical" because the Court is dealing with "[t]he stockholders' lost expectation interest." *Id.* at 1022. The damages calculation provides a "satisfactory estimate of the sale price that the [shareholders] would have obtained absent the breach by [defendant]." *Id.* at 1023. ORC cannot argue, therefore, that the damages calculation Robak used—which ORC admits is "a straight-forward calculation" based on *Duncan*, (Doc. 61)—is too speculative because any uncertainty related to the calculation is a direct result of ORC's breach of contract. Robak's calculation is "necessarily hypothetical" since he is dealing with the Shareholders' "lost expectation interest" under the MA. *See Duncan*, 775 A.2d at 1022.

### b. Incorrect for Failure to Offset Actual Profits

ORC's first argument as to why Robak's expert report is so incorrect that it cannot proceed past the summary judgment stage is that the report fails to offset any alleged damages by the actual profits made by two Shareholders, Fromm and Evans, who sold their shares at a profit using Rule 144 before August 2008.

This Court is not persuaded by ORC's first argument.  The *Duncan* Court considered, for the purposes of its damages calculation, whether after the restriction was lifted, an average sale price or an actual sale price should be deducted from the highest intermediate price during the restricted period, and determined that the former approach was better.  775 A.2d at 1024–28. Whether a share price will rise or fall after an actual sale is inherently unknown, and therefore, it is also unknown, under an actual sale price approach, whether damages will be mitigated or exacerbated.  *Id.* at 1027–28.  The *Duncan* Court concluded that "the actual sale price rule is not an appropriate default method of calculating damages," because "the parties would be unlikely to bargain for such an uncompensated transfer."  *Id.* at 1028.  It follows that actual profits made by Fromm and Evans is not relevant under the *Duncan* court's method of calculating damages. Therefore, the fact that Robak failed to account for those profits does not make his expert report incorrect; rather, it means he was accurately applying the *Duncan* formula.  ORC has failed to establish that there is no genuine issue of material fact as to whether Robak correctly applied *Duncan* by arguing Robak failed to account for Fromm and Evans profits.

### c. Incorrect for Failure to Account for Rule 144

ORC next attempts to undermine Robak's expert report by arguing that Robak failed to account for the fact that as of February 15, 2008, Shareholders were able to sell under the amended Rule 144.  This Court has already rejected the reasoning that Rule 144 dispensed of the harm suffered by the Shareholders as a result of ORC's failure to file a registration statement in light the Court's opinion in *Stuckey I*, above, *see supra* Section IV.A.2.c, but will elaborate further here as to why ORC's Rule 144 argument made in the context of Robak's expert report is unpersuasive.

Plaintiff has provided evidence on the basis of which a reasonable jury could find for Plaintiff on the Rule 144 issue.  Stuckey explains that a Shareholder would be required to take numerous steps prior to selling ORC stock under Rule 144.  A Shareholder would have to contact ORC's outside counsel and obtain a legal opinion stating that the sale complied with the requirements of Rule 144, and the Shareholder would have to do so each and every time he or she wanted to sell stock.  Rule 144 also contains a "current public information requirement," which requires that "[a]dequate current public information with respect to the issuer of the securities must be available." 17 C.F.R. § 230.144(c).  Simply stated, the Shareholders would essentially have to vouch for ORC and the accuracy of its public information when using Rule 144.  Stuckey was advised that to trade shares under Rule 144, he must have held the shares for more than 12 months, and he had to agree to indemnify the brokerage from any violations of SEC rules resulting from the sale.  He was also advised that it would take four to six weeks to effectuate the sale.  An SEC website publication advised anyone attempting to sell restricted shares under Rule 144 to obtain an attorney specializing in securities law prior to effectuating such a sale.  Finally, Stuckey points out that ORC's general counsel, Bisignano, admitted that: "The 144 rule change is a stopgap that hopefully alleviates some pressure, but we are not viewing it as a permanent solution and have not reduced our intensity."  (Doc. 73-13.)

