**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **KENT D. STUCKEY,** | : | |
| | : | **Case No. 2:08-CV-1188** |
| **Plaintiff,** | : | |
| | : | **JUDGE ALGENON L.** |
| **v.** | : | **MARBLEY** |
| | : | |
| **ONLINE RESOURCES CORPORATION,** | : | **Magistrate Judge Terence Kemp** |
| | : | |
| **Defendant.** | : | |

## BENCH OPINION

### I. INTRODUCTION

Plaintiff Kent Stuckey ("Plaintiff" or "Stuckey") brought this action against Defendant Online Resource Corporation ("Defendant" or "ORC") in December 2008.  Stuckey seeks recovery based on his remaining claims for breaches of a merger agreement, fraud, and breach of an escrow agreement.  This Court presided over a bench trial on issues of liability and damages.  For the reasons set forth below, the Court finds in Plaintiff's favor, and Plaintiff must submit his election of remedies within 30 days of this Bench Opinion, at which time **FINAL JUDGMENT** will be entered.

### II. PROCEDURAL HISTORY

Stuckey's original complaint was filed against ORC on December 19, 2008.  ORC filed a motion to dismiss thereafter, which was granted in part and denied in part on December 11, 2009.  *Stuckey v. Online Res. Corp.*, No. 2:08-cv-1188, 2009 WL 5030794, at * 20 (Dec. 11, 2009) ("*Stuckey I*").

With the Court's consent, Stuckey filed an amended complaint on April 16, 2010, alleging: (1) breach of contract arising from failure to file a registration statement, breach of the price protection clause, breach of ORC's obligation to complete the termination of the Internet Transaction Solutions, Inc. ("ITS")  profit sharing plan, and breach of terms of the escrow agreement requiring distribution of all funds therein to ITS stockholders (Count I); (2) fraudulent misrepresentation and fraudulent non-disclosure (Count II); (3) fraudulent inducement of ITS stockholders to elect price protection on or around May 10, 2008 (Count III); and (4) securities fraud under the Ohio Securities Act, Ohio Revised Code Chapter 1707 (Count IV).  ORC again filed a motion to dismiss, this time requesting that the Court dismiss all of Stuckey's claims except for breach of contract claims arising from breach of the price protection clause and breach of the escrow agreement.  This Court granted the second motion to dismiss, in part, on two claims that were not incorporated by Stuckey into the enumerated counts and on the breach of contract claim resulting from ORC's obligation to terminate ITS's profit sharing plan (portion of Count I).  *Stuckey v. Online Res. Corp.*, 819 F.Supp.2d 673, 693 (2011) ("*Stuckey II*").  As to the remainder of Stuckey's claims, the motion to dismiss was denied.  *Id.*

Before this Court ruled on the second motion to dismiss, ORC filed a summary judgment motion, asking this Court to grant summary judgment in its favor as to Stuckey's claims for breach of contract for failure to file a registration statement for ORC stock (part of Count I); breach of contract for failure to terminate the ITS profit sharing plan (part of Count I); common law fraud, including fraudulent misrepresentation, fraudulent non-disclosure, and fraudulent inducement (Counts II and III); and securities fraud under the Ohio Securities Act (Count IV).  This Court denied ORC's summary judgment motion in its entirety.  *Stuckey v. Online Res. Corp.*, No. 2:08-cv-1188, 2012 WL 468510, at *20 (Feb. 13, 2012) ("*Stuckey III*").

2

A seven-day bench trial ensued.  This Court now issues the following findings of fact and conclusions of law.

### III. FINDINGS OF FACT

*A. The Parties*

ORC is a publicly traded corporation that was incorporated in Delaware and has its principal place of business in Virginia.  (Stip. 1.)  Stuckey brought this case on behalf of the ITS stockholders, as the stockholder representative upon agency and authority established by the parties' merger agreement.[1]  (P Exs. 5, 286.)  Stuckey is the stockholder representative for: Internet Transaction Solutions, LLC; Value Recovery Group, Inc.; New Ridge LLC; PWI Inc.; G Tek LLC; Barry H. Fromm; Eben L. Kent; Mark S. Johnson; Robert J. Massey; John G. Ritchey; Sudhir and Anjali Sehgal; Richard and Cheryl Evans CRUT; Scott Evans CRUT; and Scott Evans GRAT (collectively referred to as "ITS Stockholders").

ITS was founded in Columbus, Ohio in May 1999, and provided specialized electronic payment services to accounts receivable management and utilities industries.  (Stip. 2; Tr. 11–12.)  ITS became cash positive in approximately 2003.  (Tr. 20.)  It was an industry leader in the accounts receivable management industry for electronic payments in 2006.  (Tr. 402, 632–33.)

---

[1] Section 2.12 of the merger agreement names Stuckey as the ITS stockholder representative and authorizes him to:

> [A]ct on behalf of [the ITS stockholders] in any litigation or arbitration involving this Agreement . . . including, without limitation, the power: . . .
>
> . . . .
>
> (f) to do or refrain from doing any further act or deed on behalf of the Stockholders that [he] deems necessary or appropriate in [his] sole discretion relating to the subject matter of this Agreement as fully and completely as the Stockholders could do if personally present; . . . .

(P Ex. 5.)

*B. The Sale of ITS*

ITS decided to explore whether to sell the business in 2006.  (Tr. 634; Stip. 3.)  The company retained an investment banking firm, Lane Berry, to seek advice on whether it was a good time to sell.  (Tr. 21−22.)  After consulting with Lane Berry, the ITS board decided to have Lane Berry conduct a competitive bid auction process for potential sale of ITS.  (Tr. 23−24.) Forty-five companies expressed interest in ITS, management presentations were made by ITS to eighteen of the forty-five companies, and the sale eventually came down to three bidders: ORC, Jack Henry, and TransFirst.  (Tr. 23−25.)

ORC initially proposed a merger for $40 million that would allow ITS Stockholders to elect to accept a minimum of 40% and a maximum of 90% of the purchase price in "registered Online common stock with any remainder paid in cash at closing."  (Tr. 32, 756−60; P Ex. 2.) ORC also offered price protection for twelve months after the closing "such that selling shareholders will have the opportunity to achieve at least the cash purchase equivalent price for the stock portion of their consideration."  (P Ex. 2.)  In addition to the benefits to the ITS Stockholders in the proposed merger, ORC would benefit from offering ORC stock as part of the consideration because, the more ORC stock the ITS Stockholders took, the less cash drain would be imposed on ORC.  (Tr. 255−56, 761.)  ORC later increased its offer to $45 million.  (Tr. 115; D Ex. 1.)

The ITS Stockholder selected ORC as the winning bidder.  (Tr. 256–57; P Ex. 5.) Certain ITS Stockholders testified credibly at trial that they liked the upside potential of registered ORC stock, coupled with the downside price protection, and that ORC was willing to agree to impose certain terms and representations contained in the draft stock purchase agreement, subject to necessary changes to convert the deal from a stock purchase to a merger

4

transaction.  (Tr. 35–37, 117, 635–36.)

### C. The Merger Agreement

Stuckey and ITS Stockholders' legal counsel, Scot Crow, worked with ORC's general counsel, Michael Bisignano; chief financial officer, Catherine Graham; and outside counsel, Mark Wishner of Greenberg Traurig, to negotiate and close the transaction.  (P Ex. 5; Tr. 256–57.)  The merger agreement was entered into and signed on July 26, 2007.  (Tr. 145; Stip. 5.)

The merger consideration was a combination of cash and shares of ORC's common stock ("Buyer Stock") in the amount of $45 million, subject to certain adjustments.  (P Ex. 5 § 1.5.)  At closing, each ITS share was converted into a right to receive a combination of cash and Buyer Stock in specified amounts and percentages.  (P Ex. 5 § 2.3(d).)  Section 2.7(a) of the merger agreement set up the procedures by which each ITS Stockholder was entitled to elect what portion of the purchase price to receive in cash or Buyer Stock, but nothing in the merger agreement set forth the 40% to 90% range of Buyer Stock consideration referenced in ORC's original offer.  (P Ex. 5 § 2.7(a); Tr. 115.)  A minimum of approximately 40% of Buyer Stock, however, was necessary to achieve tax deferral on the Buyer Stock received.  (Tr. 255–56.)

The share price to be utilized to determine the number of shares issued to those ITS Stockholders who elected Buyer Stock in lieu of cash was the volume weighted average price ("VWAP") per share, calculated as of the date of the merger agreement, July 26, 2007.  (P Ex. 5 § 1.5.)  The VWAP of the Buyer Stock as of the date of the merger agreement was $11.1488 per share.  (Stip. 7.)

Under section 10.6 of the merger agreement, ORC unconditionally promised to "file with Securities and Exchange Commission (the '_SEC_') a registration statement covering the resale of the Buyer Stock (the '_Registration Statement_') within 90 days after the Closing and to have the

Registration Statement declared effective by the SEC as soon as practicable thereafter." (P Ex. 5 §10.6; Tr. 764) (emphasis in original). The merger agreement transaction closed on August 10, 2007, and 90 days from August 10 was November 8, 2007. (Stip. 6, 9.)

ORC's promise to register the Buyer Stock was important to the ITS Stockholders, as was made evident by testimony from Stuckey (owner of ITS Stockholder New Ridge LLC), Gregory Salvato (owner of ITS Stockholder GTek LLC), and Fromm at the trial. (Tr. 38, 637, 690–91.) It was an important factor in the ITS Stockholder's decision to enter into the merger agreement with ORC, rather than take an all-cash offer from one of the other bidders. (Tr. 39.) Registered Buyer Stock gave ITS Stockholders control and discretion as to when to sell their Buyer Stock and for what price. (Tr. 39.) Graham knew that ORC's promise to register Buyer Stock was an important and material provision of the merger agreement, and that the ITS Stockholders were relying on ORC's promise to register. (Tr. 764–65, 769–70.)

Section 2.6 of the merger agreement contains the price protection provisions, which gave any ITS Stockholder who had not sold any of his or her Buyer Stock the right to put it all back to ORC six, nine, or twelve months after closing. (P Ex. 5 § 2.6.) When an ITS Stockholder exercised his or her put right, ORC would, at its option, either (a) buy the Buyer Stock back for cash at the VWAP per share on the closing date, or (b) issue additional Buyer Stock to make up for the intervening price decline. (P Ex. 5; Tr. 257–58.) Under the merger agreement, any additional Buyer Stock obtained when exercising price protection rights was to be registered by November 8, 2007 as well. (P. Ex. 5 §§ 1.5, 2.6, 10.6.) Six months, nine months, and twelve months after the closing were February 10, May 10, and August 10, 2008, respectively. (Tr. 40.)

Price protection was, as ORC described it in its 2007 10-K, a "standalone derivative," meaning that it is considered to be a separate security from the ORC shares themselves. (Tr.

867–68.)  Price protection was carried as a separate liability on ORC's balance sheet and was

marked to market each quarter to reflect changes in the value of ORC's price protection

obligation driven by share price, share price volatility, and time to maturity.  (Tr. 867–69.)  The

price protection obligation was valued at $2.8 million at closing, which increased the value of the

total consideration for ITS to approximately $48.1 million.  (Leaverton Dep. 130–31; P Ex. 227.)

ORC also made various representations and warranties in the merger agreement.  (P Ex.

5.)  In section 4.2(d), ORC represented that "performance of this Agreement by [ORC] . . . does

not and will not . . . require any approval, consent, order, authorization, declaration or filing with

any person, entity or body, private or governmental, which failure to obtain would have a

Material Adverse Effect on the consummation of the transactions contemplated hereby."  (P Ex.

5 § 4.2(d).)  In section 4.2(b), ORC represented that the execution and delivery of the merger

agreement was not a "violation of . . . any material government law, rule, or regulation . . .

having applicability to [ORC] which would have a material adverse effect on [ORC] or the

transaction contemplated hereby."  (P Ex. 5 § 4.2(b).)  In section 4.5, ORC represented that there

was no "action, suit, investigation, subpoena or proceeding pending against Buyer."  (P Ex. 5 §

4.5.)  Finally, section 10.1 provided that "all representations and warranties contained . . . in

Sections 4.1 through 4.6 hereof, inclusive . . . shall be deemed to have been relied upon by the

other party, shall survive the execution and delivery of this Agreement and payment of the

Merger Consideration therefor."  (P Ex. 5 § 10.1.)

Prior to closing, ORC emailed ITS Stockholders documents to be considered in

connection with their election to receive Buyer Stock, including, ORC's 2006 Form 10-K, proxy

statement filed on April 17, 2007, Form 10-Q on May 10, 2007, and Forms 8-K filed on May 17,

2007, July 26, 2007, and August 1, 2007.  (P Ex. 14.)  ORC did not disclose any document or

reference to the ongoing non-public SEC comment letter and review of ORC's 2006 10-K, discussed *infra* Part III.E.  (P Ex. 14.)