In sum, Plaintiff has presented evidence that trading unregistered shares using Rule 144 is not the same as trading registered shares, and *Duncan* provides a damages calculation method to use when a defendant has breached a promise to register shares.  The shareholders in *Duncan* and the Shareholders here bargained for the right to receive registered shares under certain circumstances, and did not receive those shares.  A reasonable jury, therefore, could find that it was unnecessary—even incorrect in light of *Duncan*'s precedent—for Robak to take into account

18

Rule 144 when computing damages in this case because Plaintiff has presented evidence demonstrating that trading unregistered stock under Rule 144 is not the equivalent of trading stock that has been registered.

### d. Incorrect for Failure to Account for Price Protection Rights

ORC's final argument as to why Robak's expert report is incorrect is that Robak failed to account for the Shareholders price protection rights. This Court held, *supra*, that the Shareholders contracted with ORC for *both* registered shares and price protection rights, as separate, bargained-for consideration. Therefore, a reasonable trier of fact could find that Robak did not need to account for the price protection mechanism when calculating damages resulting from ORC breach of the MA related to its failure to file a registration statement. ORC is simply making the same argument that it made in the context of attempting to distinguish *Duncan*, but that argument remains flawed.

### 3. Deprivation of the Opportunity to Sell During December 2007 and January 2008

ORC contends that Plaintiff has not set forth sufficient evidence to prevail at the summary judgment stage on the issue of damages because he has not shown that "he intended, desired, or was deprived of the opportunity to sell" when ORC's stock was up 8-10% over the $11.15 issue price during December 2007 and January 2008. (Doc. 61.) ORC explains that Stuckey "could have achieved greater gains in May and June 2008" by exercising his price protection rights and selling the ORC stock pursuant to Rule 144 because the ORC shares hit a higher relative price in June 2008, and stayed there longer, than in December 2007 and January 2008. (*Id.*) Therefore, even if Stuckey had presented sufficient evidence that the Shareholders were deprived of an opportunity to sell, ORC argues, "they suffered no harm by being precluded

from selling in December 2007 and January 2008." (*Id.*)  Defendant supports this argument by

pointing out that Shareholder Fromm sold his shares at a profit in June 2008.

Stuckey counters by pointing out that whether the Shareholders would have actually sold

at the highest price during December 2007 and January 2008 is irrelevant under *Duncan*.  The

*Duncan* court specifically rejected the same argument, reasoning that:

> The injury here is not the loss of a specific transaction but the loss of the ability to
> trade the shares as desired . . . [B]ecause the primary effect of the breach is to
> cause a "deprivation of [the stockholder's] range of elective action," the plaintiff
> is not required to show that she would have sold the shares during the restricted
> period.

775 A.2d at 1022 n.7 (citing *Am. Gen. Corp. v. Cont'l Airlines Corp.*, 622 A.2d 1, 10 (Del. Ch.

1992), *aff'd,* No. 251, 1992, 1992 WL 426435 (Del. Dec. 28, 1992)).

In *Am Gen. Corp.*, relied on by *Duncan,* a lender to a target corporation brought an action

against the target corporation and its acquiring corporation, alleging that the target corporation

had breached a provision in a loan agreement.  622 A.2d at 3.  According to the lender, the

provision provided that the lender was entitled to receive the same stock option that was given to

employees of the target corporation as part of the merger between the two corporations.  *Id.*  The

court found for the lender, and after a trial on damages, the sole issue before the court was what

damages were suffered by the lender because of the corporations' failure to make provisions for

the lender to receive the same option that the employees received.  *Id.* at 5.

The defendant corporations argued, *inter alia*, that the lender could not recover damages

because it would not have sold the securities at issue during the period when the acquiring

corporation was trading at prices that would make a sale attractive.  *Id.* at 9.  In other words, the

defendants were essentially arguing that the lender had to prove that it would have sold the

20

securities during the period for which it was claiming damages.  *Id.*  The *Am Gen. Corp.* court

rejected this argument, reasoning that:

> The injury the plaintiff suffers is the deprivation of his range of elective
> action . . . . To require plaintiff to show that he would have sold his securities, had
> he been able, is to require him to prove that he would have taken the "very steps"
> that defendant's "wrongful act . . . precluded him from taking. . . ."
>
> The defendant's acts prevent a court from determining with any degree of
> certainty what the plaintiff would have done with his securities had they been
> freely alienable.