The ITS Stockholders elected to accept $24,713,061.00 of the merger consideration in the form of Buyer Stock in lieu of cash, which resulted in 2,216,653 shares of Buyer Stock being issued to the ITS Stockholders.  (Tr. 38, 43; P Ex. 40 at ORC1-003911.)

### D. ORC's Stock Transfer Agent

Although the 2,216,653 shares of Buyer Stock were issued, they were retained in the possession of American Stock Transfer & Trust Company ("AS&T").  (Bisignano Dep. 237–40.) AS&T was instructed by ORC on September 21, 2007, to issue the Buyer Stock with a restrictive legend and that the "restricted shares should be issued in book entry form only and may not be transferred in the absence of an effective registration statement covering such transfer or an opinion from us [ORC] or our counsel that such transfer is exempt from registration." (Bisignano Dep. 237–41; P Ex. 31.)  Greenberg Traurig was ORC's legal counsel responsible for issuing such an opinion.  (Bisignano Dep. 240–41.)

### E. The SEC Comment Letter

On June 14, 2007, ORC received an SEC comment letter initiating a review of ORC's 2006 10-K.  (P Ex. 9; Tr. 770–71.)  All of the SEC's comments and questions in the letter had to be responded to and resolved prior to the SEC issuing a "no further comment" letter.  (Leaverton Dep. 61.)  Graham and Bisignano knew that the SEC would not allow the Buyer Stock to be declared effective until the SEC issued a "no further comment" letter.  (Tr. 772–73, 778; Bisignano Dep. 75–76, 114–15.)

KPMG, ORC's independent auditor, described the SEC comment letter as a "significant issue" for ORC.  (Leaverton Dep. 21, 59; P Ex. 204.)  ORC could not file a 10-K, 10-Q, S-1 or

8

S-3 without KPMG's consent and sign off.  (Leaverton Dep. 21, 59; P Ex. 204.)  Graham knew

an accounting firm would almost never consent to the filing of a registration statement while an

open SEC comment letter was pending.  (Tr. 801.)  Graham and Bisignano testified that at the

time of the closing, they did not know when the SEC comment letter would be cleared.  (Tr.

773–74, 800; Bisignano Dep. 75–76, 114–15; P Ex. 27.)

ORC and Graham also knew that neither the SEC comment letter, nor the SEC review

that it initiated, was publicly known or available at the time the merger agreement was executed

and closed.  (Tr. 772–73; P Ex. 24.)  No one at ORC disclosed the SEC comment letter or related

review to the ITS Stockholders or their legal counsel prior to signing the merger agreement or

the closing of the merger.  (Tr. 263, 272, 822–23; Bisignano Dep. 115.)  Crow testified that he

would have altered his recommendation that Buyer Stock was a viable alternative to cash

because the lack of liquidity put the ITS Stockholders at risk.  (Tr. 263.)  The ITS Stockholders

were relying on Crow, who would have advised them against accepting the Buyer Stock had the

SEC comment letter been disclosed.  (Tr. 272–73.)

*F. ORC's Communication Regarding the S-3*

Bisignano communicated to Crow that ORC's plan was to file a short form S-3

registration statement within a week or two after closing.  (Tr. 259–60.)  In an August 30, 2007

email responding to Salvato, Bisignano explained:

> We have the S-3 ready to file, but our 2006 10-K is under regular review by the
> SEC (they do a standard review every 2 years -- they last looked at our 10-K in
> 2004), and regulations do not allow an S-3 to become effective while there is an
> open comment letter on our 10-K (which is the primary document incorporated by
> reference in the S-3).

(Tr. 643–44; Bisignano Dep. 186; P Ex. 22.)  This was the first that Salvato had heard of the

SEC review.  (Tr. 644.)

9

The review was concluded by the SEC on October 11, 2007, about a month prior to the Buyer Stock registration deadline November 8, 2007.  (P. Ex. 36.)  The first time ORC emailed Crow with a draft Form S-3 for registration of Buyer Stock, however, was five days after the contractual deadline to register on November 13, 2007,.  (Tr. 278, 826–27; P Ex. 39.)  ORC asked Crow to review a portion of the draft and "let us know if you have any comments," adding that "[w]e intend to send this draft to the printers shortly." (Tr. 278; P Ex. 39.)  Crow responded on November 16, 2007 with minimal edits.  (Tr. 279–80; P Ex. 41.)

ORC did not send the draft S-3 to its auditors, KPMG and Crowe Chizek, however, until December 6, 2007.[2]  (Tr. 827–28.)  Crowe Chizek's role is explained further *infra*, Part III.I. Email correspondence indicates that December 6, 2007 was the first time KPMG had heard of ORC S-3 draft.  (Leaverton Dep. 22–23, 148–49; P Ex. 236.)  On the same day, Crow emailed Graham indicating that he was hoping to hear back regarding the status of the stock registration because "[s]everal of the shareholders are becoming increasingly concerned."  (Tr. 282; P Ex. 82.)  Crow asked for a written summary as to when the S-3 would be filed, but a summary was never provided by ORC.  (Tr. 282, 838; P Ex. 82; Graham Dep. 282–83.)

Graham circulated another draft S-3 dated November 20, 2007, via email, to a number of parties on January 18, 2008, including ORC's auditors, and explained that "after much circling and discussion, we are ready to file the S-3 registering the shares we issued in the acquisition of ITS." (Tr. 838–39.)  Graham also noted that, because the price protection provision in the merger agreement would be exercisable on February 10, 2008, "it is important for us to make

_____

[2] Crowe Chizek was hired by ORC in September 2007 to prepare standalone financial statements for ITS.  Crowe Chizek's role will be explained further *infra* Part III.I.

every effort to get this filed by Friday, January 25th." (Tr. 841.) KPMG responded that filing on January 25 was realistic for KPMG. (P Ex. 94.)

The registration was not filed January 25, 2008, however; rather, on January 23, 2008, Graham sent an e-mail to the auditors with a copy to Bisignano, saying "after talking with each of you about the timing for your processes, we are shooting for filing the S-3 to register the ITS acquisition shares on Wednesday, January 30." (Tr. 845; P Ex. 44.) Again, the registration statement was not filed on January 30, 2008. Despite the fact that Graham herself set these filing deadlines as chief financial officer at ORC, she testified at trial that she has no recollection as to why the S-3 was not filed on January 30, 2008, nor of who made the decision not to file. (Tr. 853–56.)

On March 12, 2008, Crow emailed Bisignano stating:

I am writing to confirm that ORCC is still pursuing the S-3 filing. While I appreciate the relaxed 144 rules, they still come with limitations and not equivalent to having the shares registered as required under the Merger Agreement. Could you please provide me with a quick status update on the filing of the S-3?

(Tr. 290–91; Bisignano Dep. 380–81; P Ex. 99.) Bisignano responded: "We are still pursuing it. The 144 rule change is a stopgap that hopefully alleviates some pressure, but we are not viewing it as a permanent solution and have not reduced our intensity." (Tr. 291; Bisignano Dep. 380–81; P Ex. 99.) Crow communicated Bisignano's response to the ITS Stockholders. (Tr. 291.)

### G. Registered v. Unregistered Shares & Rule 144

Registration of Buyer Stock would have made the Buyer Stock freely tradable. (Tr. 1082.) If the Buyer Stock were registered, the ITS Stockholders could have sold shares individually at different prices and different times; they could have sold different amounts of shares at different times; and they could freely determine how many shares to sell, when to sell,

11

and at what price.  (Tr. 1084–85.)  They could make a decision to sell some of their shares at a particular time on a particular day at a particular price and execute the trade almost instantly with the push of a button on their computer. (Tr. 81.)  ORC's own expert witness conceded that registering Buyer Stock would have made those shares freely tradable, and that the Buyer Stock was not freely tradable between August 10, 2007 through August 10, 2008.  (Tr. 1082–83.)

As this Court explained in *Stuckey III*, when the merger agreement was closed on August 10, 2007, Rule 144 required a one-year holding period before restricted securities could be sold. 17 C.F.R. § 230.144(d)(1) (1997 Amendments); *see* 2012 WL 468510 at *3.  Amendments to Rule 144 became effective February 15, 2008, changing the one-year holding period to six months.  17 C.F.R. § 230.144(d)(1)(i); *see Stuckey III*, 2012 WL 468510, at *3.  As of February 15, 2008, the ITS Stockholders had been holding the Buyer Stock for more than six months, and therefore, they could sell that Stock pursuant to the newly amended Rule 144.  *See Stuckey III*, 2012 WL 468510, at *3.

Unregistered shares sold under amended Rule 144, however, are not freely tradable. Under amended Rule 144, every time an ITS Stockholder wanted to sell any shares of Buyer Stock, the Stockholder would have to communicate that desire to Greenberg Traurig or ORC. (Bisignano Dep. 347–48; Tr. 81, 1122; P Ex. 52.)  Then ORC would have to communicate to Greenberg Traurig that a legal opinion was needed to authorize that sale, and Greenberg Traurig would have to issue the opinion letter.  (Bisignano Dep. 347–48; Tr. 858–59; P Ex. 52.)  The process would have to be repeated and a separate legal opinion obtained for each intended sale. (Bisignano Dep. 347–48; Tr. 81, 1122; P Ex. 52.)

It would take days for Greenberg Traurig to issue a legal opinion, and during that time, ORC's stock price could change.  (Bisignano Dep. 341–42; Tr. 1123.)  For example, when

Fromm sought an opinion letter from Greenberg Traurig, he had to submit a "representation

letter" to ORC, and then it took Greenberg Traurig 10 days to issue its opinion letter.  (Tr. 694,

1124–25; D Ex. 13.)

An SEC publication entitled "Rule 144: Selling Restricted and Control Securities,"

provides information about selling restricted securities using Rule 144:

> Even if you have met the conditions of Rule 144, you can't sell your restricted
> securities to the public until you've gotten the legend removed from the
> certificate. Only a transfer agent can remove a restrictive legend. But the transfer
> agent won't remove the legend unless you've obtained the consent of the issuer -
> usually in the form of an opinion letter from the issuer's counsel - that the
> restricted legend can be removed. Unless this happens, the transfer agent doesn't
> have the authority to remove the legend and execute the trade in the marketplace.
> To begin the process, an investor should contact the company that issued the
> securities, or the transfer agent of the company's securities, to ask about the
> procedures for removing a legend. *Since removing the legend can be a
> complicated process, if you're considering buying or selling a restricted security,
> it would be wise for you to consult an attorney who specializes in securities law*.

(P Ex. 347) (emphasis added).

Moreover, to sell unregistered shares using Rule 144, "adequate current public

information with respect to the issuer of the securities must be available." 17 C.F.R.

§ 230.144(c).  Under Rule 144, adequate current public information "will be deemed to be

available only if the issuer has filed all required reports under section 13 or 15(d) of the

Exchange Act, as applicable, during the 12 months preceding such sale . . . other than Form 8-K

reports." 17 C.F.R. § 230.144(c)(1).  ORC's 2007 10-K, however, indicated that it had not "filed

all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934

during the preceding 12 months." (P Ex. 166.)  ORC's Form 10-Q for March 31, 2008 also

indicated that ORC had not "filed all reports required to be filed by Section 13 or 15(d) of the

Securities Exchange Act of 1934 during the preceding 12 months."  (P Ex. 167.)

13

*H. The 3-05 Calculation*

Before closing the merger agreement, ORC performed a Rule 3-05 calculation, which it was required to do to determine whether its acquisition of ITS was material to ORC's financial statements. (Tr. 806–07.)  If it was, ORC was legally obligated under the securities laws to file audited financial statements for ITS with the 8-K filing relating to the acquisition. (Tr. 807.)

Three weeks after the closing, ORC controllers informed Graham, incorrectly, that the transaction was not material to ORC's financial statement under Rule 3-05.  (Tr. 806–08.)  ORC discovered its mistake in its 3-05 calculation in September 2007, and determined then that it was required to file standalone financial statements for ITS with ORC's Form 8-K filing relating to its acquisition of ITS.  (Tr. 809–12.)  ORC had to create standalone audited ITS financial statements rather than use the financial statements submitted by ITS in connection with the merger agreement because the ITS audited financial statements provided in connection with the merger agreement were *consolidated* statements of both ITS and ITS' then wholly-owned subsidiary, QuanComm.  (Tr. 56–57, 808.)  QuanComm was not part of the acquisition; rather, it was "spun off" to the ITS Stockholders by agreement.  (Tr. 41–42, 809.)  Thus, when ORC discovered that its Rule 3-05 calculation was erroneous and that it needed to file audited financial statements for ITS, the ITS audited statements had to be "carved out" of the consolidated audited statements of ITS and QuanComm.  (Tr. 56–57, 131, 928–29; P Ex. 64.)