*Id.* at *9−10 (citing *Kaufman v. Diversified Indus., Inc.*, 460 F.2d 1331, 1336 (2d Cir. 1972)).

This Court agrees with the reasoning of the courts in *Duncan* and *Am Gen. Corp.*  The

Shareholders do not need to show that they "intended, desired, or was deprived of the

opportunity to sell" when ORC's stock was up 8-10% over the $11.15 issue price during

December 2007 and January 2008.  (Doc. 61.)  Their injury is the deprivation of their range of

elective action.  *See Am. Gen. Corp.*, 622 A.2d at 9−10.  This Court will not require Plaintiff to

set forth evidence that the Shareholders would have sold their securities on a specific day

because doing so would require them to show that they would have taken the very steps that

ORC's failure to register precluded them from taking.  *Id.*

ORC argues that even if Stuckey had presented sufficient evidence that the Shareholders

were deprived of an opportunity to sell, "they suffered no harm by being precluded from selling

in December 2007 and January 2008" because the Shareholders could have achieved greater

gains in May and June of 2008.  (Doc. 61.)  ORC is again making an argument related to Rule

144 since the ORC shares were not registered in May and June of 2008.  This Court has already

addressed and rejected ORC's Rule 144 arguments.

ORC has therefore failed to meet its burden of demonstrating "there is no genuine dispute as to any material fact" related to Stuckey's breach of contract claim. *See* Fed. R. Civ. P. 56(a). Rather, there is evidence that a "reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. Therefore, this Court **DENIES** ORC's Summary Judgment Motion on Stuckey's breach of contract claim.

### B. Common Law Fraud Claims[4]

The elements of fraudulent misrepresentation are essentially the same as those for fraudulent nondisclosure and fraudulent inducement, and Stuckey brings all three fraud claims in his amended complaint. *Stuckey II*, 2011 WL 4953372, at *7 (citing *Gentile v. Ristas*, 828 N.E.2d 1021, 1033–34 (Ohio Ct. App. 2005)); (Doc. 37). The elements of common law fraud under Ohio law are: (1) a representation or, when there is a duty to disclose, a concealment of fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance on the representation or concealment; and (6) an injury proximately caused by that reliance. *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998). ORC contends that the evidence Plaintiff has offered fails to demonstrate that he can prove element (5), justifiable reliance, of his common law fraud claims.

---

[4] ORC filed its Summary Judgment Motion prior to this Court's decision on ORC's motion to dismiss Stuckey's amended complaint. As a result, ORC incorporated by reference the arguments it made with respect to Stuckey's common law fraud claims in that motion to dismiss, into its Summary Judgment Motion. In *Stuckey II*, this Court rejected all of ORC's arguments related to Stuckey's common law fraud claims. 2011 WL 4953372, at *7–14. As a result, there is no need for the Court to discuss those arguments again here.

<u>1. Fraudulent Misrepresentations and Non-Disclosures (Count II)</u>

In the amended complaint, Plaintiff alleges that ORC made fraudulent misrepresentations and non-disclosures that induced the Shareholders to enter into the MA and elect to receive approximately $24.7 million of the purchase price in ORC stock rather than in cash. Specifically, Plaintiff alleges that ORC made certain misrepresentation in the MA that it knew were false in light of the pending but non-public SEC review that precluded a registration statement from being filed.  Plaintiff also alleges that ORC failed to disclose the SEC review despite having a duty to do so.

ORC argues that the Shareholders could not have relied on the misrepresentations and non-disclosures because "[m]any of them lacked sufficient knowledge of what registration meant or what the process involved for disclosure of the SEC comment letter to have had any meaning."  (Doc. 61.)  Defendant relies upon deposition testimony from three Shareholders to support this argument.  Shareholder Fromm, for example, testified that he did not know the difference between registered and unregistered stock.