ORC hired Crowe Chizek in September 2007 to prepare standalone financial statements for ITS.  (Tr. 810–12.)  ORC's erroneous 3-05 calculation delayed ORC's retention of Crowe Chizek and the start of Crowe Chizek's work by a month.  (Tr. 812–13.)  The standalone ITS financial statements were filed by means of an amended Form 8-K/A on October 25, 2007. (Tr. 815–16.)

14

*I. ITS Revenue Recognition Issue*

On October 25, 2007, in conjunction with filing a Form 8-K/A with standalone ITS

financial statements, Graham signed a letter on behalf of ORC to Crowe Chizek, representing

that "the Company [ITS] has properly recorded revenue in accordance with SAB No. 104,

Revenue Recognition." (P Ex. 191A ¶ 5.) SAB is an accounting rule. (Tr. 817.) Sometime

prior to October 29, 2007, KPMG had identified an issue with the manner in which ITS had

recognized revenue. (P Ex. 229.)

Graham confirmed, however, in an email to Stuckey on November 6, 2007 that the ITS

revenue recognition issue was resolved. (Tr. 971–72; P Ex. 291.) Discussions of an ITS revenue

recognition issue again occurred in mid-December 2007 between ORC and Crowe Chizek, but

no adjustments were made to ITS's financial statements or to the audit reports. (Baer Dep. 73–

75.) Mark Baer, the lead accountant from Crowe Chizek, testified at his deposition that he was

never told of a delay in filing the registration statement that was caused by the revenue

recognition issue, nor was he aware of any such delay. (Baer Dep. 86, 103.) The audited ITS

financial statement filed on October 25, 2007 was never amended or restated in any way.

Graham signed another management representation letter on January 4, 2008,

representing that, to the best of her knowledge and belief, "the representations previously made

to you in our letter dated October 25, 2007, are still valid" and that "no events have occurred

subsequent to the balance sheet date that would require adjustment to, or disclosure in, the

financial statements [of ITS]." (Tr. 831; P Ex. 90–2.) Graham testified at trial that the

management representation letters were "the accounting firm's way of getting management to

say we've given you everything you need, we haven't misled you, we haven't lied to you." (Tr.

931.)

*J. ORC's Failure to Timely File 2007 10-K & Resulting Loss of Ability to File an S-3*

ORC failed to file timely its 2007 10-K by the March 17, 2008, deadline.  (Tr. 862; P Ex. 155.)  ORC requested an extension of the filing deadline on March 17, 2008 until April 1, 2008, which was granted, but ORC then failed to meet the extended filing deadline.  (Tr. 862–64; P Ex. 100.)  The failure to file was the result of an ongoing dispute between KPMG and Ernst & Young ("EY"), ORC's former auditor, regarding EY's accounting for ORC's taxes.  (Tr. 864; P Ex. 100.)

As a result of having missed the extended deadline, ORC lost S-3 eligibility for a period of one year.  (Tr. 864.)  To register any ORC shares after April 1, 2008, ORC would have to file a Form S-1 registration statement.  (Tr. 864.)  ORC filed its 2007 10-K on April 9, 2008.  (Tr. 866; P. Ex. 166.)

*K. ORC's Representations Regarding the Filing of an S-1*

On May 2, 2008, prior to advising the ITS Stockholders, Crow inquired of Bisignano as to the status of the Buyer Stock registration. (Bisignano Dep. 413; P Ex. 106.)  Bisignano replied that ORC thought "the best approach forward is to file an S-1 prospectus" and that "[t]he goal would be to file the S-1 right after we file our 10-Q, which is scheduled for May 10 at the latest." (Bisignano Dep. 412–15; P Ex. 106.)  When Crow inquired again on May 6, 2008 as to the time frame in which ORC was planning to filing the S-1, Bisignano responded the same day, stating:

> We are planning to file within the next couple of weeks. S-1s frequently take a long time to prepare from scratch. Fortunately, we have nearly all the material we need from our 10-K, proxy and 10-Q, so it should not take long to prepare. The SEC has a right to review, but that is usually a brief period, and given that it will be based on already filed disclosures, it is unlikely they will have many (if any) objections) [sic].

(P Ex. 107.)  There is no evidence that a draft S-1 existed on May 6, 2008, however, and

Bisignano had no recollection of a draft S-1 existing at that time.  (Bisignano Dep. 421–22.)  The earliest reference to a draft S-1 registration statement for the Buyer Stock is in an email dated June 30, 2008, from Bisignano to Graham asking her to review the draft S-1 because ORC needs to "get it over to the accountants."  (Tr. 879.)  Graham testified at trial that getting an S-1through the accountants is a time consuming task.  (Tr. 879.)  The evidence indicates that ORC did not advise KPMG that it was considering filing an S-1 for Buyer Stock until July 15, 2008.  (Tr. 886; Leaverton Dep. 297; P Ex. 126.)  Moreover, a draft S-1, dated July 14, 2008, was not sent to KPMG until July 17, 2008.  (Leaverton Dep. 298; P Exs. 127, 127A; Tr. 887–88.)

No S-1 registration form for the ITS shareholders shares of ORC was ever filed.  (Stip. 10.)  Graham testified that she did not recall why.  (Tr. 886.)  ORC never filed a registration statement for the Buyer Stock.  (Stip. 10.)

### L. Exercise of Price Protection Rights in May 2008

All of the ITS Stockholders who had not exercised price protection in February 2008 exercised their price protection rights effective May 10, 2008.  Thus, as of May 10, 2008, all ITS Stockholders had exercised price protection.  (Stip. 16.)  There was testimony at trial that on behalf of their respective companies—New Ridge LLC and GTek LLC—Stuckey and Salvato sought Crow's advice on whether to exercise price protection, and there was consensus that it made sense to do so based on the representation that the S-1 was going to be filed shortly.  (Tr. 87–89, 296, 302, 648; P Ex. 111.)

ORC's price protection obligation was treated as a liability worth $2.8 million on its financial statements and balance sheets. (Leaverton Dep. 98; P Ex. 218.)  If ORC's stock price went up, the amount of the price protection liability went down, and the change would be shown as a positive on ORC's income statement.  (P Ex. 78.)  Conversely, the amount of ORC's price

17

protection liability would increase as ORC's stock price declined. (Tr. 870; P. Ex. 166.)  If the remaining ITS Stockholders exercised price protection in May 2008 (which they did), ORC would be able to eliminate that $2.8 million liability completely, with no cash drain to ORC, by opting to issue additional Buyer Stock to the ITS Stockholders rather than paying cash for those shares. (P Ex. 5§ 2.6(b).)  In an ORC management presentation, ORC listed among its "Financial Challenges" the fact that "[f]inancial statements continue to be challenging to understand because of complex acquisition-related accounting," and one of the two examples was "[p]rice protection provided to ITS shareholders." (Tr. 873–74; P Ex. 169, slide 16.)  In May 2008, when all the remaining ITS Stockholders exercised price protection, ORC's price protection liability dropped from $2.8 million to zero. (Tr. 869–70.)

### M. Sale of Fromm and Evans's Buyer Stock

ITS Shareholders Fromm and Evans both sold Buyer Stock using Rule 144 during the period from May 2008 through July 2008.  (Tr. 413, 695.)  It took ten days for Fromm to get an opinion letter from Greenberg Traurig for his shares and the shares held by his company, Value Recovery Group, Inc.  (D. Ex. 13; Tr. 711–12.)  Evans had to engage a personal CFO financial team, who in turn engaged a broker, to assist with appropriate documentation and to execute trades under Rule 144.  (Tr. 428–29.)  Both Fromm and Evans testified at trial that they were unaware whether such sales were legal or compliant with Rule 144.  (Tr. 417, 699.)

### N. "Grey-Out" Period

There was limited evidence presented at trial that certain senior employees at ORC, including Stuckey and Kent, were subject to "grey-out" periods during which they could not

trade ORC shares.[3]  (Tr. 140–41; D Ex. 57.)  The "grey-out" period was an internal ORC policy rather than a legal restriction.  (P Ex. 350.)

### O. Issuance of Price Protection Shares in May 2008

Section 2.6 of the merger agreement requires price protection shares to be calculated using the VWAP, which is defined as "the volume weighted average price of Buyer Stock for the ten (10) trading days ending two (2) Business Days preceding an indicated date."  (P Ex. 5 § 2.6.)  A "trading day" is defined under the merger agreement as "a day that the shares can be traded on the NASDAQ global select market or such other market upon which shares of Buyer Stock are hereafter listed for trading."  (P Ex. 5 § 2.6(a).)  Moreover, "business day" means "a day other than Saturday, Sunday or a day on which banking institutions located in New York City, New York are permitted or required by law to be closed."  (P Ex. 5 § 2.1.)

May 10, 2008, which was a Saturday, was one of the indicated dates for the exercise of price protection.  Two business days preceding May 10, 2008 would be Thursday, May 8, 2008. ORC mistakenly used May 7, 2008 as the ending day of the ten trading day period.  (P Exs. 112, 285 (Ex. 16 to Robak Report)[4].)  Had ORC used the correct May 8 end date, the VWAP would have been $9.5941 per share, which would have resulted in additional shares being issued.  (Tr. 529–30; P Ex. 285 (Ex. 17 to Robak Report).)

### P. Escrow Agreement

As part of the acquisition transaction, Plaintiff, ORC, and Wilmington Trust Company executed and entered into an agreement pursuant to which a portion of the purchase price was

---

[3] Stuckey and Kent were briefly employed with OCR following OCR's acquisition of ITS.

[4] Robak's Expert Witness Report (P Ex. 285) was not admitted into evidence, but exhibits 1 through 18 which were attached to that report, and contained data upon which Robak formulated his opinion, were admitted into evidence. (Tr. 609–10.)

placed in escrow to cover claims for indemnification or other relief made by the first anniversary

of the closing of the merger agreement.  (P Ex. 141.)  According to the terms of the escrow

agreement, ORC had to provide notice of any claims by the first anniversary of the closing using

the delivery methods set forth in the escrow agreement.  (P Ex. 141 § III(b)(i).)  Section V of the

escrow agreement provides that:

> [A]ny notice, instruction or instrument to be delivered hereunder shall be in
> writing and shall be effective upon receipt at the addresses set forth on the
> signature page hereof or at such other address specified in writing by the
> addressee, or if to the Escrow Agent [Wilmington Trust Company], upon receipt
> via facsimile or telecopier transmission, at the number set forth on the signature
> page hereof, or at such other number specified by Escrow Agent.

(P Ex. 141 § V.)

The escrow agent received notice from ORC by email on August 8, 2008 and by courier

on August 11, 2008, in which ORC claimed entitlement to $760,890.89 comprised of a net

working capital adjustment.  (Stip. 19; Tr. 330–31.)  Notice was sent to Stuckey through FedEx

on "MON – 11 AUG" and was sent "PRIORITY OVERNIGHT."  (P Ex. 142 at ORC1-000020.)

Stuckey responded to ORC claiming that ORC's notice was deficient and untimely under

the terms of the escrow agreement and merger agreement, and demanded disbursement of the

escrowed funds.  (Stip. 20.)  ORC objected to Plaintiff's demand for disbursement, and because

of the objection, the escrow agent continues to hold funds in the escrow account.  (Stip. 21.)

### Q. Plaintiff's Expert Witness

Plaintiff retained an expert witness, Espen Robak, to calculate ITS Stockholders'

damages in this case.  Robak is a nationally recognized expert on valuation of restricted and

illiquid securities, who frequently speaks on the topic at national conferences and writes articles

for publication in industry magazines and journals.  (Tr. 490–91.)  His is a chartered financial

20

analyst ("CFA"), which is a designation issued by the CFA Institute.  (Tr. 491.)  Robak's

education, experience, and expertise in valuation of restricted stock and illiquid securities qualify

him as an expert to offer his opinion in this case.  (P Ex. 285 (Ex. 18 to Robak Report); Tr. 496–

92; 502–03.)  Robak calculated ITS Stockholders' damages under *Duncan v. TheraTx, Inc.*,

which this Court held provides the applicable measure of damages in this case.  775 A.2d 1019

(Del. 2001); *Stuckey III*, 2012 WL 486510, at *7.

## IV. CONCLUSIONS OF LAW

### *A. Breach of the Merger Agreement for Failure to Register*

Delaware law applies to the terms of the merger agreement.  (P Ex. 5 § 14.9.)  Under

Delaware law, the elements of a breach of contract claim are: (1) a contractual obligation; (2) a

breach of that obligation by the defendant; and (3) resulting damages to the plaintiff.  *Stuckey III*,

2012 WL 468510, at *6 (citing *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch.

2003); *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. Ct. 2005)).