Plaintiff makes three arguments in response.  First, Plaintiff argues that Section 14.7 of the MA shows justifiable reliance because it provides that "each party has regarded as material and/or has relied upon only those representations and warranties expressly set forth herein." (Doc. 73-1.)  Next, Plaintiff points to his own deposition testimony in which he testified that he relied upon the representations and warranties in the MA.  Because he is the Shareholder representative, Plaintiff argues, misrepresentations as to him are misrepresentations as to the entire groups of Shareholders.  (Doc. 73) (citing *Brevoort v. Int'l Fin. Res., Inc.,* No. 93AP-977, 1993 WL 546579, at *4 (Ohio Ct. App. Dec. 30, 1993) ("Clearly, fraud upon an agent to induce the agent to act on behalf of his principal is fraud upon the principal.")).  Finally, Plaintiff argues

23

that under the Ohio Supreme Court's precedent in *Cope v. Metropolitan Life Insurance Company*, evidence of reliance on a material, common omission is presumed.[5] (Doc. 73) (citing 696 N.E.2d 1001, 1008 (Ohio 1998)).

In *Churches of Christ in Christian Union v. Evangelical Benefit Trust*, this Court held that a provision in an agreement stating that a defendant would rely on the statements and information set forth in the agreement was enough to create a genuine issue of material fact as to whether defendant had justifiably relied on a plaintiff's representations contained in that agreement. No. C2-07-CV-1186, 2009 WL 2146095, at *10–12 (S.D. Ohio July 15, 2009). The plaintiff in *Churches of Christ* was a nonprofit corporation Christian denomination, and the defendant was a trust established by churches to provide health and welfare benefits to eligible employees and dependents of members of the churches. *Id.* at *1. Plaintiff was solicited by defendant to take part in the trust, and there was allegedly miscommunication between the parties regarding a requirement that 70% of plaintiffs' ministers participate in the trust even if those ministers were not compensated by the plaintiff. *Id.* Plaintiff argued that it had never been informed of this requirement, and if it had been, it would have terminated discussions with defendant because plaintiff was not in a position to prove coverage for 70% of its ministers. *Id.* Plaintiff completed an application agreement, in which it allegedly misreported the number of

---

[5] The *Cope* case was decided in the context of a class certification question where an argument was made that proof of reliance on each alleged fraudulent misrepresentation or omission would be required of each class member. 696 N.E.2d at 1003–04. The Court rejected that argument finding that "[c]ourts generally find that the existence of common misrepresentations obviates the need to elicit individual testimony as to each element of a fraud or misrepresentation claims, especially where written misrepresentations or omissions are involved." *Id.* at 1004. Plaintiff argues the same reasoning should apply in this case where Defendant failed to disclose the pendency of the SEC review that began nearly two months prior to closing.

full- and part-time employees due, at least in part, to the plaintiff's confusion related to the participation requirement.  *Id.* at *2.

Plaintiff thereafter brought lawsuit against the defendant, asserting causes of action which arose of out defendant's refusal to pay claims submitted by plaintiff's employees after defendant discovered the alleged misrepresentations in the application agreement.  *Id.* at *4.  Defendant brought counterclaims for rescission and fraud, asserting that it had relied on the misrepresentations in the application agreement when determining the plaintiff's eligibility to participate in the trust.  *Id.* at *3.

In its motion for summary judgment, the plaintiff argued that the defendant could never prevail on the issue of justifiable reliance.  *Id.* at *10−12.  Defendant responded by pointing to language in the application agreement, which plaintiff had reviewed and signed, that stated: "We certify that we have read and agree to the above Participation Agreement and understand that [defendant] will rely on this statement and all information set forth herein as a basis for approving our organization's application for participation under the [trust]."  *Id.* at *10.  This Court found that a jury could find justifiable reliance given this language, and summary judgment on defendant's rescission and fraud claims was inappropriate.  *Id.* at *10−12.

Based on *Churches of Christ*, this Court concludes that a reasonable jury could find that there was justifiable reliance as a result of the language in Section 14.7 of the MA expressly stating that the Shareholders were relying on the representations and warranties set forth in the MA.  The MA is arguably the strongest evidence of the understanding between the Parties at the time of the merger in this lawsuit, and the fact that it specifically states that the Shareholders were relying on the representations within undercuts ORC's argument.