Stuckey has satisfied each element of his breach of contract claim for failure to register.

### 1. Contractual Obligation

Section 10.6 of the merger agreement imposes an unconditional obligation on ORC to file

"a registration statement covering the resale of the Buyer Stock" with the SEC no later than

November 8, 2007, and "to have the Registration Statement declared effective by the SEC as

soon as practicable thereafter."  (P Ex. 5.)  Stuckey has satisfied the first element of his breach of

contract claim.  ORC does not dispute this conclusion of law.

### 2. Breach of the Contractual Obligation

ORC breached its obligation to file a registration statement with the SEC by November 8,

2007.  (Stip. 10.)  Stuckey has satisfied the second element of his breach of contract claim, and

21

again, ORC does not dispute this conclusion of law.

### 3. Resulting Damages to Plaintiff

In *Stuckey III*, this Court held *Duncan* provides the applicable measure of damages in this case.  2012 WL 486510, at *7; *see* 775 A.2d 1019.  As in *Duncan,* this Court concludes, as a matter of law, that the ITS Stockholders "reasonably expected to have the maximum freedom to choose when to trade their shares during this period and at what price," as of November 8, 2007 at the latest, and ORC's breach of its unconditional obligation in the merger agreement to register the Buyer Stock "caused this expectation to be disappointed."  *See* 775 A.2d at 1022.

The rule established in *Duncan*, which this Court held is applicable in this case, is that contract damages are measured by calculating the difference between:

> (1) the highest intermediate price of the shares during a reasonable time at the beginning of the restricted period, which functions as an estimate of the price that the stockholders would have received if they had been able to sell their shares, and ["first selling period"]

> (2) the average market price of the shares during a reasonable period after the restrictions were lifted ["second selling period"].

*Id.* at 1020, 1029; *Stuckey III*, 2012 WL 468510, at *7.  This Court adopts the reasoning behind this rule, as established by the *Duncan* court:

> The intuition behind this rule is that the issuer-defendant should bear the risk of uncertainty in the share price because the "defendant's acts prevent a court from determining with any degree of certainty what the plaintiff would have done with his securities had they been freely alienable."  But the issuer should not bear the risk of all subsequent share price increases because it is impossible to know whether and when the stockholders actually would have sold their shares during the restricted period.  We find that this method of calculating damages provides a satisfactory estimate of the sale price that the Duncan Group [here, ITS Stockholders] would have obtained absent the breach by TheraTx [here, ORC] and, thus, the value of the opportunity lost by the Duncan Group [ITS Stockholders] as a result of the restriction.

775 A.2d at 1023.  The sales in the first and second selling periods upon which the damages

22

formula rely are "necessarily hypothetical." *Id.* at 1022.  The injury "is not the loss of a specific transaction but the loss of the ability to trade the shares as desired." *Id.* at 1022 n.7.  As such, the ITS Stockholders are not required to show that they actually would have sold during the restrictive period "because the primary effect of the breach is to cause a 'deprivation of [the ITS Stockholder's] range of elective action.'" *Id.*  (citing *Am. Gen. Corp. v. Cont'l Airlines Corp.*, 622 A.2d 1, 10 (Del. Ch. 1992), *aff'd*, 620 A.2d 856 (1992)).

This Court finds, as a matter of law, that ITS Stockholders were damaged from ORC's breach of the merger agreement by failure to register Buyer Stock.  A calculation of *Duncan* damages is provided *infra* Part V.A.

### 4. ORC's Defenses to Plaintiff's Claim for Breach of Merger Agreement for Failure to Register Are Without Merit

#### a. Impossibility of Performance

Plaintiff filed a "Motion to Strike Defendant's Unpled new Affirmative Defense of 'Impossibility of Performance'" the morning of the first day of trial.  (Doc. 116.)  This Court has not yet ruled on that motion.  Plaintiff argues that ORC's impossibility of performance defense must be stricken because it is an affirmative defense that must have been raised, pursuant to Federal Rule of Civil Procedure 8(c)(1), in a responsive pleading or is waived, and ORC failed to assert it in any responsive pleading.  ORC raised its impossibility of performance defense, for the first time, five days prior to trial.  Relying on *Mitchell v. Thompson*, ORC retorts that a party may amend pleadings at any time, even after trial, to conform to the evidence presented.  *See* No. 06CA8, 2007 WL 2897752, at *5–6 (Ohio Ct. App. Oct. 1, 2007).  The issue of impossibility of performance was sufficiently presented at trial, ORC argues, and therefore, Plaintiff is not prejudiced by ORC bringing this defense.

23

Under Federal Rule Civil Procedure 8(c)(1), when "responding to a pleading, a party must affirmatively state any avoidance or affirmative defense."  State law governs whether a defense is an affirmative defense under Rule 8(c)(1), *Roush v. Stone*, Case No. 2:08-cv-141, 2010 U.S. Dist. LEXIS 89593, at *5–6 (S.D. Ohio Aug. 2, 2010), and Ohio courts have established that impossibility of performance is an affirmative defense, *Skilton v. Perry Local Schl. Dist. Bd. of Educ.*, No. 2001-L-140, 2002 WL 31744700, at *5 (Ohio Ct. App. Dec. 6, 2002); *Mitchell*, 2007 WL 2897752, at *4.

Although the question of whether a defense is an affirmative defense under Rule 8(c)(1) is a matter of state law, the question of whether an affirmative defense has been waived due to failure to assert that defense in a timely manner, is governed by federal law.  *See Roush*, 2010 U.S. Dist. LEXIS 89593, at *5–6 (explaining that "[a]s a federal court exercising diversity jurisdiction, this Court is bound to apply state law to substantive issues and federal law to procedural issues," and the question of whether an affirmative defense had been waived "by failing to assert it in a timely manner is governed by federal law").  This Circuit has held that a "[f]ailure to plead an affirmative defense in the first responsive pleading to a complaint generally results in a waiver of that defense."  *Horton v. Potter*, 369 F.3d 906, 911 (6th Cir. 2004).  The rule is not absolute, however, and "[a] defendant does not waive an affirmative defense if the defense is raised at a time when plaintiff's ability to respond is not prejudiced" since the purpose of Rule 8(c) is to give notice and opportunity to respond.  *R.H. Cochran & Assocs. v. Sheet Metal Workers Int'l Ass'n Local Union No. 33*, 335 F. App'x 516, 519 (6th Cir. 2009).

In *Roush*, a defendant who waited until 31 days prior to trial was barred from raising an affirmative defense of statutory immunity.  2010 U.S. Dist. LEXIS 89593, at *7.  The court explained that "[a]t this point, the prejudice to the plaintiff, who has already waited more than

24

two years to try this case and has expended a great deal of time and money preparing for trial, cannot be seriously disputed."  *Id.* at *9.

Similar to the plaintiff in *Roush*, Stuckey would be prejudiced if this Court allowed ORC to assert its affirmative defense of impossibility of performance a mere five days before trial, in a case that has been pending more than three years.  ORC's reliance on *Mitchell* is unpersuasive because that was a state case where state law applied, not only to the substantive issues, but also to the procedural issues.  Additionally, the appellees in *Mitchell* had raised issues related their affirmative defense in their counterclaim.

Thus, Plaintiff's motion to strike is **GRANTED**.

Even if it was necessary for this Court to address the merits of ORC's impossibility of performance defense, ORC would be unsuccessful.[5]  Under Ohio law, "[i]mpossibility of performance occurs where, after the contract is entered into, an unforeseen event arises rendering impossible the performance of one of the contracting parties."  *Truetried Serv. Co. v. Hager*, 691 N.E.2d 1112, 1118 (Ohio Ct. App. 1997).  ORC argues that it was impossible to file a registration statement because Crowe Chizek needed to file unforeseen ITS financial statements. This assertion fails for two reasons.  First, the ITS financial statements prepared by Crowe Chizek were completed and filed on October 25, 2007, which was two weeks prior to the registration filing deadline on November 8, 2007.  Second, as explained in this Court's findings of fact, *supra*, ORC had to hire Crowe Chizek to prepare standalone financial statements for ITS

---

[5] ORC also asserts the affirmative defense of "temporary supervening impossibility of a brief duration."  (Doc. 124 at 23–24) ("Alternatively, if the Court decides that the doctrine of impossibility does not apply, Online Resources [sic] the doctrine of temporary supervening impossibility of brief duration also excused Online Resources failure to file a registration statement.").  ORC makes no arguments distinct from those it makes in relation to its impossibility of performance defense.  This Court, therefore, need not address this defense separately, but its analysis with respect to the impossibility of performance defense applies also to the temporary supervening impossibility defense.

was because *ORC* initially performed the 3-05 calculation erroneously.  Under the doctrine of impossibility of performance, the "performance must be rendered impossible without fault of the party asserting the defense."  *United Steelworkers of Am., AFL-CIO, CLC v. Metro. Distrib. Co.*, No. 3:03CV7589, 2005 WL 2233477, at *4 (N.D. Ohio Sept. 13, 2005).[6]

Next, ORC argues that issues identified by KPMG regarding the manner in which ITS recognized revenue delayed Crowe Chizek's work on the registration statement.  Crowe Chizek's work—which ORC argues had to be completed before Crowe Chizek could consent to the filing of the registration statement—was not completed until late January 2008, purportedly as a result of the revenue recognition issue.  Stuckey has presented persuasive evidence, however, that refutes ORC's assertion.  First, as explained in this Court's findings of fact, both before and after the revenue recognition issues arose, Graham signed management representation letters that were sent to Crowe Chizek and which represented that ITS had properly recorded revenue in accordance with SAB No. 104.  Despite an attempt to downplay the importance of the management representation letters at trial, Graham testified that management representation letters were "the accounting firm's way of getting management to say we've given you everything you need, we haven't misled you, we haven't lied to you."  (Tr. 931.)  Thus, the evidence shows that Graham represented to Crowe Chizek that ITS had properly recorded its revenue.

Furthermore, the dialogue between ORC and Crowe Chizek regarding revenue

---

[6] As Stuckey notes, ORC references Ohio case law on its impossibility of performance defense, but does not address whether Delaware or Ohio law applies to the defense.  This Court references Ohio law because both parties rely on Ohio law in their post-trial briefing.  ORC's impossibility of performance defense, however, would fail on the merits under Delaware law as well.  *See, e.g.*, *Martin v. Star Publ'g Co.*, 126 A.2d 238, 242 (Del. 1956) (explaining that the doctrine of impossibility of performance applies only where the unforeseen event that causes non-performance is a "fortuitous one"); *City of Newark v. NVF Co.*, Civil Action No. 5176, 1980 Del. Ch. LEXIS 567, at *9–10 (1980) (impossibility of performance not applicable where impossibility created by the breaching party's own act).

recognition in December 2007 did not result in any change to Crowe Chizek's audit report.  Baer testified at his deposition that he was never told of a delay in filing the registration statement that was caused by the revenue recognition issue, nor was he aware of any such delay.  The audited ITS financial statement filed on October 25, 2007 were never amended or restated in anyway.

ORC's final impossibility of performance argument is that it could not file a timely registration statement because of issues that arose between EY and KPMG, which delayed the filing of its 2007 10-K in March and then again in April 2008 (the extended filing deadline), and ultimately caused ORC to lose S-3 eligibility for one year.  This argument also fails on its merits. Ohio courts have declined to find impossibility of performance where a defendant claims he was unable to perform due to the actions of a third party, or where it was foreseeable at the time a defendant entered into a contract, that he or she might encounter certain issues involving third parties.  *See, e.g.*, *J.J.O. Constr. v. Baljak*, No. 06AP-1300, 2007 WL 2309741, at *4 (Ohio Ct. App. Aug. 14, 2007) (explaining that "one who makes a promise that cannot be performed without the cooperation of a third person, is not excused from liability, even if cooperation from that third person cannot be secured"); *Truetried*, 691 N.E.2d at 1117 (rejecting defendant's claim of impossibility where it was foreseeable at the time defendants entered into the lease contract that they may encounter zoning and licensure issues).  ORC knew at the time it entered into the merger agreement that in order to file a registration statement, it would need consent of its auditors.  The necessity of obtaining consent to file a registration statement was reasonably foreseeable.  ORC's final impossibility of performance arguments are not well-taken.

### b. Any Harm to the ITS Stockholders Was the Result of Their Own Decisions

ORC argues that any harm to the ITS Stockholders was the result of their own decisions and was not caused by ORC.  First, ORC argues that no ITS Stockholders would have sold

27

Buyer Stock until after January 1, 2008, because the ITS Stockholders could defer paying taxes on Buyer Stock until filing their 2008 tax returns in 2009.  More specifically, ORC argues that, when Buyer Stock reached a high of $12.21 per share on December 27, 2007, ITS Stockholders would not have sold because they had an incentive to hold onto their shares until 2008 so that they could delay paying taxes on the gain.