In addition, there is conflicting deposition testimony with respect to the issue of reliance. ORC has presented testimony that indicates certain Shareholders did not rely on its misrepresentations and non-disclosures, while Stuckey has presented testimony that there was, in fact, justifiable reliance.  Sufficient disagreement warrants submission of this evidence to a jury. *See Anderson*, 477 U.S. at 251–52; *Tapp v. Banks*, 1 F. App'x 344, 349–50 (6th Cir. 2001) (holding that summary judgment was not appropriate where the record failed to include "any indication that the district court considered the countervailing deposition testimony given by the appellant" where the "court must draw all reasonable inference in favor of the non-moving party").

Because this Court has found Plaintiff's first and second arguments persuasive, and holds the ORC has not met its burden on summary judgment, there is no need to address Plaintiff's third argument related to presumed reliance where there is a material, common omission.  This Court **DENIES** ORC's Summary Judgment Motion on Plaintiff's common law fraud claims in Count II.

### 2. Fraudulent Inducement (Count III)

In Count III of his amended complaint, Stuckey alleges that ORC fraudulently induced the Shareholders to exercise their price protection rights on or around May 10, 2008.  ORC made the following statements upon which the Shareholders allegedly relied in deciding to exercise their rights under the price protection provision of the MA: (1) on March 12, 2008, that ORC was "still pursuing [registration]" and had not "reduced [its] intensity," (2) on May 2, 2008, that "[t]he goal would be to file the S-1 right after we file our 10-Q, which is scheduled for May 10 at the latest," and (3) on May 6, 2008, that "[w]e are planning to file within the next couple of weeks."  (Am. Compl. ¶ 153.)  Stuckey alleges that by exercising their price protection rights in

May 2008 rather than August 2008, the Shareholders suffered additional harm because the ORC stock continued to decline after May of 2008.

ORC again challenges element (5) of Stuckey's fraud claim, justifiable reliance, arguing that the "undisputed evidence shows that the [Shareholders] did not actually rely on the alleged representations in deciding to exercise price protection."  (Doc. 61.)  Defendant supports this contention with the deposition testimony of three Shareholders who stated that they exercised their price protection rights because they thought ORC's shares were at a price that would maximize the value of the price protection.  Defendant argues that Stuckey cannot point to any evidence indicating any Shareholder, other than himself, was influenced by the statements made by ORC in March and May 2008.

Defendant also challenges Robak's calculation of damages based on the Shareholders' exercise of their price protection rights in May 2008 rather than August 2008.  ORC argues that it is "wholly irrelevant that a former ITS shareholder would have received more shares, or greater value of stock, in August 2008 than they received in May 2008" because "[t]hat increase in the number of shares received results only from the fact that the price of Online Resources' shares was lower in August 2008 than in May 2008."  (Doc. 61.)  ORC continues that "[r]egardless of when price protection was exercised, the exercising former ITS shareholder would have been put in an identical position." (*Id*.)

Plaintiff retorts by presenting evidence that some of the Shareholders did rely on ORC's representations in making their decision to exercise their price protection rights.  Stuckey testified that he exercised his price protection rights in light of the assurances he received from ORC.  Crow, Shareholders' counsel, testified that one of the reasons that the Shareholders chose to exercise their price protection rights in May of 2008 was because of ORC's "continuing

27

promise of registration," (Doc. 73) (citing Doc. 65), and Shareholder Salvato testified that

ORC's representations were "an important factor" in his decision to exercise price protection,

(*id.*) (citing Doc. 70).

As for ORC's challenge to Robak's calculation of damages that resulted from the

exercise of price protection rights in May of 2008, Stuckey simply argues that if the Shareholders

had instead held their ORC stock until August 2008, "they would have been protected from

further declines during that intervening period" that amounted to approximately $2.7 million

worth of damages, and that "[a]t a minimum, genuine issues of material fact exist to preclude

summary judgment on this claim."  (*Id.*)

As was the case with Stuckey's common law fraud claims in Count II, there is sufficient

disagreement surrounding the issue of justifiable reliance on ORC's statements to warrant

submission of the evidence to a jury.  *See Anderson*, 477 U.S. at 251–52.  The Parties have

presented conflicting deposition testimony on the issue of reliance, making summary judgment

inappropriate.  *See Tapp*, 1 F. App'x at 349–50.