As explained above, under *Duncan*, the "issuer-defendant should bear the risk of uncertainty in the share price because the 'defendant's acts prevent a court from determining with any degree of certainty what the plaintiff would have done with his securities had they been freely alienable.'"  775 A.2d at 1023 (citing *Am. Gen. Corp.,* 622 A.2d at 10).  The injury is "not the loss of a specific transaction but the loss of the ability to trade the shares as desired."  *Id.* at 1023 n. 7.  A "plaintiff is not required to show that she actually would have sold the shares during the restricted period," "because the primary effect of the breach is to cause a 'deprivation of [the stockholder's] range of elective action.'"  *Id.* (citing *Am. Gen. Corp.*, 622 A.2d at 10).  Thus, whether an ITS Stockholder would have sold his or her shares before January 1, 2008 is unknowable because those shares were not registered.  It is also irrelevant under *Duncan*. ORC's tax deferral argument is unpersuasive.

Next, ORC argues Stuckey and Kent could not sell Buyer Stock during certain "grey-out" periods that affected certain senior employees at ORC.  ORC contends the "grey-out" period was from December 10 or 11, 2007 until April 11, 2008.  The evidence presented indicates, however, that the "grey-out period" was an internal ORC policy, not a legal restriction.  (P Ex. 350.) There was no contract or statute binding Stuckey, Kent, and/or their respective companies to any "grey-out" period, and therefore, ORC's "grey-out" period arguments are unconvincing.

Third, ORC again attempts to argue that the ITS Stockholders had no intent to trade

28

Buyer Stock by highlighting the following: (1) Crow took three business days to review the draft registration statement provided to him by ORC on November 13, 2007; and (2) Stuckey did not begin the process of opening an account in the name of his single member LLC until August 2008, which ORC argues indicates he did not have any intention of trading in 2007.

ORC's contentions are unpersuasive.  Again, the ITS Stockholders are not required to show that they would have actually sold their Buyer Stock during the restricted period under *Duncan*.  *See* 775 A.2d at 1023 n.7.  Moreover, this Court finds unpersuasive ORC's argument that Crow's taking three days to review a draft registration statement somehow shows a lack of urgency—particularly in light of the fact that ORC *never filed* a registration statement for Buyer Stock.

Fourth, ORC argues that the evidence presented at trial indicates that the ITS Shareholders could have had "freely tradable shares in accounts of their choosing shortly after February 15, 2008, and specifically by March 12, 2008, the date the last of Mr. Fromm's shares were received in his FBR account."  (Doc. 124 at 39.)  The failure to move or trade Buyer Stock after March 12, 2008, ORC contends, was the result of individual decisions by the ITS Stockholders, not the result of any action or inaction by ORC.  Defendant argues that the evidence shows the actions of Fromm and Evans indicate that no ITS Stockholder would have sold Buyer Stock prior to exercising their price protection rights.  Stuckey counters that there was no onus on ITS Stockholders to take the risks that Fromm and Evans took when selling their Buyer Stock pursuant to Rule 144.

In *Stuckey III*, this Court addressed ORC's contention that, after February 15, 2008, the ITS Stockholders could freely trade their Buyer Stock under Rule 144 just as if it were registered.  The Court rejected this argument, stating that the ITS Stockholders bargained for

registered shares of Buyer Stock and that Rule 144 was not the equivalent of registered shares:

> As the *Duncan* court explained, the remedy for breach of contract is based upon the reasonable expectation of the parties, and is measured by damages that would put the promisee back into a position that he or she would have been had the promisor not breached the contract. [775 A.2d] at 1022. Both the *Duncan* shareholders and the [ITS Stockholders] here contracted for the right to *registered* shares in the respective merger agreements, and did not receive that bargained-for right. It does not matter whether Rule 144's prohibition period was one year or six months because, . . . the ability to trade registered stock is different from the ability to trade stock using Rule 144. The *Stuckey I* Court in this case already explained that "[t]he availability to plaintiffs of Rule 144 . . . did not dispense with the harm suffered as a result of ORC's refusal to file a registration statement. . . . While Rule 144 has greatly aided the resale of restricted and control securities . . . . numerous requirements and conditions remain." *Stuckey I*, 2009 WL 5030794, at *8. Furthermore, [ITS Stockholders] "would not have had to ensure compliance with the requirements of Rule 144, with the potential for liability associated with Rule 144 resales, had a registration statement been in effect." *Id.* at *9. *Duncan* is not distinguishable because Rule 144's prohibition period has since been reduced.

*Stuckey III*, 2012 WL 468510, at *8. Moreover, this Court held that a reasonable fact finder

could determine "it was unnecessary—even incorrect in light of Duncan's precedent—for Robak

to take into account Rule 144 when computing damages in this case because Plaintiff has

presented evidence demonstrating that trading unregistered stock under Rule 144 is not the

equivalent of trading stock that has been registered." *Id.* at *10.

Based upon all of the evidence, and the Court's findings of fact, *supra* Part III.G, the

Court concludes that Buyer Stock held subject to Rule 144 was not the equivalent of registered

stock. Robak rightly excluded sales under Rule 144 from his analysis and rightly began the

second selling period after the point at which the Rule 144 holding period had expired and the

ITS Stockholders reasonably would have received de-legended stock in their brokerage accounts.

Fifth, ORC argues that the fact that ITS Stockholder Kent never attempted to sell his

Buyer Stock shows he was not harmed. Kent may have chosen not to sell his Buyer Stock for a

number of different reasons. A plaintiff is not required to show he or she would have actually sold his or her shares during the restricted period because the primary effect of the breach is that it caused s "deprivation of [the stockholder's] range of elective action." *Duncan*, 775 A.2d at 1022 n.7 (citing *Am. Gen. Corp.*, 622 A.2d at 10). ORC's fifth argument is unpersuasive.

Finally, ORC highlights various testimony in trial in an attempt to support its argument that no ITS Stockholder was actually harmed by ORC's failure to register the Buyer Stock. This Court has already made findings of fact that ITS chose ORC during the bidding process because ITS Stockholders liked the upside potential of registered ORC stock, coupled with the downside price protection. Yet, the ITS Stockholders never received the registered stock for which they bargained. The testimony cited by ORC is unpersuasive. Plaintiff has clearly demonstrated that ITS Stockholders were damaged, and that such damage was caused not by the ITS Stockholders, but by ORC.

### B. Breach of Merger Agreement for Failure to Provide the Correct Number of Price Protection Shares

As indicated in this Court's findings of fact, ORC mistakenly used May 7, 2008 as the ending day for the ten trading day period when calculating the VWAP for issuance of price protection shares in May 2008. ORC should have used May 8, 2008 as the end date. ORC argues that Plaintiff's breach of contract claim is refuted by a statement Crow made in May 2008 that the price protection calculation had been done correctly. Stuckey replies that Crow's position in May 2008 was incorrect.

This Court finds the evidence supports Stuckey's claim for breach of merger agreement for miscalculating price protection in May 2008. Plaintiff has shown that ORC had a contractual obligation to calculate the VWAP according to the terms of the merger agreement, that ORC did

31

so incorrectly, thus breaching its obligation, and that the ITS Stockholders were damaged as a result because they should have received additional shares. *See H-M Wexford*, 832 A.2d at 140; *Interim Healthcare*, 884 A.2d at 548.

*C. Violations of Ohio Securities Act*

Stuckey brings a claim against ORC for Ohio securities fraud based on misrepresentations in the merger agreement and the failure to disclose the existence of the SEC comment letter and corresponding review at the time of the merger transaction. The Court makes the following conclusions of law with respect to Plaintiff's third claim.

The Buyer Stock shares were "securities" under the Ohio Securities Act. Ohio Rev. Code § 1707.01(B). The Ohio Securities Act defines a "sale" of securities to include "every disposition . . . of a security or of an interest in a security." Ohio Rev. Code § 1707.01(C)(1). ITS Stockholders elected to receive Buyer Stock in return for relinquishing the right to receive $24.7 million in cash, constituting a sale by ORC of its securities to the ITS Stockholders under the Ohio Securities Act. *See Murphy v. Stargate Defense Sys. Corp.*, 498 F.3d 386 (6th Cir. 2007) (applying Ohio law and finding that plaintiffs who exchanged stock in one company for new stock in another company were "purchasers" of that new stock under Ohio Revised Code Chapter 1707).

Section 1707.44(B)(4) of the Ohio Revised Code provides: "No person shall knowingly make or cause to be made any false representation concerning a material and relevant fact, in any oral statement or in any prospectus, circular, description, application, or written statement, for any of the following purposes: . . . Selling any securities in this state." Section 1707.44(G) states: "No person in purchasing or selling securities shall knowingly engage in any act or practice that is, in this chapter, declared illegal, defined as fraudulent, or prohibited."

32

Furthermore, "fraud" or "fraudulent" is defined under the Ohio Securities Act as:

> [A]nything recognized on or after July 22, 1929, as such *in courts of law or equity*; any device, scheme, or artifice to defraud or to obtain money or property by means of any false pretense, representation, or promise; any fictitious or pretended purchase or sale of securities; and any act, practice, transaction, or course of business relating to the purchase or sale of securities that is fraudulent or that has operated or would operate as a fraud upon the seller or purchaser.

Ohio Rev. Code § 1707.01(J).

As this Court explained in *Stuckey III*, it was "the italicized language that led the Ohio Supreme Court to hold in *In re Columbus Skyline* that the definition of 'fraud' or 'fraudulent' incorporates federal securities decisions."  2012 WL 468510, at *18 (citing *Holderman v. Columbus Skyline Secs. (In re Columbus Skyline),* 660 N.E.2d 427, 429 (Ohio 1996) ("[T]he legislature broadly drafted R.C. 1707.01(J) to draw from *all* securities case law defining fraudulent conduct in both state and federal courts.") (emphasis in original)).  In *Stuckey III*, Plaintiff argued that, because the Ohio Supreme Court held that the definition of "fraud" or "fraudulent" under the Ohio Securities Act includes the definition announced in federal securities decisions, the definition of "material" announced by the United States Supreme Court in federal securities decisions should apply in the context of his Ohio Securities Act claims as well.  2012 WL 468510, at *17.  Thus, relying on the language in federal securities decisions, Stuckey argued, "a statement is material if there is a substantial likelihood that a reasonable investor would have viewed the misrepresentation or omitted fact as having significantly altered the total mix of information available."  *Id.* (citing *TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (adopting expressly the *TSC Industries* standard of materiality in the § 10(b) and Rule 10b–5 context)).  Materiality "does not require proof of a substantial likelihood that proper disclosure would have caused an investor to

33

change a decisions," but rather "proof that proper disclosure would have significantly altered the 'total mix' of available information."  *Id.* (citing *TSC Indus.*, 426 U.S. at 449). This Court concluded that "Stuckey's reasoning as to why the definition of 'material' as set forth in the United States Supreme Court securities case law is persuasive in light of the Ohio Supreme Court's precedent in *In re Columbus Skyline*."  *Id.* at \*18.[7]

This Court finds that ORC violated §§ 1707.44(B)(4) and (G) of the Ohio Securities Act when it sold Buyer Stock to the ITS Stockholders because it made false representations in §§ 4.2(b), (d), and 4.5 of the merger agreement, and failed to disclose the existence of the SEC comment letter and corresponding review, as set forth in the findings of fact above.  ORC knew about the SEC comment letter and corresponding review prior to signing and closing the merger agreement, and it knew no registration statement could be declared effective until the review was concluded.  ORC did not know when or whether the SEC comment letter would be resolved.  It also knew registration of Buyer Stock was a critical part of the merger transaction and that anything impeding the ability to register Buyer Stock was critical.  ORC nevertheless failed to disclose the SEC comment letter and corresponding review to the ITS Stockholders.

ORC knew the representations it was making in §§ 4.2(b), (d), and 4.5 of the merger agreement were false at the time it was making those representations.  (P Ex. 5 §§ 4.2(b) (representing that the execution and delivery of the merger agreement was not a "violation of . . . any material government law, rule, or regulation . . . having applicability to [defendant] which

---

[7] This Court noted that it was unable to locate any case law explicitly adopting Stuckey's reasoning, but it also did not find any case law indicating Stuckey's definition of "material" was incorrect.  *Id.* at \*18.  ORC presented no case law or legal arguments on the issue.  *Id.*  This Court also noted that some Ohio courts adopted a different definition of material in the context of fraudulent misrepresentation claims, but those cases were in the context of common law fraud claims rather than Ohio Securities Act fraud, and fraud has been defined more broadly under the Ohio Securities Act.  *Id.* at \*18 n.6.

would have a material adverse effect on [defendant] or the transaction contemplated hereby");
(d) (representing that "performance of this Agreement by [ORC] . . . does not and will not . . .
require any approval, consent, order, authorization, declaration or filing with any person, entity
or body, private or governmental, which failure to obtain would have a Material Adverse Effect
on the consummation of the transactions contemplated hereby"); 4.5 (representing that there was
no "action, suit, investigation, subpoena or proceeding pending against Buyer").)  ORC's
representation in § 4.2(b) was false because it was violating the Ohio Securities Act.  Its
representation in § 4.2(d) was false because registration of Buyer Stock required approval,
consent, authorization, and declaration from the SEC that its review of ORC's 2006 10-K was
concluded.  Finally, ORC's representation in § 4.5 was false because there was an SEC
investigation and/or proceeding pending regarding its 2006 10-K.