Furthermore, this Court finds ORC's damages argument that it is irrelevant whether the

Shareholders received more ORC shares, or greater value of shares, in August 2008 than in May

2008 because the increase was a result of ORC share value dropping unconvincing.  ORC is

implicitly assuming that as soon as a Shareholder exercised his or her price protection rights and

received additional ORC stock, he would immediately turn around and sell the ORC stock.

However, there are still genuine issues of material fact surrounding Rule 144 and a Shareholder's

ability to sell his or her ORC stock between May 2008 and August 2008.  Had a Shareholder

exercised his or her price protection rights in May of 2008, received additional stock from ORC,

and then held onto the ORC stock which declined in value thereafter, that Shareholder would

have sustained a loss due to decline in stock value that he or she could have avoided had he or she waited to exercise price protection until August 2008.  ORC's argument is not well-taken by this Court, and it is clear that ORC has not met its burden of demonstrating no genuine issues of material fact exist as to Stuckey's fraud claim in Count III.  *See Celotex*, 477 U.S. at 322–23.

This Court **DENIES** ORC's Summary Judgment Motion on Plaintiff's common law fraud claims in Count III.

### *C. Fraud Under Ohio Revised Code Chapter 1707*

In Count IV of his amended complaint, Stuckey alleges ORC violated certain provision of the Ohio Securities Act.  First, Stuckey alleges that ORC violated Ohio Revised Code § 1707.44(B)(4) by knowingly making false representations concerning material facts in oral and written statements for purposes of selling ORC stock to the Shareholders.  Stuckey also alleges that ORC violated Ohio Revised Code §1707.44(G) by knowingly engaging in acts and practices that were illegal, fraudulent, or prohibited by the Ohio Securities Act, "including making false representations of material fact, and failing to disclose material acts relating to the existence of the pending SEC review."  (Am. Compl. ¶ 166.)

ORC asks this Court to grant summary judgment in its favor as to Stuckey's Ohio Securities Act claims.  ORC makes the same arguments here as it did when it argued that Stuckey's common law fraud claims in Count II should fail, except ORC posits its arguments under the guise of attacking the materiality element of Stuckey's Ohio Securities Act claims.  ORC argues that the evidence shows that there was "no materiality to the alleged misrepresentations" because the Shareholders could not have "viewed [the SEC review] as material to their decision to elect to receive Online Resources stock" as "[m]any of them lacked sufficient knowledge of what registration meant or what the process involved for disclosure of

the SEC comment letter to have had any meaning." (Doc. 61.) ORC does not cite any case law when making this argument, but supports it with the same deposition testimony that it used to support its contention that Stuckey cannot show justifiable reliance as to his Count II common law fraud claims.

Stuckey counters that Defendant has failed to demonstrate that ORC's misrepresentation in the MA and non-disclosure of the SEC review fall short of the materiality requirement under the Ohio Securities Act.  Because the Ohio Supreme Court in *In re Columbus Skyline* held that the definition of "fraud" or "fraudulent" under the Ohio Securities Act includes the definition announced in federal securities decisions, the definition of "material" announced by the United States Supreme Court in federal securities decisions should apply in the context of his Ohio Securities Act claims. (Doc. 73) (citing *Holderman v. Columbus Skyline Secs. (In re Columbus Skyline)*, 666 N.E.2d 495, 497 (Ohio 1996)).  Thus, "a statement is material if there is a substantial likelihood that a reasonable investor would have viewed the misrepresentation or omitted fact as having significantly altered the total mix of information available." (*Id.*) (citing *TSC Indust., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *Basic Inc. v. Levinson*, 485 U.S. 224, 231−32 (1988) (adopting expressly the *TSC Industries* standard of materiality in the § 10(b) and Rule 10b-5 context)).  Materiality "does not require proof of a substantial likelihood that proper disclosure would have caused an investor to change a decisions" but rather, "proof that proper disclosure would have significantly altered the 'total mix' of available information." (*Id.*) (citing *TSC Indust.*, 426 U.S. at 449).  Stuckey also quotes deposition testimony from Shareholder Salvato in which he testified, *inter alia*, that he "was very concerned about the stock being registered because [he] understand[s] the difference between registered and unregistered securities." (*Id.*) (citing Doc. 70).