The Ohio Supreme Court has held that Ohio Revised Code § 1707.44(G) "prohibits not
only affirmative misrepresentations, but also fraudulent nondisclosures where there is a duty to
disclose." *Ohio v. Warner*, 564 N.E.2d 18, 40 (1990).  Plaintiff presented sufficient evidence
that despite Defendant's disclosure of numerous other SEC filings at the time of the execution
and closing of the merger agreement, it failed to disclose the SEC comment letter.  This failure to
disclose violated the Ohio Securities Act.

The evidence at trial conclusively established that ORC's knowingly false representations
were material to the ITS Stockholders' decision  to take ORC stock in lieu of $24.7 million in
cash.  The fact that the SEC review was pending and that Buyer Stock could not be declared
effective until the review was concluded were material facts that altered the "total mix of
available information" to a reasonable investor who was deciding whether to elect cash or Buyer
Stock. *See Stuckey III*, 2012 WL 468510, at *17 (citing *TSC Indus.*, 426 U.S. at 449).  Graham

35

knew ORC's promise to register Buyer Stock was an important and material provision of the merger agreement, and that the ITS Stockholders were relying on ORC's promise to register. Crow even testified that, had he known about the SEC comment letter and pending review, he would have altered his recommendation that Buyer Stock was a viable alternative to cash because the lack of liquidity put the ITS Stockholders at risk.

ORC argues that the SEC comment letter was not material based on one line in ORC board meeting minutes that states: "Mr. Newman advised the [Accounting and Legal] Subcommittee that a SEC Comment letter was received that was seeking comment on the embedded derivatives and revenue recognition polices.  Mr. Newman indicated, and KPMG concurred, that the issues were not material."  (P Ex. 350 at KPMG-E0027888.)  It is unclear, however, from the exhibit how Newman was using the word "material."  The fact that the issues presented in the SEC comment letter were not, in the opinion of Newman and KPMG, material, does not mean that the existence of letter itself—and the fact that the SEC review was pending and would prevent Buyer Stock registration—was not material to ORC's transaction with ITS. ORC's argument is unpersuasive given the contrary evidence Plaintiff presented that the SEC comment letter was material.

Finally, Plaintiff is not required to prove reliance in order to recover under the Ohio Securities Act.  *See Murphy v. Stargate Defenses Sys. Corp.*, 498 F.3d 386, 392 (6th Cir. 2007) (citing *Nickels v. Koehler Mgmt. Corp.*, 541 F.2d 611, 616  (6th Cir. 1976), *overruled on other grounds in Metz v. Unizan Bank*, 649 F.3d 492, 499 (6th Cir. 2011)) (noting that "under Ohio's Blue Sky Law, '[r]escission is available for intentional misrepresentation without a showing of reliance'").

ORC's main argument, rejected above, is that the SEC comment letter was not material.

36

It also argues, however, that if the letter *was* material, it "could <u>not</u> have been disclosed to the ITS Stockholders," because it would constitute a disclosure of non-public information in violation of federal securities law.  (Doc. 124 at 12–14) (emphasis in original).  "Not only was Online Resources not obliged to disclose the SEC Comment Letter to Plaintiff and the other former ITS shareholders, but it would have been a violation of federal securities law for Online Resources to do so."  (Doc. 124 at 14.)  This argument is unpersuasive as it fundamentally misconstrues federal securities law.

First, materiality of information to the ITS Stockholders and materiality of information to the investing public are not the same thing.  The existence of the SEC comment letter was material to ITS Stockholders' decision to enter into the merger agreement and to elect to receive $27.4 million of merger consideration in Buyer Stock.  Yet, that does not mean it was material to the investing public, who were buying and selling *registered* ORC shares.  Next, ORC is arguing that federal securities laws somehow require them to commit fraud in the sale of Buyer Stock to ITS Stockholders by preventing ORC from disclosing the SEC comment letter.  ORC also argues that federal securities law requires it to make false representations (in §§ 4.2(b), (d), and 4.5 of the merger agreement).  This cannot be the case.  Fourth, even if the SEC comment letter and corresponding review were material, non-public information under federal securities law, the law ORC cites to support its argument, 17 C.F.R. § 243.100, did not preclude ORC from disclosing the information to ITS Stockholders in conjunction with the merger transaction.  17 C.F.R. § 243.100 precludes selective disclosures to brokers, dealers, investment advisors, institutional investment managers, investment companies, and holders of the issuer's securities under circumstances in which it is reasonably foreseeable that the person will purchase or sell the issuer's securities on the basis of the information.  ITS Stockholder fell into none of these

37

categories at the time of the merger, and even if they had fallen into any of these categories, they

could have expressly agreed to maintain the disclosure in confidence under 17 C.F.R.

§ 243.100(b)(2)(ii).  Finally, ORC incorrectly relies on 17 C.F.R. § 240.10b5-1, which prohibits

insider trading by precluding any person from engaging in any practice that would "operate as a

fraud or deceit upon any person."  ORC was itself the seller, and because it obviously knew

about the SEC comment letter and review, there is no way ITS Stockholders could have

committed a fraud upon ORC by electing to take Buyer Stock with knowledge of the pending

SEC review.

ORC also makes a number of arguments that it has made throughout this litigation, and

that have been rejected, in an attempt to prove it did not violate the Ohio Securities Act.  ORC

argues that it had no duty to disclose the SEC comment letter because ITS Stockholders "lacked

sufficient knowledge of what registration meant or what the process involved."  (Doc. 124 at 11.)

In *Stuckey II*, this Court held ORC had  a duty to disclose the SEC comment letter and

corresponding review.  819 F. Supp. 2d at 687 (citing *Bays v. Hunter Savings Ass'n*, 539 F.

Supp. 1020, 1025 (S.D. Ohio 1982)) ("That nondisclosure within the context of other related

disclosures forms the basis of Defendant's duty to disclose.").

ORC next argues that its failure to disclose the SEC comment letter did not cause any

harm.  In an attempt to make this argument relevant in the context of Stuckey's claim for

violations of the Ohio Securities Act, ORC argues "as a basic element of any claim, and thus as

an element of a statutory fraud claim, Plaintiff must show an injury proximately caused by the

breach of duty, the fraud."  (Doc. 124 at 17.)  To support this argument, however, ORC relies on

two Ohio Supreme Court cases that did not involve claims for violations of the Ohio Securities

Act.  (Doc. 124 at 17) (citing *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1143–

38

44 (Ohio 2002); *Simmers v. Bentley Constr. Co.*, 597 N.E.2d 504, 507–08 (Ohio 1992)). Thus,

this Court finds this argument unconvincing. Moreover, Ohio Revised Code § 1707.43(A) states

that the remedy for a violation of Chapter 1707 is "the full amount paid by the purchaser," and

that remedy is not conditioned by proof of independent damages beyond the illegality of the

transaction caused by the defendant's violation of the statute. *See also Crater v. Int'l Res., Inc.*,

633 N.E.2d 1212, 1216 (Ohio Ct. App. 1993) (explaining that § 1707.43 "is designed to redress

the defendant's unlawful securities transactions by restoring 'the full amount paid by [the]

purchaser,' regardless of the ultimate success or failure of the investment").

ORC again argues Stuckey is not entitled to rescission of the $24,713,061 purchase price

for the Buyer Stock under Ohio Revised Code § 1707.43(A) because Stuckey is not asking for

rescission but for modification of the merger agreement. This Court has twice rejected this

argument, in both *Stuckey II* and *Stuckey III*. *Stuckey III*, 2012 WL 468510, at *19 (citing

*Stuckey II*, 819 F.Supp.2d at 690).

ORC argues Ohio statutory securities fraud contains an element of intent to mislead or

deceive, and that Stuckey has not proven this element. A violation of the Ohio Securities Act

exists when a false representation is made "knowingly . . . for any of the following purposes . . .

selling any securities in this state." (Doc. 124 at 14) (citing Ohio Rev. Code § 1707.44(B)(4)).

In *Ohio v. Warner*, the Ohio Supreme Court interpreted "knowingly" in the context of a criminal

prosecution for violation of the Ohio Securities Act. 564 N.E.2d 18, 43 (Ohio 1990). The Court

held that "[u]nder R.C. 1707.44(B)(4) [and] (G) . . . a person is criminally liable if he represents

facts to be different than he should have known them to be if he had exercised reasonable

diligence to ascertain the facts prior to the commission of the offense." *Id.* There is a dearth of

Ohio case law on point. Given the language of Ohio Revised Code § 1707.44(B)(4) and the

*Warner* precedent, this Court finds ORC had the requisite scienter where both Graham and Bisignano admitted that they had *actual* knowledge of the pending SEC comment letter and review prior to signing and closing the merger transaction with ITS.  Graham testified that she knew ORC's promise to register Buyer Stock was an important and material provision of the merger agreement, and that the ITS Stockholders were relying on ORC's promise to register. This fact, coupled with the fact that ORC did not know if and when the SEC comment letter would clear, indicates ORC knowingly made a false representation.  Thus, ORC final argument is not well-taken.  Stuckey has proven ORC violated the Ohio Securities Act.

### D. Common Law Fraud Inducing ITS Stockholders to Enter Into Merger Agreement and to Elect to Receive Buyer Stock

Stuckey also contends that ORC committed common law fraud by making misrepresentations in the merger agreement and failing to disclose the existence of the SEC comment letter and corresponding review at the time of the merger transaction.

The elements of fraudulent inducement are essentially the same as those for fraudulent misrepresentation, fraudulent concealment, and fraudulent nondisclosure.  *Gentile v. Ristas*, 828 N.E.2d 1021, 1033–34 (Ohio Ct. App. 2005).  The elements of common law fraud under Ohio law are:

(1) a representation or, when there is a duty to disclose, a concealment of fact;

(2) which is material to the transaction at hand;

(3) made falsely, with knowledge of its falsity, or with such utter disregard as to whether it is true or false that knowledge may be inferred;

(4) with the intent of misleading another into relying upon it;

(5) justifiable reliance on the representation or concealment; and

(6) an injury proximately caused by that reliance.

*Stuckey II*, 2012 WL 468510, at *12 (citing *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998)).

Unlike Plaintiff's Ohio Securities Act claim, his common law fraud claim requires a showing that ORC's misrepresentations or omissions were made with the intent of misleading ITS Stockholders into relying upon them, and that the ITS Stockholders justifiably relied.  This Court finds, however, that Plaintiff has not sustained his burden of proving ORC intended to mislead the ITS Stockholders.

Stuckey argues ORC intended to mislead the ITS Stockholders because it knew of the SEC comment letter and review and that registration of Buyer Stock would be precluded until the letter was cleared, before the merger was signed and closed.  He argues that ORC wanted to win the competitive bid process and that it knew the proposed to-be-registered Buyer Stock coupled with the price protection would distinguish its proposal from other bids.  Consequently, it did not disclose the SEC comment letter and review prior to entering into the merger agreement.

Graham testified at trial that ORC "never discussed disclosing [the SEC comment letter] to the ITS shareholders because it was just something in the normal course of business and it didn't even occur to us," and "truthfully, there were no—literally no discussions of whether this was something that had any interplay with this transaction."  (Tr. 777–79.)  After the transaction closed, Bisignano disclosed the existence of the SEC comment letter to Salvato when he was explaining that ORC was otherwise ready to file the S-3.  While this Court doubts the credibility of Graham and Bisignano's testimony, it cannot conclude that ORC intended to mislead ITS into entering into the merger agreement.  Although Graham and Bisignano knew or should have known that the SEC comment letter and review were material disclosures that ORC should have

41

made, there is not enough evidence on the record to conclude ORC failed to disclose the letter

and review in order to win the bidding process.

Knowledge and intent to mislead another into relying are different elements.  Stuckey has

not presented sufficient evidence to prove his claim common law fraud for inducing ITS

Stockholders to enter into the merger agreement.