Section 1707.44(B)(4) of the Ohio Revised Code provides: "No person shall knowingly make or cause to be made any false representation concerning a material and relevant fact, in any oral statement or in any prospectus, circular, description, application, or written statement, for any of the following purposes . . . . Selling any securities in this state."  Section 1707.44(G) states: "No person in purchasing or selling securities shall knowingly engage in any act or practice that is, in this chapter, declared illegal, defined as fraudulent, or prohibited."  O.R.C. § 1707.44(G).  Furthermore, "fraud" or "fraudulent" is defined under the Ohio Securities Act as:

> anything recognized on or after July 22, 1929, as such *in courts of law or equity*; any device, scheme, or artifice to defraud or to obtain money or property by means of any false pretense, representation, or promise; any fictitious or pretended purchase or sale of securities; and any act, practice, transaction, or course of business relating to the purchase or sale of securities that is fraudulent or that has operated or would operate as a fraud upon the seller or purchaser.

O.R.C. § 1707.01(J) (emphasis added).  It is the italicized language that led the Ohio Supreme Court to hold in *In re Columbus Skyline* that the definition of "fraud" or "fraudulent" incorporates federal securities decisions.  666 N.E.2d at 498 ("[T]he legislature broadly drafted R.C. 1707.01(J) to draw from *all* securities case law defining fraudulent conduct in both state and federal courts.") (emphasis in original).

"Material" or "materiality" is not defined anywhere in the Ohio Securities Act.  Stuckey's reasoning as to why the definition of "material" as set forth in the United States Supreme Court securities case law is persuasive in light of the Ohio Supreme Court's precedent in *In re Columbus Skyline*.  This Court has not found any case law explicitly adopting Stuckey's

31

reasoning; nor has this Court found any case law indicating Stuckey's definition of "material" is

incorrect,[6] and ORC presents no case law or legal arguments briefing this issue.

Regardless, it is clear the ORC has not met its burden on summary judgment.  As the

United States Supreme Court explained in *TSC Industries*:

> The issue of materiality may be characterized as a mixed question of law and fact,
> involving as it does the application of a legal standard to a particular set of facts.
> In considering whether summary judgment on the issue is appropriate, we must
> bear in mind that the underlying objective facts, which will often be free from
> dispute, are merely the starting point for the ultimate determination of materiality.
> The determination requires delicate assessments of the inferences a "reasonable
> shareholder" would draw from a given set of facts and the significance of those
> inferences to him, and *these assessments are peculiarly ones for the trier of fact.*
> Only if the established omissions are "so obviously important to an investor, that
> reasonable minds cannot differ on the question of materiality" is the ultimate issue
> of materiality appropriately resolved "as a matter of law" by summary judgment.

426 U.S. 438, 450 (1976) (emphasis added).  This Court, therefore, may only grant summary

judgment in ORC's favor if the alleged fraudulent misrepresentations and omissions are so

obviously unimportant to a Shareholder that reasonable minds cannot differ on the question of

materiality.  The evidence presented by both Parties demonstrates that there is a genuine issue of

material fact as to whether a reasonable investor would have viewed ORC's misrepresentations

and omissions as material.  Thus, ORC's Summary Judgment Motion on Plaintiff's Ohio

Securities Act claims in Count IV is **DENIED**.