### E. *Common Law Fraud Inducing ITS Stockholders to Exercise Price Protection Rights*

Stuckey contends that ORC committed common law fraud by inducing the ITS

Stockholders to exercise their price protection rights in May 2008 by falsely misrepresenting that

it was planning on filing an S-1 in early May.  The same common law fraud elements recited

*supra* Part IV.D, apply to this claim as well.  Again, the intent to mislead element is problematic

for Stuckey.

Stuckey argues that Bisignano's representation regarding the S-1 in early May 2008 were

false because the earliest draft of an S-l appeared in an email date June 30, 2008.  ORC had a

motive to induce ITS Stockholders to exercise price protection, and the representations made by

Bisignano were made with an intent to mislead the ITS Stockholders to rely, because ORC's

price protection obligation was recorded as a liability.  If ORC could induce the remaining ITS

Stockholders to exercise price protection in May 2008, Stuckey argues, ORC would be able to

eliminate the $2.8 million price protection liability with no cash drain on ORC.  Stuckey also

points to internal ORC documents that indicate eliminating the price protection liability was

important to the company.

This Court cannot conclude, however, on the basis of the fact that the price protection

was a liability on ORC's balance sheet alone, that ORC, through Bisignano, intentionally misled

ITS Stockholders into exercising their price protection in May 2008.  As ORC points out, there is

evidence on the record that ORC was working toward filing the S-1, albeit slowly.  Furthermore, Graham testified that the price protection affected ORC's accounting numbers, but not its core earnings, the latter of which it discussed with investors and analysts.  (Tr. 947–48.)  Stuckey has not met the high bar of proving that ORC intentionally mislead ITS Shareholders in May 2008 to exercise price protection.

### F. Breach of Escrow Agreement

Stuckey argues that ORC breached the escrow agreement because notice was insufficient under the terms in section V in the agreement.  (P Ex. 141 § V.)  This Court is not convinced that Stuckey breached the escrow agreement.

Section V provides that notice is sufficient if it is "in writing" and if it is sent to the escrow agent "via facsimile or telecopier transmission, at the number set forth on the signature page hereof, or at such other number specified by Escrow Agent."  (P Ex. 141 § V.)  The evidence shows that the escrow agent "received the letter via e-mail August 8 and via courier August 11."  (P Ex. 142 at ORC1-000019.)  August 8, 2008 was before the first anniversary of the closing of the merger agreement.  (P Ex. 141 § III(b)(i).)  The term "in writing" is not defined in the escrow agreement, and this Court finds email to be sufficient "in writing" notice.  Moreover, "facsimile" means "an exact copy," *see* Black's Law Dictionary 610 (7th ed. 1999), and transmission of a "pdf" document by email qualifies as sending "an exact copy."  Plaintiff's requested relief—compelling disbursement of all funds remaining in the escrow agreement at Wilmington Trust Company—is **DENIED**.

### V. DAMAGES

#### A. Breach of the Merger Agreement for Failure to Register

Robak's analysis applying the *Duncan* damages formula in this case is reliable, probative,

and provides the proper measure of damages.  Plaintiff demonstrated, by a preponderance of the

evidence, that Robak's calculation of the ITS Stockholders' damages under *Duncan* is

reasonable and correct, and this Court, therefore, concludes that Robak's calculation is

reasonable and correct.  Notably, ORC offered no calculation of damages under the *Duncan*

formula.  The following is an explanation of Robak's damages calculation, which this Court now

adopts.

### 1. First Selling Period and Highest Intermediate Price

#### a. Beginning of the First Selling Period

Under *Duncan*, Robak was required to assume that ORC timely filed a registration

statement for the Buyer Stock to determine the starting date of the first selling period.  Robak

used November 8, 2007—ORC's contractual deadline for filing—as the assumed date.  (Tr.

498.)  Robak then analyzed how long it could reasonably be expected to take for the SEC to

declare the registration statement effective.  (Tr. 499.)  ORC's breach of its obligation to file the

registration statement timely by November 8, 2007, renders this question necessarily

hypothetical.  (Tr. 499.)

Robak examined two sets of data: (a) comparable filings in that same time frame by

comparable public companies; and (b) ORC's own history with such filings.  For comparable

companies, the average number of days from filing an S-3 to the SEC's declaration of

effectiveness was 43 days, with a median of 33 days.  (Tr. 504–05; P Ex. 285 (Ex. 1 to Robak

Report).)  ORC's own historical experience revealed an average of 33 days from filing to

effectiveness, with a median of 27 days.  (Tr. 505–07; P Ex. 285 (Ex. 4 to Robak Report)).

Based upon these data, Robak opined that if the registration statement had been timely filed on

November 8, 2007, it would have been declared effective (and the Buyer Stock would therefore

44

have been freely tradable) on December 18, 2007, which was 40 days later.  (Tr. 500–07; P Ex. 285 (Exs. 1–5 to Robak Report).)  ORC's own expert witness, Anthony Alfonso, conceded on cross-examination at trial that 40 days is reasonable. (Tr. 1111–13.)

This Court finds that 40 days is a reasonable period of time for a registration statement to be declared effective, and that December 18, 2007 is the date that begins the first selling period.

<u>b. Duration of the First Selling Period</u>

Under *Duncan*, the first selling period is to last for a reasonable time after registration of the Buyer Stock would have become effective, which is "the time in which [the plaintiff] could have disposed of the shares without depressing the market." *Duncan,* 775 A.2d at 1023 n.9.  This analysis is also necessarily hypothetical because of ORC's breach of its obligation to file timely the registration statement.

After studying the trading market for ORC's stock and its daily trading volume, and based upon his experience in the field, Robak opined that a skilled trader could sell between 10% and 20% of the daily trading volume of ORC's stock without depressing or impacting the market negatively for those shares.  (Tr. 509.)  Robak opined that it would therefore require 44 days to sell the block of 2,216,654 shares held by the ITS Stockholders after the registration became effective.  (Tr. 508–10.)

At trial, ORC's expert witness, Alfonso, offered no contrary opinion as to the length of time required to sell into the market the 2,216,654 shares of Buyer Stock during the first selling period without depressing the market. He opined instead that the ITS Stockholders could sell large blocks of stock at one price at one time under "alternative trading mechanisms."  (Tr. 1085.)  Those "alternative trading mechanisms" included "NASDAQ opening and closing and intraday cross," "secondary markets," and so-called "dark pools."  (Tr. 1085–86, 1091–1102.)

All of these methods, however, require the sale of large blocks of stock at one time and one price.  (Tr. 1097–98.)  All of the ITS Stockholders would have had to decide to sell all of their shares together on one day at one price.  (Tr. 1098.)  This Court declines to adopt Alfonso's approach, which appears to be far different from the freely tradable registered shares for which the ITS Stockholders bargained.

The Court finds that the duration of the first selling period was 44 days from December 18, 2007, ending on February 21, 2008.

<u>c. Highest Intermediate Price</u>

Based upon the NASDAQ stock price data for the selling prices during the first selling Period, Robak concluded that the highest intermediate price during the first selling period was $12.21, reached on December 27, 2007.  (Tr. 511–12; D Ex. 64 (ORCC stock chart).)  The Court takes judicial notice of Online Resources' NASDAQ stock price data.  Fed. R. Evid. 201(d); *see, e.g.*, *Monday v. Meyer*, No. 1:10 CV 1838, 2011 WL 5974664, at * (N.D. Ohio Nov. 29, 2011) (*citing Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S.Ct. 2499, 2509 (2007); *Bovee v. Coopers & Lybrands C.P.A.*, 272 F.3d 356, 361–61 (6th Cir. 2001)) ("Public records include any materials subject to judicial notice, including securities filings made with the SEC and publicly available stock prices.").  The highest intermediate price for Buyer Stock during the first selling period was $12.21.

**2. Second Selling Period and Average Selling Price**

<u>a. Beginning of the Second Selling Period</u>

Under *Duncan*, the second selling period begins after the restrictions are lifted.  On August 10, 2008, the one-year holding period under Rule 144 expired, and the Buyer Stock

46

became eligible to have the restrictive legends removed. (Stip. 17.)[8]  Buyer Stock was still

unregistered on August 10, 2008, however because ORC's instructions to AS&T prohibited

AS&T from transferring Buyer Stock in the absence of: "an effective registration statement

covering such transfer or an opinion from us [ORC] or our counsel that such transfer is exempt

from registration."  (P Ex. 31.)  AS&T could not release the shares to the ITS Stockholders on or

after August 10, 2008, without an opinion from ORC or its legal counsel, and to trade the

unregistered shares, they would have to be "de-legended," which could only be done by AS&T.

(Tr. 513; P Exs. 31, 347.) Thus, the restriction on the trading of the unregistered Buyer Stock

remained until those steps were completed.  (Tr. 513.)

Obtaining an opinion letter from ORC or its legal counsel on or after August 10, 2008,

required action by ORC, Greenberg Traurig, and AS&T. (Tr. 513.)  Bisignano told the ITS

Stockholders on August 11, 2008, that "Mark Wishner [of Greenberg Traurig] is instructing

AS&T to release the hold on the electronic book entry shares at AS&T" and "they should be

released tomorrow."  Instructions were not sent to AS&T on August 11, 2008; rather, on August

18, 2008, ORC sent a letter to AS&T "authorizing" release of the Buyer Stock.  The letter was

forwarded to ITS Stockholders' counsel on August 19, 2008.  (Bisignano Dep. 530–32; P Ex.

130, 136.)

The ITS Stockholders had varying degrees of success at getting AS&T to de-legend and

release the Buyer Stock to their respective brokerage accounts.  (P Ex. 285 (Ex. 8 to Robak

Report).)  Thus, to determine a starting period for the second selling period, Robak examined

data indicating when each of ITS Stockholders received their shares into their accounts.  (Tr.

---

[8] Stipulation 17 refers to the expiration of the one-year holding period being under Rule 144(k); however, as part of
the amendment to Rule 144 effective February 15, 2008, Rule 144(k) was recodified as Rule 144(b)(1)(i).

513–13.)  There was a wide range of experiences, but the bulk of the ITS Stockholders received their shares in either early-to-mid-September or early-to-mid-October.  (Tr. 513–15; P Ex. 285 (Ex. 8 to Robak Report).)

Based on the data examined, Robak opined that a reasonable starting date for the second selling period was September 10, 2008.  (Tr. 513.)  The Court finds September 10, 2008 an appropriate date for beginning the second selling period.

### b. Duration of Second Selling Period

Under *Duncan,* the second selling period lasts for the period of time in which the plaintiff could have disposed of the shares "without disturbing the market." *Duncan*, 775 A.2d at 1024 n. 14 (citing *Madison Fund, Inc. v. Charter Co.*, 427 F. Supp. 597, 609 (S.D.N.Y. 1977)).  This instruction reflects the reality that selling shares into the market in large blocks can depress the share price.  (Tr. 1092–93.)  Again, Robak concluded that a skilled trader could reasonably sell between 10% and 20% of the daily trading volume of ORC's stock without depressing or impacting the market negatively.  (Tr. 509, 515–16.) The Court finds that the ITS Stockholders could sell 20% of the median trading volume of the ORC shares each day without depressing the market, which amounted to 26,768 shares per day.  (Tr. 518; P Ex. 285 (Ex. 9 to Robak Report).)

### c. Number of Shares to be Sold During the Second Selling Period

The duration of the second selling period is determined by dividing the total number of shares to be sold by 26,768, which is 20% of the median trading volume of the ORC shares. (P Ex. 285 (Ex. 9 to Robak Report).)  Robak determined the number of shares held by the ITS Stockholders at the beginning of the second selling period, which totaled 2,289,438, consisting of the 2,216,653 shares originally issued, minus the shares redeemed for cash in February 2008 (364,578), plus the price protection shares issued to the ITS Stockholders, which were supposed

to be registered, but were not (262,073). (Tr. 517–18, 582; P Ex. 285 (Ex. 14 to Robak Report); P Ex. 5 §§ 2.6, 10.6.) Robak did not deduct from this block any unregistered shares sold by Fromm or Evans in the May-July 2008 timeframe. (Tr. 517–18.) The Court finds that the reasonable duration of the second selling period is 86 trading days, from September 10, 2008 through January 12, 2009. (Tr. 516.)

<u>d. Average Selling Price During the Second Selling Period</u>

*Duncan* requires that the selling price for the Second Selling Period should be the average market price during the Second Selling Period. 775 A.2d at 1020, 1029. ORC's market price ranged from a high of $9.31 (on September 19, 2008) to a low of $1.80 (on November 21, 2008). The VWAP over that period was $4.89 per share. (Tr. 518–19.)