---

[6] There are some Ohio courts who have adopted a different definition of material in the context of
fraudulent misrepresentation claims.  *See Saxe v. Dlusky*, No. 09AP 673, 2010 WL 4324198, at * 10
(Ohio Ct. App. Nov. 2, 2010) (citing *Brannon v. Mueller Realty & Notaries*, No. C-830876, 1984 WL
7018, *3–4 (Ohio Ct. App. Oct. 24, 1984)) ("In the fraud context, a misrepresentation of fact is material
when, under the circumstances, it would likely affect the conduct of a reasonable person in determining
whether to enter into the transaction at issue.").  But these cases were decided in the context of common
law fraud claims rather than fraud claims under the Ohio Securities Act, and fraud has been defined more
broadly under the Ohio Securities Act than it has under the common law.

*D. Rescission*

As a result of ORC's alleged fraudulent misrepresentations and omission in violation of the Ohio Securities Act, Stuckey asks this Court for rescission pursuant to Ohio Revised Code § 1707.43(A).  Specifically, Stuckey alleges that the Shareholders "are entitled to void the exchange for Defendant's Stock and receive their $24,713,061 purchase price for the Stock, plus other costs incurred in this matter."  (Am. Compl. ¶ 166.)

ORC makes the same argument in its Summary Judgment Motion that it made in its motion to dismiss Plaintiff's amended complaint—that while Plaintiff couches his claim as one for rescission, he is actually asking this Court to change the MA.  *Compare* (Doc. 57) ("Plaintiff seeks an alternative remedy that would allow the ITS stockholders now to receive cash in exchange for the ORC shares they elected to receive at closing.") *with* (Doc. 61) ("Plaintiff sought to have this Court change the Agreement. . . . what Plaintiff now wishes to do is to change the very feature that Plaintiff and the other former ITS shareholders found distinguished Online Resources' proposal, namely the inclusion of stock.").  ORC cites no case law to support the arguments related to rescission that it makes in its Summary Judgment Motion.  Rather, it argues that discovery has confirmed that Plaintiff's request is "not a rescission at all."  (Doc. 61.) The discovery ORC refers to is Shareholder deposition testimony in which Shareholders testified that the merger with ORC was attractive because of the inclusion of stock.

This Court has already rejected ORC's argument that Stuckey is not asking for rescission, but for a modification of the MA in *Stuckey II*.  2011 WL 4953372, at *14–15 ("Defendant offers no law to refute the proposition that . . . Plaintiff's 'alternative remedy' falls within to 'full amount' contemplated by R.C. § 1707.43(A). . . . it is possible for the parties to be restored to their former position by other means.").  Because ORC has offered no new arguments as to why

33

Stuckey's rescission claim should fail and presented no persuasive evidence, ORC's request for summary judgment on Stuckey's rescission claim is **DENIED**.

### E. Stuckey as a Representative

ORC runs into the same problems with respect to its argument that Stuckey cannot act as a Shareholder representative as it does with its argument that Stuckey's rescission claims should fail at the summary judgment stage.  ORC argues that Stuckey cannot act as a Shareholder representative because the question of whether each Shareholder justifiably relied is an individualized one.  ORC points only to the same deposition testimony of Fromm, Evans, and Salvato that it used to argue Plaintiff cannot show justifiable reliance on his common law fraud claims to support this claim.  Yet, this Court already rejected ORC's argument at the motion to dismiss stage:

> Taken in a light most favorable to Plaintiff, this Court finds that the fraud claims as alleged in the Amended Complaint can be construed as "involving" the Agreement, insofar as Plaintiff's representation is concerned, including those fraud claims that may require individual review of reliance at the pertinent time.

*Stuckey II*, 2011 WL 4953372, at *17.  Stated simply, this Court has held that because Section 2.12 of the MA states that Stuckey can act as a Shareholder representative in any litigation involving the MA, and the fraud claims involve the MA, ORC's argument related to individual reliance is unpersuasive.  Thus, this Court hereby **DENIES** ORC's Summary Judgment Motion with regard to its argument that Stuckey may not act as the Shareholder representative.

## V. CONCLUSION

For the foregoing reasons, Defendant's Summary Judgment Motion is **DENIED**.

**IT IS SO ORDERED.**


 **s/ Algenon L. Marbley**
**Algenon L. Marbley**
**United States District Judge**

**Dated: February 13, 2012**