**3. Resulting Breach of Contract Damages Under *Duncan***

Robak calculated damages to be $7.32 per share, using a first selling period highest intermediate price of $12.21 per share and a second selling period average price of $4.89. (Tr. 519–20; P Ex. 285 (Ex. 11 to Robak Report).) Robak then multiplied $7.32 per share by the total number of ORC shares the ITS Stockholders elected to receive at the closing of the merger agreement (2,216,653 shares), minus the shares that ORC repurchased in February 2008 from RCE CRUT, Sudhir Seghal, and PWI, Inc. This left a net of 1,976,735 shares that Robak used to calculate damages. (Tr. 520, 528; P Ex. 285 (Ex. 11 to Robak Report).) That calculation resulted in $14,463,322.45 in damages for ORC's breach of its contractual obligation to file the registration statement for the Buyer Stock. (Tr. 520; P Ex. 285 (Ex. 11 to Robak Report).)

At trial Robak conceded an error in the number of shares he used to calculate damages. (Tr. 595–96.) He inadvertently left out 50,000 shares that ITS, LLC had received under Rule

144. (Tr. 595–96.) Had those 50,000 shares been included, the damages would be $366,000 greater than $14,463,322.45, for a total of $14,835,700.20. (Tr. 595–96.)

Robak also opined on an alternative calculation of damages applicable to Kent, who was subject to a contractual "lock-down period" under the terms of the merger agreement. (Tr. 520–21; P Ex. 5, § 2.11.) Section 2.11 of the merger agreement provides that any ITS Stockholder who is an employee of ORC and received Buyer Stock is prohibited from selling 50% of the Stock until expiration of six months from the date of closing. (P Ex. 5 § 2.11.) Fifty percent of Kent's shares would be 57,497 shares, and the effect of the "lock-down period" is that the first selling period would begin on February 10, 2008. (Tr. 521–22.) The highest intermediate price during that period would be $10.80, which would result in a reduction of $81,074.43 to the ITS Stockholder total damages resulting from ORC's breach of contact. (Tr. 522–23.)

Price protection did not allow any ITS Stockholder to sell at a gain as registration of the Buyer Stock would have allowed. (Tr. 606–07.) Moreover, Robak did not offset for price protection because ITS Stockholders were separately entitled to that "additional valuable right." (Tr. 578, 582); *Stuckey III*, 2012 WL 468510, at *8 (explaining that ITS Stockholders "contracted with ORC for *both* registered shares and price protection rights, as separate, bargained-for consideration") (emphasis in original). This Court finds that Robak was correct not to offset damages because of price protection.

### 4. Alternative Damages Calculation Using Alfonso's Recommendation

Alfonso testified that to determine the duration of the second selling period, Robak should have used Buyer Stock issued by ORC to ITS Stockholders at the closing of the merger agreement, which would have been 2,216,653 shares. (Tr. 1102.) Robak used 2,289,438 shares, making the different 72,785 shares. If Robak were to use the number of shares recommended by

Alfonso, the duration of the second selling period would be reduced from 86 days to 83 days.[9]

Alfonso conceded this fact.  (Tr. 1103.)  Using 83 trading days, rather than 86, would increase

the average price by only a cent per share, which would reduce damages only a small amount.

This Court finds the difference de minimus.

### 5. ORC's Arguments Attacking Robak's Report Are Meritless

ORC argues that Stuckey did not present evidence on which damages could be awarded

because Robak's *Duncan* analysis is flawed.  This Court finds ORC's arguments unpersuasive,

but will briefly address each argument.

First, ORC argues that Robak's decision to use 40 days for the beginning of the first

selling period was arbitrary because there was "no mathematical formula" and it was a

"judgment call."  (Tr. 569.)  This Court concluded above, however, that Robak's finding was

based upon two separate sets of data.  ORC's expert, Alfonso, also conceded on cross-

examination that 40 days was reasonable.  (Tr. 1111–13.)  Second, ORC attacks Robak's

decision to begin the second selling period on September 10, 2008, arguing that the delays in

getting registered Buyer Stock to ITS Stockholders were not the fault of ORC. This Court has

already determined September 10, 2008 was an appropriate date for the beginning of the second

selling period.

ORC also argues Robak's analysis was flawed because he failed to account for ITS

Stockholders' ability to trade using Rule 144 as of February 15, 2008; for the ITS Stockholders'

right to exercise price protection; and  ITS Stockholders who were unable to trade because of the

"grey-out" period.  All of these arguments have been rejected by this Court, *supra*.

This Court finds that the appropriate amount of damages for ORC's breach of the merger

---

[9] 2,216,653 shares / 26,768 share per day = 83 days.

agreement for failure to register is $14,835,700.20 reduced by $81,074.43, which is the amount

Robak calculated damages should be reduced by given the contractual "lock-down period" under

the terms of the merger agreement which affected 50% of Kent's Buyer Stock, for a **total

damages amount of $14,754,625.77.**

### 6. Prejudgment Interest

In a diversity case in federal court, state law governs the award of prejudgment interest.

*FDIC v. First Heights Bank, FSB*, 229 F.3d 528, 534 (6th Cir. 2000).  Plaintiff contends pre-

judgment interest accrues from the date of breach, but the Delaware case law states that such

interest accrues from the date when "payment was due."  *Moskowitz v. Mayor & Council of

Wilmington*, 391 A.2d 209, 210 (Del. 1978); *Citadel Holding Corp. v. Roven,* 603 A.2d 818, 826

(Del. Super. Ct.1992).  If the amount of recovery is not liquidated, interest accrues only from the

date that the amount of recovery "could be readily ascertained."  *Rollins Envtl. Serv., Inc. v.

WSMW Indus., Inc.,* 426 A.2d 1363, 1366 (Del. Super. 1980).

Here, the amount of damages awarded is similar to that which the Plaintiff sought in his

initial complaint.  ORC, therefore, had notice of the amount it owed from the date it was served

with the complaint.  Although ORC waived service, it received process through counsel on

December 23, 2008.  Thus, the pre-judgment interest accrued from that date.  On December 23,

2008, the Federal Reserve's Discount Rate was 0.50%, a fact of which this Court takes judicial

notice.  By applying 6 Del C. 2301(a), the Court adds 5% to that rate to arrive at a prejudgment

interest rate of 5.5%.

Using a rate of 5.5% from December 23, 2008 until November 9, 2012, the date of this

judgment, this Court finds Plaintiff is entitled to $3,150,417.21 in prejudgment interest for his

breach of merger agreement for failure to register claim.[10]

### B. Breach of Merger Agreement for Failure to Provide the Correct Number of Price Protection Shares

Based on the evidence presented by Plaintiff, given the share price at the time, ITS

Stockholders' damages from Stuckey's breach of merger agreement from miscalculating price

protection in May 2008 was $77,839.91.  Again, using a rate of 5.5% from December 23, 2008

until November 9, 2012, this Court finds Plaintiff is entitled to $16,620.43 in prejudgment

interest for his breach of merger agreement for miscalculating price protection in May 2008.[11]

### C. Violations of Ohio Securities Act

Because ORC violated §§ 1707.44(B)(4) and 1707.44(G) of the Ohio Securities Act, the

ITS Stockholders have a statutory right to recover under § 1707.43(A) of the Act.  Section

1707.43(A) provides that:

> every sale or contract for sale made in violation of Chapter 1707. of the Revised
> Code, is voidable at the election of the purchaser. The person making such sale or
> contract for sale, and every person that has participated in or aided the seller in
> any way in making such sale or contract for sale, are jointly and severally liable to
> the purchaser, in an action at law in any court of competent jurisdiction, upon
> tender to the seller in person or in open court of the securities sold or of the
> contract made, for the full amount paid by the purchaser and for all taxable court
> costs, unless the court determines that the violation did not materially affect the
> protection contemplated by the violated provision.

The Ohio Securities Act is a remedial act that must be liberally construed to effectuate its

purposes.  *In re Columbus Skyline,* 660 N.E.2d at 429.

The full amount paid by the ITS Stockholders for the Buyer Stock was $24,713,061.00.

---

[10] This figure represents simple interest (without compounding) at rate of 5.5% per annum for 1,417 days (the number of days between December 23, 2008 and November 9, 2012). The daily interest rate is 0.0150685% (5.5%/365).

[11] *See* text accompanying note 10, *supra.*

Plaintiff has satisfied his obligation to tender back the Buyer Stock on behalf of the ITS

Stockholders.  Plaintiff tendered the Buyer Stock to defendant on behalf of the ITS Stockholders

twice in this case, once in person at Bisignano's deposition, and again during trial.  (P Ex. 143;

Tr. 998–99.)  ORC has rejected that tender twice. (P Ex. 143; Tr. 998–99.)  In light of the

foregoing, the Court concludes that the ITS Stockholders are entitled to receive from ORC the

full amount paid, equal to $24,713,061.00, and all taxable court costs pursuant to Ohio Revised

Code §1707.43.

### D. Punitive Damages & Attorneys' Fees

In an action for fraud a plaintiff may recover punitive damages if he or she shows "'that

the fraud is aggravated by the existence of malice or ill will,' or that it is 'particularly gross or

egregious.'"  *See e.g.*, *Ruma v. Shashura*, Civil Action 2:09-cv-0012, 2011 U.S. Dist. LEXIS

29879, at *7–8 (S.D. Ohio Feb. 7, 2011) (citing *Gold Craft v. Ebert's Contracting &*

*Remodeling, LLC*, No. 09AP-448, 2010 WL 3171311, at *3 (Ohio Ct. App. Aug. 12, 2010)

(quoting *Charles R. Combs Trucking, Inc. v. Int'l Harvester Co.*, 12 Ohio St.3d 241, 241, 466

N.E.2d 883 (Ohio 1984)); *Auto Chem. Labs., Inc. v. Turtle Wax, Inc.*, Case No. 3:07cv156, 2010

U.S. Dist. LEXIS 100677, 22–23 (S.D. Ohio Sept. 24, 2010).  Malice is (1) that state of mind

under which a person's conduct is characterized by hatred, ill will, or a spirit of revenge, or (2) a

conscious disregard for the rights and safety of other persons that has a great probability of

causing substantial harm. *Preston v. Murty,* 512 N.E.2d 1174 (Ohio 1987) (syllabus).

Furthermore, in a tort involving fraud "when punitive damages are awarded, the award for

compensatory damages may include attorney fees." *Zappitelli v. Miller*, 114 Ohio St. 3d 102,

103, 2007 Ohio 3251, 868 N.E.2d 968 (Ohio 2007); *see also Zoppo v. Homestead Ins. Co.*, 71

Ohio St. 3d 552, 558, 1994 Ohio 461, 644 N.E.2d 397 (Ohio 1994) ("Attorney fees may be

awarded as an element of compensatory damages where the jury finds that punitive damages are warranted.").

      This Court finds that Plaintiff did not prove malice, *i.e.*, that ORC acted in a manner characterized by hatred, ill will, or a spirit of revenge, or with a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm. *See Preston v. Murty,* 512 N.E.2d 1174 (Ohio 1987) (syllabus).  As such, this Court declines to award punitive damages or attorneys' fees.

## VI. ELECTION OF REMEDIES

      A party "is not entitled to recover twice for the same loss even if the party would otherwise be able to recover for that loss under separate theories of liability." *Auto Chem Labs., Inc. v. Turtle Wax, Inc.*, Case No. 3:07cv156, 2010 U.S. Dist. LEXIS 100677, at *36 (S.D. Ohio Sept. 24, 2010) (citing *Johnson v. Howard,* 24 F. App'x 480, 484–85 (6th Cir. 2001)); *General Tel. Co. v. EEOC,* 446 U.S.318, 333, 100 S. Ct. 1698, 1708, 64 L. Ed. 2d 319 (1980) ("courts can and should preclude double recovery by an individual").  Accordingly, Plaintiff is hereby **ORDERED** to submit to this Court within 30 days his election of remedies as set forth below, at which time final judgment will be entered in accordance herewith:

1.   Damages to be elected based on one of the following:

    a.   *Breach of the merger agreement for failure to register:* Compensatory damages in the amount of $14,754,625.77, plus prejudgment interest from December 23, 2008 until the date of this Opinion and Order, in the amount of $3,150,417.21; OR

    b.   *Violation of Ohio Securities Act:*  $24,713,061.00 plus all taxable court costs as provided in O.R.C. 1707.43;

2.  Damages for breach of the merger agreement from miscalculating price protection in
    May 2008 in the amount of $77,839.91, plus prejudgment interest from December 23,
    2008 until the date of this Bench Opinion, in the amount of $16,620.43.

### VII. CONCLUSION

For the reasons set forth below, the Court finds in Plaintiff's favor, and Plaintiff must
submit his election of remedies within 30 days of this Opinion and Order, at which time **FINAL
JUDGMENT** will be entered.

**s/ Algenon L. Marbley**
**Algenon L. Marbley**
**United States District Judge**

**Dated: November 9, 2012**